## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-1557

DARREN PATTERSON CHRISTIAN ACADEMY,

*Plaintiff,*

v.

LISA ROY, in her official capacity as Executive Director of the Colorado Department of Early Childhood; and DAWN ODEAN, in her official capacity as Director of Colorado's Universal Preschool Program,

*Defendants.*

---

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

### INTRODUCTION

1.   This civil-rights action seeks to prevent the government from forcing a Christian preschool to surrender its religious character, beliefs, and exercise to participate in Colorado's universal preschool program just like everyone else.

2.   Set to go into effect July 1, 2023, Colorado's brand-new universal preschool program ("UPK") guarantees every 4-year-old in the state at least 15 hours per week of state-funded preschool services for the upcoming school year.

3.     All licensed preschools in the state were encouraged to register to participate, and many have.

4.     Darren Patterson Christian Academy ("the school") was one of those schools; it operates a state-licensed, Christian preschool called "Busy Bees" and was excited for the opportunity to serve more preschool children.

5.     Founded in 1982, Darren Patterson Christian Academy is one of only a few Christian schools in Chaffee County. Because of the unique Christian education it provides, the overwhelming majority of children who attend Busy Bees preschool continue their education at the school.

6.     The preschool's ability to attract and maintain students and families is essential to Darren Patterson Christian Academy's overall health and growth.

7.     Darren Patterson Christian Academy's model is evangelistic, meaning it will enroll any child that meets its enrollment criteria regardless of that child's or child's family's religious beliefs or background. And the school does in fact have students and families that do not share the school's religious beliefs, though those families understand and appreciate the Christian education the school provides.

8.     As a Christian school, Darren Patterson Christian Academy's beliefs guide and permeate *everything* it does, including the education of its students, its internal policies and practices, its interactions with the public, and its hiring and employment decisions.

9.     But the Colorado Department of Early Childhood ("the Department") is requiring religious preschools like Darren Patterson Christian Academy to forgo their religious character, beliefs, and exercise to participate in UPK.

10.     The Department does so through two provisions that prohibit discrimination against any person based on religion, sexual orientation, or gender identity.

11.     So even though the school welcomes all families and children, these provisions would force it to hire employees who do not share its faith and to alter internal rules and policies that are based on the school's religious beliefs about sexuality and gender, including those that relate to restroom usage, pronouns, dress codes, and student housing during school expeditions and field trips.

12.     After applying and being approved for UPK, the school raised this issue with the Department—as did other faith-based groups—and requested a religious exemption that would allow it to participate in UPK without surrendering its religious beliefs and exercise.

13.     The Department denied the requested exemption, and said all religious schools must comply.

14.     Darren Patterson Christian Academy is now left with the choice of either (a) adhering to its religious beliefs and exercise and forfeiting participation in an otherwise generally available public program, or (b) giving up its beliefs and exercise to participate equally with other preschools in the state.

15.     Putting the school to that choice is unconstitutional.

16.     Families participating in UPK have already chosen to send their children to Darren Patterson Christian Academy for the upcoming school year, with many of them choosing the school precisely because they share the school's beliefs and values.

17.     In fact, the school has already been matched with 17 children under UPK for the upcoming school year. But unless it capitulates and agrees to violate its

religious beliefs and exercise, the school will lose valuable tuition reimbursement from the state and inevitably some students and families too.

18.    By denying the school participation in UPK because of its religious character, beliefs, and exercise, the Department penalizes the school and its students and families based on their religion—discrimination that is "odious to our constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017).

19.    The Constitution is clear: religious schools can hire those who share their faith, and the government may not deny participation in a public program simply due to a school's internal religious exercise.

20.    Darren Patterson Christian Academy needs declaratory and injunctive relief to remedy this religious discrimination and to allow it to participate in UPK without sacrificing its religious character, beliefs, or exercise.

## JURISDICTION & VENUE

21.    This civil-rights action raises federal questions under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

22.    This Court has original jurisdiction over the school's federal claims under 28 U.S.C. §§ 1331 and 1343.

23.    This Court can grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

24.    This Court can award costs and attorneys' fees under 42 U.S.C. § 1988(b).

25.    Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

26.    Plaintiff Darren Patterson Christian Academy is a 501(c)(3) nonprofit, private Christian school in Buena Vista, Colorado. It is organized exclusively for

religious, charitable, and educational purposes. *See* Excerpts of the Darren Patterson Christian Academy's Articles of Incorporation at 1, a true and accurate copy attached as **Exhibit 1**.

27.     Defendant Dr. Lisa Roy is the Executive Director of the Colorado Department of Early Childhood. Defendant Roy is authorized to implement and promulgate rules to execute Title 26.5 of Colorado's Revised Statutes, including UPK. Colo. Rev. Stat. § 26.5-1-105. She is sued in her official capacity.

28.     Defendant Dawn Odean is the Department's Universal Preschool Program Director and responsible for implementing and coordinating UPK. She is sued in her official capacity.

29.     Defendants Roy and Odean administer Colorado's universal preschool program. They are collectively referred to herein as "the Department" unless the context dictates otherwise.

<u>STATEMENT OF FACTS</u>

**A.     Darren Patterson Christian Academy and its preschool.**

30.     Named in memory of a 14-year-old boy who was killed by a drunk driver on Thanksgiving Day in 1981, Darren Patterson Christian Academy was founded in 1982 to give other Chaffee County kids the opportunity Darren Patterson never had: to attend a local Christian school.

31.      Darren Patterson Christian Academy is a private, nonprofit, Christian school. It is one of only a few Christian schools in Chaffee County, and the only Christian school in the Central Rockies that incorporates expeditionary learning.

32.     While the school is "distinctly Christ-centered" and educates from a faith-based, Christian worldview, its doors are open to everyone—students and families of all faiths and backgrounds are welcome to enroll.

33.     As set forth in its Articles of Incorporation, the school exists "to prepare youth for their future through providing academic excellence, teaching responsible citizenship, inspiring a love for our country, encouraging regeneration through the new life in Christ, inspiring a value system consistent with God's word, upholding the sanctity of the home and family, and fostering the sacredness of our churches and their work." Ex. 1 at 1–2.

34.     It strives "to teach the truth about God" and "to present the Word of God as the authoritative source upon which to build a life that has purpose and meaning." Ex. 1 at 2.

35.     The school "guides students in knowledge, character, and faith to discover an authentic love of learning and a life of opportunity." Excerpts of the Darren Patterson Christian Academy's Family Handbook at 2, a true and accurate copy attached as **Exhibit 2**.

36.     The school offers a unique and highly effective educational experience. For instance, the school believes family is the primary influence on students, so it uses a four-day school week so families can spend more time together. And with approximately 140 students (including preschool), it intentionally keeps class sizes small to ensure students receive personalized care and instruction.

37.     The school also has daily times of prayer and devotions for its students and employees, offers Bibles classes and lessons to students throughout each week, and holds weekly chapel services for all employees and students to attend.

38.     The school also focuses on Christ-centered expeditionary learning, emphasizing project-based instruction and out-of-classroom adventure.

39.     Expeditionary learning allows students to learn both inside and outside the classroom, enabling them to develop the character and skills to creatively and

compassionately contribute to the world around them. Unlike traditional schools, Darren Patterson Christian Academy students embark on outdoor expeditions like climbing, backpacking, cross-country skiing, and much more.

40.     Importantly, the school's expeditionary learning is designed to create impactful Christian discipleship opportunities. Darren Patterson Christian Academy plans and structures outdoor expeditions and field trips to place students in new and challenging environments, giving them the opportunity to put their faith into practice and to gain real-life experiences that will help them grow in Christian faith and character.

41.     Darren Patterson Christian Academy consists of a preschool ("Busy Bees Preschool"), an elementary school (K-5th grade), and a middle school (6th-8th grade).

42.     Busy Bees Preschool is a licensed "child care center." It enrolls roughly 30 to 50 students each year, ranging from 2 ½ to 5 years old.

43.     Consistent with the school's Christ-centered approach, Busy Bees' purpose is to "equip[ ] preschool students for excellence in Christian life and service by providing a nurturing, distinctively Christian school environment that emphasizes knowing Christ, imitating His character, and integrating the Bible in life while learning and mastering academic knowledge and skills." Excerpts of Busy Bees Family Handbook at 3, a true and accurate copy attached as **Exhibit 3**.

44.     Busy Bees offers parents four scheduling options: (a) full-time days (4 full class days per week); (b) part-time days (2 full days per week); (c) full-time mornings (4 mornings-only per week); and (d) part-time mornings (2 mornings-only per week).

45.     The school/Busy Bees charges varying tuition rates depending on the scheduling option selected. But the school/Busy Bees strives to be accessible to families of all socio-economic statuses, so it offers lower-than-average tuition rates.

46.     Parents wishing to enroll their child(ren) at the school/Busy Bees must submit a completed enrollment form and supporting documentation each year.

47.     Parents applying for enrollment must also read and sign the school's Parent-Student Agreement.

48.     Parents do not have to agree with the school's religious beliefs to enroll their child. *See* Ex. 2 at 3 ("[Y]ou don't have to be a Believer to join our learning community. We welcome students of all beliefs and backgrounds to experience the joy of learning at the Academy.").

49.     But they are asked to affirm that they have reviewed—and had the chance to ask questions about—the Busy Bees Family Handbook (Ex. 3) and agree to "support and uphold the school staff and the religious mission, intent, policies, rules, and requirements of the Academy." Darren Patterson Christian Academy Parent-Student Agreement at 1, a true and accurate copy attached as **Exhibit 4**.

50.     If the applying parents and child satisfy Darren Patterson Christian Academy's enrollment requirements and there are sufficient open spots at Busy Bees, the school administrators will schedule an interview with the applying family.

51.     The interview process allows the school administrators to determine whether all enrollment requirements have been satisfied and whether the school would be a good fit for the child and family.

**B.**     **Darren Patterson Christian Academy's religious beliefs guide its operations and hiring practices.**

52.     Darren Patterson Christian Academy is a Christian school that bases its culture, curriculum, and staff on its sincerely held religious beliefs rooted in the Holy Bible.

53.     The school's Statement of Faith provides that it "believe[s] in the Scriptures of the Old and New Testaments as verbally inspired of God and inerrant in the original writings, and that they are of supreme and final authority in faith and life." Excerpts of the Darren Patterson Christian Academy's Employee Handbook at 3, a true and accurate copy attached as **Exhibit 5**.

54.     The school believes every person is created in God's image and deserves love and respect, and it enrolls students of varying faiths and backgrounds.

55.     However, families choose to send their children to Darren Patterson Christian Academy for the Christian education that it offers and provides. And the school believes it must strive to fulfill the Great Commission: to spread the Gospel of Jesus Christ to the whole world and to make disciples of all nations.

56.     So the school instructs its students according to its Christian faith and doctrine and teaches students to live lives of service to Jesus Christ and His world.

57.     Darren Patterson Christian Academy sincerely believes that its teachers and staff are important Christian role models for its students and therefore must properly represent Christ at all times.

58.     And the school sincerely believes that, to advance its religious purposes and goals, it must maintain an internal community of employees who share and live out its faith.

59.     The school also holds sincere religious beliefs about marriage, sexuality, and gender. It believes and teaches that God created only two unique, immutable

9

sexes—male and female; "that the definition of *marriage* found in the Bible specifically and only means one biological man joined to one biological woman in a sexually exclusive, covenantal union"; that "sexual expression and activity is by God's design reserved for marriage for our joy, happiness, and well-being, both as individuals and for society"; and that any "sexual activity outside of Biblical marriage"—such as premarital, extramarital, or homosexual activity—is sinful and wrong. Ex. 5 at 16.

60.    The school integrates and follows its Christian beliefs—including those about marriage, sexuality, and gender—throughout all its operations, including in its employment practices and how it operates its preschool facilities.

61.    The school maintains sex-separated bathrooms and dress codes for boys and girls based on their biological differences and cannot agree to use pronouns that do not correspond to the person's biological sex.

62.    For example, the school's policy on "Sensitive School Spaces" provides that "[s]tudent restrooms, locker rooms, showers, or any other part of the school facility, permanently or temporarily, designated for the use of one biological sex for any reason at the discretion of school administration shall be restricted to the use of members of that biological sex." Ex. 2 at 9.

63.    The school's dress code also requires staff and students to dress according to their biological sex.

64.    Moreover, because Darren Patterson Christian Academy is a Christian school that teaches Christian values, doctrine, and beliefs to its students and others in the community, it must maintain an internal body of like-minded believers that agree with and live out the school's Christian beliefs—i.e., "coreligionists."

65.    All school employees are "expected to be in substantial agreement with the statement of faith and are required to affirm such agreement at the time of application for employment, and to reaffirm at each contract renewal." Ex. 5 at 3.

66.    To develop a Christian life and character in its students, as well as biblical literacy and understanding, the school also expects all teachers and staff to:

- Teach the Bible as God's inspired Word and endeavor to help students develop attitudes of love and respect toward it;

- Seek to develop in students a desire to know and obey the will of God as revealed in Scriptures;

- Endeavor to encourage and equip [students] to carry out the will of God daily, encouraging them to live out their relationship with Him in the areas of service and good works in accordance with Matthew 5:16 (*"In the same way, let your light shine before men, that they may see your good deeds and praise your Father in heaven."*).

- Endeavor to assist [students] in developing the mind of Christ toward godliness and sin;

- Teach the students how to overcome sin and live in grace; and

- Strive to develop in students thoughtful, Biblical critique of modern culture and the wisdom and steadfastness to operate according to Biblical principles even when personally costly.

Ex. 5 at 7.

67.    Darren Patterson Christian Academy's teachers also are expected to integrate biblical teachings and principles throughout all subjects and classes. They often lead weekly Chapel services, regularly pray for and with students, and attend morning devotionals. *See* Ex. 5 at 18–23.

68.     To that end, school employees must agree to abide by a "Lifestyle Statement," which requires every employee to be a "'born-again' Christian" and to adhere to certain lifestyle requirements, including abstaining from any sexual activity outside of biblical marriage. Ex. 5 at 15.

69.     So Darren Patterson Christian Academy cannot employ a person who disagrees with—or lives a life contradictory to—its Christian beliefs, including its beliefs about marriage, sexuality, and gender.

70.     This ensures the school maintains an internal community of like-minded individuals who can compellingly articulate and advance its Christian messages and beliefs to students, parents, employees, and the broader community.

71.     Keeping an internal community of coreligionists also facilitates discipleship amongst school employees, making Darren Patterson Christian Academy a place of Christian fellowship and community. Employees support each other in their Christian journey, provide biblical teaching and encouragement, give lifestyle guidance, and help hold each other accountable.

72.     Working with fellow Christian believers is the very reason many employees want to work at Darren Patterson Christian Academy.

**C.      Colorado's universal preschool program.**

**1.      Overview of UPK.**

73.     In April 2022, Governor Polis signed HB 22-1295, which created the Colorado Universal Preschool Program Act ("the Act"), codified at Colo. Rev. Stat. § 26.5-4-201, *et seq.*

74.     The Act created within the Department a universal preschool program that provides Colorado children with access to "preschool services free of charge in the school year before a child enrolls in kindergarten." *Id.* § 26.5-4-204.

75.     The Colorado legislature passed the Act, finding that "Colorado voters in rural, urban, and suburban communities . . . demonstrated their strong commitment to expand[ ] access to quality preschool for children regardless of their economic circumstances," *id.* § 26.5-4-202(1)(a)(V), and that UPK "increases the ultimate social and economic benefits of high-quality preschool programming for the state as a whole," *id.* § 26.5-4-202(1)(a)(VI).

76.     Under UPK, "eligible children" can receive 15 hours per week of publicly funded preschool services.[1]

77.     On top of the standard 15 hours per week, some children are eligible for additional hours of publicly funded preschool services if they have an individualized education program, are in a low-income family, or meet at least one "qualifying factor" as defined by the Department's Executive Director. *Id.* § 26.5-4-204(3); *see also* 8 Colo. Code Regs. § 1404-1:4.103(B) (identifying qualifying factors).

78.     For the 2023-24 school year, children in the year before they are eligible for kindergarten (i.e., 4-year-olds) who meet certain qualifying factors are eligible for an additional 15 hours stacked on top of the first 15 hours, for a total of 30 hours per week, pending eligibility confirmation and available funding.

79.     For the 2023-24 school year, 3-year-olds with a qualifying factor may receive 10 hours per week of publicly funded preschool services.

---

[1] Although the Act specifies 10 hours, *see* Colo. Rev. Stat. § 26.5-4-204(2)–(3), the Department increased the amount to 15 hours for the 2023–24 school year, *see* 8 Colo. Code Regs. § 1404-1:4.104(C) ("Subject to available appropriations . . . the department may distribute additional funding equivalent to five (5) hours of preschool programming per week . . . .").

80.     The Department works with "local coordinating organizations" to identify and recruit preschool providers to participate in UPK. Colo. Rev. Stat. § 26.5-4-204(2).

81.     In identifying and recruiting preschool providers, the Department and local coordinating organizations must seek "as broad a range [of providers] as possible." *Id.*

82.     Families wishing to participate in UPK must submit an application, which requests the families to list preferred preschools.

83.     Children approved to participate in UPK are then matched with participating preschools based on preference and availability.

84.     Preschools wishing to participate in UPK must be licensed to provide preschool services in Colorado, must meet quality standards as established by the Department, and must sign a provider service agreement. A true and accurate copy of UPK's Service Agreement & Terms and Conditions is attached as **Exhibit 6**.

85.     Once a child is matched with a preschool, the Department distributes funds as calculated by the Department pursuant to the Act. *See* Colo. Rev. Stat. § 26.5-4-208(3).

86.     Under current Department rates, preschools in Chaffee County—including Darren Patterson Christian Academy—would receive $6,018.24 per child attending a half-day (15 hours per week) and $10,700.78 per child attending a full day (30 hours per week) for the 2023-24 school year.

87.     The first UPK payment to preschool providers for the 2023-24 school year is set to be distributed in August 2023. Three additional payments are expected to be made by the Department in November 2023, February 2024, and May 2024.

### 2.   UPK's nondiscrimination provisions.

88.   For licensed preschools to participate in UPK, they must agree to two separate nondiscrimination provisions—both of which are set forth in UPK's Service Agreement. *See* Ex. 6 at 2, 27.

89.   First, preschools must agree to abide by the "Quality Assurance Provision." The Quality Assurance Provision, which is statutorily mandated, requires a preschool to "provide eligible children an equal opportunity to enroll and receive preschool services regardless of . . . religious affiliation, sexual orientation, [or] gender identity . . . as such characteristics and circumstances apply to the child or the child's family." Ex. 6 at 2; *see also* Colo. Rev. Stat. § 26.5-4-205(2)(b).

90.   Second, UPK's Service Agreement's Terms and Conditions contain a catch-all provision that says a "[p]rovider shall not discriminate against any person on the basis of . . . religion . . . sexual orientation, [or] gender identity." Ex. 6 at 27 ("Blanket Provision"). Unlike the Quality Assurance Provision, the Blanket Provision is not mandated by statute or regulation but instead has been unilaterally imposed by the Department.

91.   Together, the provisions prohibit Darren Patterson Christian Academy from requiring employees to share and live out its faith and from aligning its internal policies on restroom usage, dress codes, pronouns, and student housing during outdoor expeditions/field trips with its religious beliefs about sexuality and gender.

92.   Yet the Act allows for individualized exemptions: the Department "may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the

quality standards" if it finds such exemption "necessary to ensure the availability of a mixed delivery system within a community." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II).

93.   The Department also has discretion to create categorical exemptions for preschool providers, and it has done so.

94.   For instance, the Department allows participating preschools to prefer children who have siblings enrolled in that school and to prefer children whose parents are employees of that school. *See* UPK FAQs, a true and accurate copy attached as **Exhibit 7**.

95.   And the Department has created a partial exemption for participating preschools that are operated by houses of worship, allowing them to give preference to members of their congregation and to decline matches from families that are not part of their congregation. But because Darren Patterson Christian Academy is not a church-run school, it cannot avail itself of this exception.

96.   Thus, some preschools can decline the Department's student placements, but others (such as Darren Patterson Christian Academy) cannot.

**D.   Darren Patterson Christian Academy seeks to participate in UPK.**

97.   Soon after the Act was passed, Darren Patterson Christian Academy began working with its local coordinating organization—the Chaffee County Early Childhood Council—to participate in UPK as a preschool provider.

98.   When the school registered in January 2023, it was asked to electronically sign UPK's Service Agreement & Terms and Conditions (Ex. 6), which it did.

99.   Darren Patterson Christian Academy was approved to participate, and students were matched with the school through UPK for the upcoming 2023-24 school year.

100.    Upon closer review of UPK's nondiscrimination provisions, however, the school determined that those provisions would prevent it from operating consistently with its religious beliefs.

101.    In February 2023, a group of faith-based preschool providers and private organizations raised similar concerns to Governor Polis, asking him to "intervene in the implementation" of UPK. February 17, 2023, Coalition Letter to Governor Polis at 1, a true and accurate copy attached as **Exhibit 8**.

102.     The group stated that UPK's nondiscrimination provisions "infringe[d] upon the religious liberty of faith-based providers," and excluded many religious preschools from participating in UPK. Ex. 8 at 1–2.

103.    The group explained it had sought a religious exemption from the Department, but that the Department provided no direct guidance. Ex. 8 at 2.

104.    So they asked Governor Polis and the Department to discuss the possibility of religious exemptions "for faith-based religious providers from aspects of the UPK Program that . . . run counter to their sincerely held beliefs." Ex. 8 at 2.

105.    Defendant Roy responded to the group by letter, claiming she could not "create an exemption" for faith-based providers. February 28, 2023, CDEC Letter to Coalition at 1, a true and accurate copy attached as **Exhibit 9**.

106.    Recognizing that its religious beliefs and exercise would keep it from participating in UPK, Darren Patterson Christian Academy also asked the Department for a religious exemption from certain aspects of UPK's nondiscrimination provisions so it could participate in UPK while still adhering to its religious beliefs and practices.

107.    In May 2023, the school emailed its local coordinating organization, Defendant Roy, and Defendant Odean to "request an exemption based on [its]

17

religious beliefs" from "certain aspects of the [UPK] Agreement's two nondiscrimination provisions." May 12, 2023, Drexler Email Chain with the Department at 2, a true and accurate copy attached as **Exhibit 10**.

108.   Darren Patterson Christian Academy explained that it "welcomes all children and families to its preschool," but its "internal rules, policies, and student expectations . . . are based on its religious beliefs, including those about sexuality and gender." Ex. 10 at 2.

109.   As such, the school continued, its "policies on bathroom and locker room usage, pronoun usage, and dress codes" are all "based on [a] student's biological sex" and thus it could not comply with UPK's gender identity rules. Ex. 10 at 2.

110.   The school also explained that the Blanket Provision would prohibit it from "mak[ing] hiring decisions based on its religious beliefs and requir[ing] all employees to affirm and follow its beliefs about marriage, sexuality, and gender." Ex. 10 at 2.

111.   The school concluded by asking the Department to confirm if a religious exemption was available and if it could participate in UPK without agreeing to the religious, sexual orientation, and gender identity nondiscrimination provisions. Ex. 10 at 2.

112.   Defendant Roy's response was nearly identical to her response to the group of faith-based providers in February 2023.

113.   Defendant Roy stated there were no exemptions available for religious preschools like Darren Patterson Christian Academy. Ex. 10 at 1.

114.   Still, Defendant Roy noted the Department had a partial exemption for preschools run by houses of worship, allowing them to "reserve all or a portion of their [preschool] seats" for members of their congregations. Ex. 10 at 1.

115.    This partial exemption does not help Darren Patterson Christian Academy because it is not a church, nor is it run by a church, and it does not have "members" or a "congregation."

**E.    Darren Patterson Christian Academy faces irreparable harm.**

116.    Darren Patterson Christian Academy currently is, and intends to continue, operating Busy Bees Preschool and the rest of the school according to its religious beliefs, including by hiring coreligionists and by separating restrooms, using pronouns, enforcing its dress code, and assigning student housing and lodging for expeditions/field trips based on biological sex.

117.    The school currently has open employment positions that it needs to fill, and it intends to fill these positions with individuals who are coreligionists—those who agree with and follow the school's religious beliefs, including its beliefs on marriage, sexuality, and gender.

118.    But UPK's Quality Assurance and Blanket Provisions prohibit Darren Patterson Christian Academy from continuing to operate according to its religious beliefs.

119.    By filling its open positions with only coreligionists and expecting all its employees to agree with and live out its religious beliefs, the school would violate the Blanket Provision and be excluded from UPK.

120.    And by maintaining its restroom, pronoun, dress code, and outdoor expedition/field trip policies, the school would violate both the Quality Assurance and Blanket Provisions and be excluded from UPK.

121.    These provisions thus encroach on the school's religious beliefs and exercise, forcing it to alter its very character and purpose to participate in UPK.

122. Darren Patterson Christian Academy satisfies all other terms of UPK's Service Agreement & Terms and Conditions and all other conditions for participating in UPK.

123. The school has requested a religious exemption from the Quality Assurance and Blanket Provisions' prohibitions on religious, sexual orientation, and gender identity discrimination, but the Department denied that request.

124. The Department will deny Darren Patterson Christian Academy tuition funds and further participation in UPK unless the school agrees to forfeit its religious beliefs and practices and comply with UPK's nondiscrimination provisions.

125. So Darren Patterson Christian Academy is left with a choice:

Option A: it can forego its religiously based policies and practices and participate in UPK; or

Option B: it can retain its religiously based policies and practices and be excluded from UPK.

126. The Department forces the school to decide between exercising its constitutionally protected rights and participating in a public benefits program like everyone else, causing it irreparable harm.

127. As a result of its exclusion from UPK, the school's students and families would also be put to an unconstitutional choice: (A) pursue religious education and lose out on state-funded preschool, or (B) forgo religious education and have preschool paid for by the state like everyone else.

128. Darren Patterson Christian Academy's exclusion from UPK would also force the school to decide between covering thousands of dollars in tuition costs withheld by the Department or risk losing those preschool students and families currently matched with the school through UPK.

129.   Yet damages in the form of monetary reimbursement for UPK tuition is an inadequate remedy because it fails to alleviate the constitutional harm of depriving the school and its students and families from *participation* in UPK altogether due to their religious beliefs and exercise.

130.   Accordingly, Darren Patterson Christian Academy needs judicial relief declaring that it is unconstitutional for the Department to require the school to comply with nondiscrimination provisions that violate its religious beliefs and exercise to participate in UPK.

131.   Darren Patterson Christian Academy also needs injunctive relief prohibiting the Department from denying tuition reimbursement payments or otherwise penalizing the school for its inability to comply with the Quality Assurance and Blanket Provisions' prohibitions on religious, sexual orientation, and gender identity discrimination.

### CLAIMS FOR RELIEF

#### FIRST CLAIM FOR RELIEF
**Violation of the First Amendment's Religion Clauses: Religious Autonomy**

132.   Plaintiff incorporates by reference paragraphs 1–131.

133.   Darren Patterson Christian Academy is a religious organization.

134.   Both Religion Clauses of the First Amendment protect the school's "power to decide for [itself], free from state interference, matters of [internal] government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

135.   This right to religious autonomy protects the school's internal employment decisions about who should further its religious purposes and goals.

136.   The right to religious autonomy contains two similar but separate protections: the ministerial exception and the coreligionist exemption.

137.    Under the ministerial exception, the government cannot interfere with the school's employment decisions about its "ministerial employees." The government cannot second-guess the school's decisions about those employees (whatever the reason), nor can the school be penalized by the government for those decisions. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 140 S. Ct. 2049, 2060 (2020).

138.    Darren Patterson Christian Academy has ministerial employees, including but not limited to its teachers.

139.    The coreligionist exemption is broader in that it applies to all the school's employees, but it only protects the school's non-ministerial employment decisions when they are rooted in its religious beliefs, practices, or observances. *See, e.g., Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648 (10th Cir. 2002).

140.    The Blanket Provision violates both the ministerial exception and coreligionist exemption by prohibiting the school from hiring only those who agree with and live out its religious beliefs, including its beliefs on marriage, sexuality, and gender.

141.    Requiring Darren Patterson Christian Academy to forfeit its religious autonomy to participate in UPK violates both Religion Clauses of the First Amendment.

### SECOND CLAIM FOR RELIEF
### Violation of the Free Exercise Clause: Religious Discrimination

142.    Plaintiff incorporates by reference paragraphs 1–131.

143.    The Department cannot disqualify otherwise eligible preschools from participation in UPK "solely because of their religious character," *Trinity Lutheran,* 582 U.S. at 462, nor "on the basis of their religious exercise," *Carson v. Makin*, 142 S. Ct. 1987, 2002 (2022).

144.   Darren Patterson Christian Academy's religious beliefs and exercise prevent it from complying with the Quality Assurance and Blanket Provisions' religious, sexual orientation, and gender identity nondiscrimination rules.

145.   The Department requires the school to abandon its religious beliefs and exercise in order to participate in UPK.

146.   Requiring the school to forfeit its religious status, beliefs, and exercise to participate in UPK violates the Free Exercise Clause.

147.   The Quality Assurance and Blanket Provisions—and the Department's decision to enforce them against the school—do not serve a compelling governmental interest and are not narrowly tailored to achieve any purported compelling interest, and therefore violate the Free Exercise Clause of the First Amendment.

### THIRD CLAIM FOR RELIEF
### Violation of the Free Exercise Clause: Not Neutral or Generally Applicable

148.   Plaintiff incorporates by reference paragraphs 1–131.

149.   Darren Patterson Christian Academy's sincerely held religious beliefs guide and permeate everything that it does.

150.   The school exercises its sincerely held religious beliefs through the operation of its school, by educating children through a Christian worldview, and by hiring like-minded people of faith to facilitate its educational and religious goals.

151.   Application of the Quality Assurance and Blanket Provisions to the School substantially burdens the school's religious exercise.

152.   The Quality Assurance and Blanket Provisions are not neutral or generally applicable because the Department has discretion to create individualized and categorical exceptions, which it has done for certain preschools.

153.   The Quality Assurance and Blanket Provisions are not neutral or generally applicable because there is a mechanism for individualized exemptions: the Department has authority to "allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II).

154.   The Department's enforcement of the Quality Assurance and Blanket Provisions is not neutral or generally applicable because it has denied requests for religious exemptions while giving them for other reasons.

155.   The Quality Assurance and Blanket Provisions also are not neutral and generally applicable because the practical "effect" of those provisions is to exclude only those preschools with religious beliefs and practices like Darren Patterson Christian Academy's. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535–36 (1993) (the "effect" of the challenged law "in its real operation is strong evidence of its object").

156.   Because The Quality Assurance and Blanket Provisions—and the Department's decision to enforce them against the school—are not neutral or generally applicable, they must survive strict scrutiny.

157.   The Quality Assurance and Blanket Provisions—and the Department's decision to enforce them against the school—do not serve a compelling governmental interest and are not narrowly tailored to achieve any purported compelling interest, and therefore violate the Free Exercise Clause of the First Amendment.

#### FOURTH CLAIM FOR RELIEF
### Violation of the First Amendment: Expressive Association

158.   Plaintiff incorporates by reference paragraphs 1–131.

159.    The First Amendment protects the right of people "to associate with others in pursuit of . . . educational [and] religious . . . ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up).

160.    When an association expresses a collective message, the First Amendment prohibits the government from forcing the association to admit those who disagree with its message, seek to change that message, or express a contrary view.

161.    Darren Patterson Christian Academy employs only like-minded believers to fulfill its educational and religious purposes and to express its religious beliefs to its students and the public.

162.    The Blanket Provision unconstitutionally forces the school to expressively associate with people who do not hold the same religious views and who, therefore, cannot express the same message.

163.    The Blanket Provision does not serve any compelling or even valid interest in a narrowly tailored way by infringing the school's freedom of expressive association.

164.    Requiring Darren Patterson Christian Academy to forfeit its right to expressive association to participate in UPK violates the First Amendment.

### FIFTH CLAIM FOR RELIEF
### Violation of the Free Speech Clause

165.    Plaintiff incorporates by reference paragraphs 1–131.

166.    The First Amendment's Free Speech Clause protects the Darren Patterson Christian Academy's ability to speak in accordance with its religious views and protects its ability to not speak.

167.    The school's decision and policy to use pronouns based on a person's biological sex and to teach about human sexuality and gender in line with its religious beliefs is protected speech.

168.    The Quality Assurance and Blanket Provisions restrict and compel the school's speech about human sexuality and gender based on the speech's content and viewpoint by requiring the school to use a person's "preferred pronouns" and to affirm a person's self-professed gender identity, and by prohibiting speech to the contrary.

169.    The Quality Assurance and Blanket Provisions are thus content- and viewpoint-based limitations on speech, do not serve any compelling or even valid interest in a narrowly tailored way, and infringe the school's right to free speech.

170.    Requiring Darren Patterson Christian Academy to forfeit its right to free speech to participate in UPK violates the Free Speech Clause.

### SIXTH CLAIM FOR RELIEF
### Violation of the Equal Protection Clause

171.    Plaintiff incorporates by reference paragraphs 1–131.

172.    The Equal Protection Clause prohibits discrimination on the basis of religion.

173.    The Equal Protection Clause prohibits the Department from excluding Darren Patterson Christian Academy from participation in UPK because of its religious status, character, beliefs, and exercise.

174.    By enforcing the Quality Assurance and Blanket Provisions against the school, the Department asks the school to surrender its religious status, character, beliefs, and exercise to participate in UPK.

175.    The Department treats Darren Patterson Christian Academy less favorably than similarly situated preschools because of its religious status, character, beliefs, and exercise.

176.   Enforcement of the Quality Assurance and Blanket Provisions against the school must satisfy strict scrutiny because the disparate treatment is based on the school's fundamental rights: religious exercise, association, and speech.

177.   The Quality Assurance and Blanket Provisions—and the Department's decision to enforce them against the school—do not serve a compelling governmental interest and are not narrowly tailored to achieve any purported compelling interest, and therefore violate the Equal Protection Clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Darren Patterson Christian Academy requests that this Court enter judgment against Defendants, and order the following relief:

A.   Enter a declaratory judgment, declaring that enforcement of the Quality Assurance and Blanket Provisions' prohibitions on religious, sexual orientation, and gender identity discrimination against Darren Patterson Christian Academy and other similarly situated religious preschools as a condition to participating in UPK violates the Free Exercise, Establishment, Free Speech, and Equal Protection Clauses, as well as their constitutional rights to expressive association and religious autonomy.

B.   Enter a preliminary and permanent injunction: (1) enjoining the Department from requiring Darren Patterson Christian Academy and similarly situated religious preschools to abide by the Quality Assurance and Blanket Provisions in order to participate in UPK to the extent that those provisions would prohibit them from requiring employees to share and live out their faith and from aligning their internal policies with their

religious beliefs about sexuality and gender; (2) enjoining the Department from prohibiting Darren Patterson Christian Academy and similarly situated religious preschools from participating in UPK because of their religious status, character, beliefs, or exercise; and (3) enjoining the Department from withholding or denying Darren Patterson Christian Academy and similarly situated religious preschools tuition reimbursement payments under UPK due to their religious status, character, beliefs, or exercise.

C.     Costs and attorneys' fees.

D.     Grant any other relief this Court deems equitable, just, and proper.

E.     Retain jurisdiction of this matter as necessary for enforcing this Court's orders.

Respectfully submitted this 20th day of June 2023,

_s/ Jeremiah Galus_
Jeremiah Galus
AZ Bar No. 30469
David Cortman
AZ Bar No. 29490
Ryan Tucker
AZ Bar No. 034382
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Email: jgalus@ADFlegal.org
        dcortman@ADFlegal.org
        rtucker@ADFlegal.org

Jacob E. Reed
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Email: jreed@ADFlegal.org

_Counsel for Plaintiff_

**DECLARATION UNDER PENALTY OF PERJURY**

I, Joshua Drexler, a citizen of the United States and a resident of the State of Colorado, declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing Verified Complaint and the factual allegations contained therein are true and correct to the best of my knowledge.

Executed on June 19, 2023, in Clayton, Georgia.

s/ Joshua Drexler
_____
Joshua Drexler
Head of School