# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-1557

DARREN PATTERSON CHRISTIAN ACADEMY,

> *Plaintiff,*

v.

LISA ROY, et al.,

> *Defendants.*

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

---

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Factual Background ............................................................................................... 2

    A. Darren Patterson Christian Academy and its preschool. ........................... 2

    B. The school's religious beliefs and practices. ............................................. 4

    C. Colorado's Universal Preschool Program. ................................................ 5

    D. The Department forces Darren Patterson Christian Academy to give up its constitutional rights to participate in the program. ................. 7

Legal Standard ...................................................................................................... 8

Argument ............................................................................................................... 8

    I. Darren Patterson Christian Academy is likely to succeed on the merits of its claims ................................................................................................. 8

    A. The Department's rules infringe the school's religious autonomy and expressive association. ........................................................................ 8

        1. The rules interfere with the school's right to select its ministers and to hire coreligionists. .............................................. 9

        2. The rules violate the school's right to expressive association by forcing it to hire those who disagree with its beliefs. ........................... 11

    B. The Department's rules violate the Free Exercise Clause ........................ 13

        1. The rules exclude the school based on its religious character and exercise. .................................................................................. 13

        2. The rules are not neutral and generally applicable ............................. 15

    C. The rules violate the Free Speech Clause. .................................................. 17

    D. The Department's rules fail strict scrutiny. ............................................... 18

    II. The school satisfies the other preliminary injunction factors ........................ 19

Conclusion ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*303 Creative, LLC v. Elenis,*
  No. 21–476 (June 30, 2023) ............................................................................... 17, 18

*Boy Scouts of America v. Dale,*
  530 U.S. 640 (2000) ........................................................................................... 11, 12

*Bryce v. Episcopal Church in the Diocese of Colorado,*
  289 F.3d 648 (10th Cir. 2002) .................................................................................. 9

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ................................................................................................... 8

*Carson v. Makin,*
  142 S. Ct. 1987 (2022) .............................................................................. 13, 14, 15, 18

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
  508 U.S. 520 (1993) ........................................................................................... 15, 16

*Espinoza v. Montana Department of Revenue,*
  140 S. Ct. 2246 (2020) ....................................................................................... 14, 18

*Fulton v. City of Philadelphia,*
  141 S. Ct. 1868 (2021) ............................................................................ 15, 16, 18, 19

*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) ........................................................................... 8, 20

*Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Employment
  Opportunity Commission.,*
  565 U.S. 171 (2012) ....................................................................................... 9, 10, 12

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North
  America,*
  344 U.S. 94 (1952) ..................................................................................................... 9

*Kikumura v. Hurley,*
  242 F.3d 950 (10th Cir. 2001) ................................................................................ 19

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ................................................................... 19

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ........................................................................ 9, 10

*Prescott v. Rady Children's Hospital-San Diego,*
    265 F. Supp. 3d 1090 (S.D. Cal. 2017).................................................. 17

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ................................................................................ 17

*Slattery v. Hochul,*
    61 F.4th 278 (2d Cir. 2023) .............................................................. 12, 13

*Telescope Media Group v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) ................................................................. 19

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) .......................................................................... 14, 15

*Watson v. Jones,*
    80 U.S. 679 (1871) ................................................................................... 9

## Statutes

Colo. Rev. Stat. § 26.5-4-202............................................................................ 19

Colo. Rev. Stat. § 26.5-4-204....................................................................... 2, 5, 6, 18

Colo. Rev. Stat. § 26.5-4-205....................................................................... 6, 16, 19

Colo. Rev. Stat. § 26.5-4-208................................................................................ 6

## Regulations

3 Colo. Code Regs. § 708-1:81.6 ....................................................................... 17

Darren Patterson Christian Academy moves this Court pursuant to Fed. R. Civ. P. 65 to issue a preliminary injunction enjoining Defendants from:

(A) requiring Darren Patterson Christian Academy to abide by the universal preschool program's nondiscrimination provisions (to the extent that they prohibit Darren Patterson Christian Academy from requiring employees to share and live out its religious beliefs and from basing its internal school policies on its religious beliefs about sexuality and gender) in order to participate in the program;

(B) denying Darren Patterson Christian Academy participation in the universal preschool program because of its religious character and exercise; and

(C) withholding or denying Darren Patterson Christian Academy tuition reimbursement payments under the universal preschool program.

This motion is supported by the Verified Complaint, ECF No. 1 ("VC"), its Exhibits, the Memorandum in Support below, and the Declarations filed herewith.

In compliance with D.C.COLO.LCivR 7.1(a), Plaintiff's counsel conferred with the Colorado Attorney General's Office on July 5 and July 6 about the nature of this motion and the requested relief. The Colorado Attorney General's Office said it represented Defendants and that Defendants opposed the motion.

## INTRODUCTION

Darren Patterson Christian Academy is a small Christian school in Buena Vista, Colorado. Its namesake, Darren Patterson, wanted to attend a Christian school but there were none in Chafee County where he lived. Tragically, Darren was killed by a drunk driver on Thanksgiving Day in 1981, so he never did get to go to a Christian school. But those who loved Darren the most—his parents, his family, and his friends—decided to make his dream a reality for others and founded Darren Patterson Christian Academy. Over 40 years later, Darren's legacy lives on. The

school now has a preschool, an elementary school, and a middle school. And it has provided thousands of Chaffee County residents with the Christian education and community that Darren always wanted but never had.

Unfortunately, the state is demanding that the school abandon its Christian character and beliefs to participate in the state's brand-new universal preschool program. That program promises preschool tuition money for every four-year-old in the state, and the Colorado Department of Early Childhood is supposed to recruit "as broad a range [of preschool providers] as possible." Colo. Rev. Stat. § 26.5-4-204(2). Yet when Darren Patterson Christian Academy applied, the Department demanded assurances that the school does not "discriminate" against anyone based on "religion," "sexual orientation," or "gender identity." While the school welcomes students and families of all faiths and backgrounds, it cannot make those unqualified assurances because it limits employment to those who share its beliefs and aligns its policies about bathroom usage, dress codes, pronouns, and student lodging with its religious beliefs about sexuality and gender.

So the school wrote to the Department and requested a religious exemption. The Department denied the request, forcing the school and its families to choose between their religion and the universal preschool program. But recent Supreme Court rulings explain that the Department cannot put them to that choice. Because the school and its families need not give up their constitutional rights to participate in the program like everyone else, a preliminary injunction should issue.

## FACTUAL BACKGROUND

### A.   Darren Patterson Christian Academy and its preschool.

Named in memory of a 14-year-old boy who was killed by a drunk driver on Thanksgiving Day, Darren Patterson Christian Academy was founded in 1982 to

give other Chaffee County kids the opportunity Darren Patterson never had: to attend a local Christian school. Decl. of Joshua Drexler ("Drexler Decl.") ¶ 4. More than 40 years later, the school continues to serve Chafee County families and children who desire a Christian education. *Id*. ¶ 5. One of just a few options in the area, Darren Patterson Christian Academy is the only Christian school in the county with a preschool ("Busy Bees Preschool"), an elementary school (K–5th grade), and a middle school (6th–8th grade). *Id.*

Although the school is "distinctly Christ-centered," and teaches from a Christian worldview, its doors are open to students and families of all faiths and backgrounds.VC ¶ 32; Drexler Decl. ¶ 6. Yet prospective students and families are aware of the school's Christian faith and focus, and many pick the school for that reason. *E.g.*, Joint Decl. of Jason & Sarah Tippetts ("Tippetts Decl.") ¶¶ 3, 5; Joint Decl. of Jordan & Carrie Euler ("Euler Decl.") ¶¶ 5–7. Parents must also sign a Parent-Student Agreement and agree "to support and uphold the school staff and the religious mission, intent, policies, rules, and requirements of [the Academy]." VC, Ex. 4 at 1.

The preschool, Busy Bees, is an essential part of the school. Busy Bees enrolls roughly 30 to 50 students each year, ranging from 2 ½ to 5 years old, and most who graduate from the preschool go on to continue their education at Darren Patterson's elementary school. Drexler Decl. ¶¶ 13, 14. Like the rest of the school, Busy Bees' primary purpose is to equip "students for excellence in Christian life and service by providing a nurturing, distinctively Christian school environment that emphasizes knowing Christ, imitating His character, and integrating the Bible in life while learning and mastering academic knowledge and skills." VC, Ex. 3 at 3.

**B.      The school's religious beliefs and practices.**

Darren Patterson Christian Academy's educational experience is unique, effective, and rooted in its religious beliefs. For example, the school believes family is the most important influence on children, so it uses a four-day school week to allow families to spend more time together. Drexler Decl. ¶ 10. It also incorporates Christ-centered expeditionary learning, where students embark on outdoor expeditions like climbing, backpacking, cross-country skiing, kayaking, and more. *Id.* ¶ 11. These challenging expeditions encourage students to put faith into practice, to strengthen friendships, and to appreciate all God's creation. *Id.* The school also holds daily prayer and devotions; offers Bible classes and lessons throughout the week; and holds weekly chapel services. *Id.* ¶ 12.

The school strives in all things "to teach the truth about God" and "to present the Word of God as the authoritative source upon which to build a life that has purpose and meaning." VC, Ex. 1 at 2. The employee handbook therefore states that all teachers and staff must:

- Teach the Bible as God's inspired Word and endeavor to help students develop attitudes of love and respect toward it;

- Seek to develop in students a desire to know and obey the will of God as revealed in Scriptures;

- Endeavor to encourage and equip [students] to carry out the will of God daily, encouraging them to live out their relationship with Him in the areas of service and good works in accordance with Matthew 5:16 ("*In the same way, let your light shine before men, that they may see your good deeds and praise your Father in heaven.*").

- Endeavor to assist [students] in developing the mind of Christ toward godliness and sin;

- Teach the students how to overcome sin and live in grace; and

4

- Strive to develop in students thoughtful, Biblical critique of modern culture and the wisdom and steadfastness to operate according to Biblical principles even when personally costly.

VC, Ex. 5 at 7. The school also expects its teachers to incorporate biblical teachings and principles in all classes, to attend and sometimes lead weekly chapel services, to pray for and with students, and to lead morning devotionals. VC, Ex. 5 at 18–23.

Given all this, the school only hires employees who share its faith. Drexler Decl. ¶ 25; VC, Ex. 5 at 3. And all employees must agree to a "Lifestyle Statement," which requires them to be a "born-again Christian" and to adhere to certain lifestyle requirements, including abstaining from any sexual activity outside of biblical marriage. VC, Ex. 5 at 15. This policy of hiring only coreligionists—i.e., those who share and live out the school's beliefs—allows the school to believably teach its Christian beliefs and values to students. It also fosters an environment of Christian fellowship and discipleship amongst school employees. Drexler Decl. ¶ 26.

The school's religious beliefs guide more than its employment practices. For instance, the school believes and teaches that God created only two unique, immutable sexes—male and female—and it aligns internal policies accordingly. Drexler Decl. ¶¶ 19, 20. The school maintains sex-separated bathrooms and dress codes for boys and girls based on their biological differences and cannot agree to use pronouns that do not correspond to the person's biological sex. *Id.* ¶ 20.

## C.    Colorado's Universal Preschool Program.

Colorado's brand-new universal preschool program (the "program") guarantees every 4-year-old in the state at least 15 hours per week of state-funded preschool services for the upcoming school year. Colo. Rev. Stat. § 26.5-4-204. The Colorado Department of Early Childhood, in conjunction with "local coordinating

organizations," is responsible for recruiting "as broad a range" of preschool providers as possible to participate in the program. *Id*. § 26.5-4-204(2).

Under the program, families must first apply and list their preferred preschools. The Department then matches students to participating preschools based on preference and availability. *See* Colo. Rev. Stat. § 26.5-4-208(3). Under current rates, preschools in Chaffee County would receive $6,018.24 per child attending a half-day (15 hours per week) and $10,700.78 per child attending a full day (30 hours per week).[1] VC ¶ 86. The first payment to preschool providers is set to be made in August 2023. *Id*. ¶ 87.

Participating preschools must, among other things, sign a program service agreement. VC, Ex. 6. That agreement contains two nondiscrimination provisions that are relevant here. *Id*. at 2, 27. *First*, preschools must agree to abide by the "Quality Assurance Provision." That provision, which is statutorily mandated, requires participating preschools to "provide eligible children an equal opportunity to enroll and receive preschool services regardless of . . . religious affiliation, sexual orientation, [or] gender identity." *Id*. at 2; *see also* Colo. Rev. Stat. § 26.5-4-205(2)(b). *Second*, preschools must also abide by a catch-all provision that prohibits "discriminat[ion] against any person on the basis of . . . religion . . . sexual orientation, [or] gender identity." VC, Ex. 6 at 27 ("Blanket Provision"). Unlike the Quality Assurance Provision, the Blanket Provision is not mandated by statute or regulation but instead is unilaterally imposed by the Department.

Together, the provisions forbid schools like Darren Patterson Christian Academy from requiring employees to share their faith and from aligning their

---

[1] Children meeting certain factors can get up to 30 hours.

internal policies—such as those involving restroom usage, dress codes, pronouns, and student lodging—with their religious beliefs about sexuality and gender.

### D. The Department forces Darren Patterson Christian Academy to give up its constitutional rights to participate in the program.

After learning about the universal preschool program, Darren Patterson Christian Academy was excited to participate. Drexler Decl. ¶ 27. The school applied and was asked to electronically sign the program service agreement, which it did. *Id*. ¶ 28. Although the school was approved to participate, it was concerned that the Department required agreement with nondiscrimination provisions that would prevent the school from operating consistently with its beliefs. *Id*. ¶ 29.

Others shared the school's concern. In February 2023, a group of faith-based preschool providers and private organizations raised the issue with Governor Polis. VC, Ex. 8 at 1–2. The group explained the program's nondiscrimination provisions "infringe[d] upon the religious liberty of faith-based providers" and excluded many religious preschools. *Id*. They asked Governor Polis and the Department to discuss the possibility of religious exemptions, *id*. at 2, but Defendant Roy responded by claiming she could not "create an exemption." VC, Ex. 9 at 1.

Similarly, in May 2023, Darren Patterson Christian Academy emailed Defendants Roy and Odean to request a religious exemption from "certain aspects of the Agreement's two nondiscrimination provisions." VC, Ex. 10 at 2. The school explained that it "welcomes all children and families to its preschool," but its "internal rules, policies, and student expectations . . . are based on its religious beliefs, including those about sexuality and gender." *Id*. So the school's "policies on bathroom and locker room usage, pronoun usage, and dress codes" are all "based on [a] student's biological sex" and thus conflict with the Department's gender identity rules. *Id*. The school added that the Blanket Provision—which prohibits

discrimination against "any person" based on "religion," "sexual orientation," or "gender identity"—would prohibit the school from requiring "employees to affirm and follow its beliefs," including those "about marriage, sexuality, and gender." *Id.*

Defendant Roy's response was nearly identical to her response to the group of faith-based providers. She said the Department could not accommodate religious preschools like Darren Patterson Christian Academy. *Id.* at 1. Instead, she explained there was a partial exemption for preschools run by houses of worship, which allowed those schools to "reserve all or a portion of their [preschool] seats" for members of their congregations. *Id.* This exemption does not help Darren Patterson Christian Academy because it is not operated by a church. Drexler Decl. ¶ 35.

## LEGAL STANDARD

A party moving for a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm; (3) the alleged harm outweighs any harm to the nonmoving party; and (4) the injunction will be in the public interest. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). The likelihood of success is often "the determinative factor" in First Amendment cases. *Id.* at 1145 (citation and quotation marks omitted).

## ARGUMENT

I. **Darren Patterson Christian Academy is likely to succeed on the merits of its claims.**

  A. **The Department's rules infringe the school's religious autonomy and expressive association.**

The program's nondiscrimination provisions ("rules") interfere with Darren Patterson Christian Academy's internal management and employment decisions, which violate the school's religious autonomy and expressive association.

### 1. The rules interfere with the school's right to select its ministers and to hire coreligionists.

The Religion Clauses of the First Amendment protect the autonomy of religious organizations. This includes the right to form "voluntary religious associations to assist in the expression and dissemination of any religious doctrine" and to adopt rules requiring "conformity of the members . . . to the standard of morals required of them." *Watson v. Jones*, 80 U.S. 679, 728–29, 733 (1871). And it includes "independence . . . to decide for themselves, free from state interference, matters of [internal] government." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

This promise of autonomy gives religious schools like Darren Patterson Christian Academy the freedom to make internal membership and employment decisions. It does so through two separate but similar protections: the church autonomy doctrine and the ministerial exception. The ministerial exception is a subset of the church autonomy doctrine and prevents any interference with the school's decision to hire or fire one of its "ministers," whatever the reason. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC.*, 565 U.S. 171 (2012). The church autonomy doctrine includes (among other things) the freedom to prefer coreligionists for *all* positions—at times called the coreligionist exemption. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002).[2]

The Department's rules seek to strip the school of both freedoms. The Department insists that, to participate in the program, the school must hire those

---

[2] This freedom is broader than the ministerial exception in some ways, yet narrower in others. Broader because it applies to all positions (not just ministers); narrower because it protects non-ministerial employment decisions only when rooted in religious belief, practice, or adherence. *See Bryce*, 289 F.3d at 657.

who reject its faith, including its beliefs about gender and sexuality. *See* VC, Ex. 6 at 27 (a "[p]rovider shall not discriminate against any person on the basis of . . . religion . . . sexual orientation, [or] gender identity"). But if the school cannot hire based on its religion, it will no longer be religious.

This violates the ministerial exception. Darren Patterson Christian Academy has multiple ministerial employees, including its teachers. The school educates students from a Christian worldview, bases its curriculum on the Bible, and seeks to bring every child into a relationship with God through Jesus Christ. VC, Ex. 5 at 4–5. To that end, Darren Patterson Christian Academy's teachers are "committed to mentoring and discipling students in the Christian faith." *Id.* at 12. They are expected to integrate "Biblical principles in the study of all subjects in all areas of the curriculum and in all co-curricular activities," and their "foremost goal" is to "assist[ ] students in developing a Christian mind." *Id.* at 18. The school's teachers also pray with and for students, attend (and sometimes lead) weekly chapel with students, and attend daily morning devotions. Drexler Decl. ¶ 24.

Simply put, "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission" of Darren Patterson Christian Academy. *Our Lady*, 140 S. Ct. at 2064. And like the teachers in *Hosanna-Tabor* and *Our Lady*, the school's teachers are "entrusted with the responsibility of 'transmitting the [Christian] faith to the next generation.'" *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 192). Yet the Department's rules interfere with the school's freedom to select its teachers and other ministerial employees, infringing the school's religious autonomy.

The Department's rules also interfere with the school's ability to hire coreligionists for all positions. The First Amendment protects the school's right to

hire those who share and live out its faith, regardless of position. The reason why is obvious. The school's mission is to provide "a nurturing, distinctively Christian school environment that emphasizes knowing Christ, imitating His character, [and] integrating the Bible in all of life and learning." VC, Ex. 5 at 4. So the school teaches students, through both word and deed, that *every* person can and should "know[] Christ," "imitat[e] His character," and "integrat[e] the Bible in all of life and learning." *Id.* That's true whether the person is the head of school, a preschool teacher, or the janitor. Employees who reject, disagree, or live a life contrary to that faith cannot credibly teach or demonstrate it; they would instead undermine it.

As such, the rules violate the First Amendment, per se.

### 2. The rules violate the school's right to expressive association by forcing it to hire those who disagree with its beliefs.

The Department's forced inclusion of nonbelievers also infringes the school's First Amendment right "to associate with others in pursuit of . . . educational [and] religious . . . ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). This right to expressive association includes "freedom not to associate" with people who "may impair [the group's] ability" to express its views. *Id.* at 647–48. The right applies if (1) "the group engages in 'expressive association,'" and (2) "the forced inclusion" of a person "affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. The school satisfies both elements.

First, the school "engage[s] in some form of expression." *Id.* at 648. The school was founded to "teach the truth about God, life and living and to present the Word of God as the authoritative source upon which to build a life that has purpose and meaning." VC, Ex. 1 at 2. And although the school welcomes any student, it teaches from a Christian worldview and shares the Gospel of Jesus Christ to every student and parent. That is the point of being an evangelistic school. In fact, many parents

choose to send their children to the school because of the religious education they will receive. *E.g.*, Tippetts Decl. ¶¶ 3, 5; Euler Decl. ¶¶ 5–7. In short, the Mission's "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor,* 565 U.S. at 200–201 (2012) (Alito, J., concurring).

Second, the Department's rules demand the school hire people who disagree with the school's religious beliefs. But courts must "give deference to an association's view of what would impair its expression," *Dale,* 530 U.S. at 653, and nothing would impair the school's more than having employees who reject its foundational beliefs. Again, the reason why is obvious. If employees disagreed with the school's beliefs (about marriage, sexuality, gender, or otherwise) those employees could not effectively teach—let alone defend or exemplify—those beliefs to others. *See id.*

The Second Circuit's recent decision in *Slattery v. Hochul,* 61 F.4th 278 (2d Cir. 2023), is directly on point. There, New York state passed a law that prohibited employment discrimination based on an employee's "reproductive health decision making." *Id.* at 283. A pro-life pregnancy center challenged the law, arguing it violated its right to expressive association because the law forced the center to hire employees who supported abortion, undermining its pro-life message. *Id.* at 284. The court agreed, first finding that the center engaged in expressive activity because it "aim[ed] to share [its] pro-life message with the world" and did so with the women to whom it offered health-care services. *Id.* at 287. Next the court found the law "significantly burden[ed]" the center's expressive activity because it "force[d] the center to employ individuals who act or have acted against the very mission of its organization." *Id.* at 288. The court took no issue that the law arose in the employment context, explaining that "compelled hiring, like compelled membership, may be a way in which a government mandate can affect in a

significant way a group's ability to advocate public or private viewpoints." *Id.* at 288 (citation and quotation marks omitted). So it applied strict scrutiny and held that any purported interest in preventing discrimination against abortion supporters could not "overcome the expressive rights of an association dedicated to outlawing or otherwise opposing that specific conduct." *Id.* at 289

Here, like *Slattery*, the Department's rules force the school to hire those whose views or conduct run contrary to the organization's. And here, like *Slattery*, complying with the rules would impede the school's ability to express its message. Because "[t]he right to expressive association allows [Darren Patterson Christian Academy] to determine that its message will be effectively conveyed only by employees who sincerely share its views," *id.* at 288, but the rules compel the school to hire those who do not, they violate the school's expressive association.

### B.    The Department's rules violate the Free Exercise Clause.

#### 1.    The rules exclude the school based on its religious character and exercise.

The Department violates the Free Exercise Clause by disqualifying Darren Patterson Christian Academy because of its religious character and exercise.

Because the Free Exercise Clause "protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions," the Supreme Court has "repeatedly held" that the government cannot "exclude[ ] religious observers from otherwise available public benefits" just because they are religious or do religious things. *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) (citation and quotation marks omitted). Indeed, the Supreme Court has held as much three times within the last six years.

In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 455–56 (2017), a church preschool applied for and was denied a playground resurfacing grant because the government had an express policy of excluding applicants controlled by a church. The Court held the policy unconstitutional, explaining that it disqualified eligible recipients "from a public benefit solely because of their religious character," thereby imposing a "penalty on the free exercise of religion that trigger[ed] the most exacting scrutiny"—which it failed. *Id.* at 462.

Next, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2255 (2020), the Court struck down the Montana constitution's no-aide provision because it barred religious schools from participating in the state's scholarship program "solely because of the religious character of the schools." The Court explained that when a State decides to "subsidize private education," it cannot then decide to "disqualify some private schools solely because they are religious." *Id.* at 2261.

And most recently, in *Carson v. Makin*, the Court held that Maine could not exclude sectarian private schools from the state's tuition assistance program. 142 S. Ct. at 2002. Trying to avoid *Trinity Lutheran* and *Espinoza*, Maine argued it did not exclude religious schools based on religious-*status*, but only on religious-*use* because "a school is excluded only if it promotes a particular faith and presents academic material through the lens of that faith." *Id.* at 2001 The Court rejected that argument, noting the very reason religious schools exist is to teach their faith. "Any attempt to give effect to such a distinction," the Court continued, would raise serious constitutional concerns. *Id.* It concluded, "the prohibition on status-based discrimination under the Free Exercise Clause is not a permission to engage in use-based discrimination." *Id.*

14

These "'unremarkable' principles" are dispositive here. *Id.* at 1997. The Department's rules forbid Darren Patterson Christian Academy from hiring only coreligionists and from aligning its internal policies on restroom usage, pronouns, dress code, and student lodging with its religious beliefs. So the school can either participate in the program or continue its religious exercise, but not both. If it elects the latter, its "freedom [of religion] comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the [school] is otherwise fully qualified." *Trinity Lutheran*, 582 U.S. at 462. By forcing the school to decide between faith or funding, devotion or dollar, piety or payment, the Department "penalizes the free exercise of religion" and engages in religious discrimination that is "odious to our Constitution." *Carson*, 142 S. Ct. at 1996–97 (citations and quotation marks omitted).

### 2.  The rules are not neutral and generally applicable.

The program's rules violate the Free Exercise Clause for another reason: they are neither neutral nor generally applicable and cannot survive strict scrutiny. *Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1876–77 (2021). "Neutrality and general applicability are interrelated" and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993). A law is not generally applicable if: (1) it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or (2) it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up). And a law is not neutral if its "object" is religious exercise. *Lukumi*, 508 U.S. at 535.

The Department's rules are neither neutral nor generally applicable for at least three reasons. *First*, the Act contains a mechanism for individualized exemptions that permits the Department "to grant exemptions based on the circumstances underlying each application." *Fulton*, 141 S. Ct. at 1877. The Department can approve a preschool to participate in the program even if it does not meet the quality standards (including the Quality Assurance Provision) if the Department finds it "necessary to ensure the availability of a mixed delivery system within a community." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II).

*Second*, the Department has created categorical exemptions for others but has refused a religious exemption for Darren Patterson Christian Academy. The Department allows some preschools to decline matched students to make room for "preferred" students—those who have a sibling enrolled at the school or a family member employed by the school. *See* VC, Ex. 7 at 5. And it even allows preschools operated by houses of worship to give preference to members of their congregation, a clear example of otherwise prohibited religious discrimination. VC, Ex. 10 at 1.

*Third*, the Department's nondiscrimination rules, in "real operation," harm only religious preschools like Darren Patterson Christian Academy, thus creating a "religious gerrymander" that "target[s] [religious schools] and their religious practices." *Lukumi*, 508 U.S. at 534, 535 (citation omitted). When Darren Patterson Christian Academy sought an exemption, *see* VC, Ex. 10, the Department claimed its hands were tied, even though exemptions exist for various other reasons. Because the Department "may not refuse to extend that system [of exemptions] to cases of religious hardship without compelling reason," *Fulton*, 141 S. Ct. 1868, the Department's rules trigger (and fail) strict scrutiny, *see infra* § I.D.

C.       **The rules violate the Free Speech Clause.**

The Department's rules also infringe Darren Patterson Christian Academy's free speech rights by censoring and compelling the school's speech based on "the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Start with the school's protected speech. "[T]he First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided." *303 Creative, LLC v. Elenis*, No. 21–476, slip op. at 8 (June 30, 2023) (citations and quotation marks omitted). The school engages in protected speech when it teaches and uses pronouns in line with its view that sex is based on biology, unchangeable, and predetermined by God. Now consider the speech restrictions. The Department's rules require the school to give "preschool services regardless of," and to "not discriminate . . . on the basis of," gender identity. VC, Ex. 6 at 2, 27. The State interprets these restrictions to regulate the school's use of pronouns and any instruction that sex is immutable.

We know this for at least three reasons. *First*, the State prohibits "[d]eliberately misusing an individual's preferred name" or "gender-related pronoun" under the Colorado Anti-Discrimination Act ("CADA"), which, like the Department's rules, broadly prohibits gender identity discrimination. 3 Colo. Code Regs. § 708-1:81.6. *Second,* other states and courts interpret similar language to compel the use of preferred pronouns. *See, e.g.*, *Prescott v. Rady Children's Hosp.-San Diego,* 265 F. Supp. 3d 1090, 1096–1099 (S.D. Cal. 2017) (interpreting Unruh Civil Rights Act and Affordable Care Act to apply to compel preferred pronouns). *Third*, Darren Patterson Christian Academy specifically raised the pronoun issue when requesting an exemption, VC, Ex. 10 at 2, yet the Department said no exemption was available and that the school must comply with the rules.

When it comes to the question of sexuality and gender, the Department makes clear that the school "must either speak as the State demands or face [the penalty of not participating in the program] for expressing [its] own beliefs." *303 Creative*, No. 21–476, slip op. at 11. That's the epitome of a content-based speech restriction that must face strict scrutiny, which it cannot satisfy. *See infra* § I.D.

### D. The Department's rules fail strict scrutiny.

Because the Department's rules infringe the school's First Amendment rights, they must survive strict scrutiny. To do so, the challenged rules "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Carson*, 142 S. Ct. at 1997 (cleaned up). The rules fail both prongs.

First, the Department lacks a compelling interest in making Darren Patterson Christian Academy choose between its religious character and exercise and participating in the program. Such government action "that targets religious conduct for distinctive treatment will survive strict scrutiny only in rare cases." *Carson*, 142 S. Ct. at 1997. Nor does the Department have any legitimate interest "in separating church and State 'more fiercely' than the Federal Constitution." *Espinoza*, 140 S. Ct. at 2260. To the contrary, the legislation enacting the program instructed the Department to identify and recruit "as broad a range [of preschool providers] as possible." Colo. Rev. Stat. § 26.5-4-204(2). Once the State decided to "subsidize private education," it cannot implement rules that "disqualify some private schools solely because they are religious." *Espinoza*, 140 S. Ct. at 2261.

Second, the Department cannot rely on a "broadly formulated" interest in "equal treatment" or in "enforcing its non-discrimination policies generally," but must establish a compelling interest "in denying an exception" to Darren Patterson Christian Academy. *Fulton*, 141 S. Ct. at 1882. Any such interest is undermined by

existing exemptions. The Department exempts preschools based on sibling attendance and family employment, and it allows preschools operated by houses of worship to favor students whose parents are members of the congregation—thus allowing religious discrimination. On top of that, the Department can hand out individualized exemptions from the Quality Assurance Provision if it finds the exemption "necessary." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). This "system of exceptions . . . undermines [the Department's] contention that its non-discrimination policies can brook no departures." *Fulton,* 141 S. Ct. at 1882.

Third, the Department lacks any interest in policing the school's speech. "[R]egulating speech because it is discriminatory or offensive is not a compelling state interest." *Telescope Media Grp. v. Lucero,* 936 F.3d 740, 755 (8th Cir. 2019). Indeed, any such claimed interest is particularly "weak" in the context of education and pronouns. *Meriwether v. Hartop,* 992 F.3d 492, 510 (6th Cir. 2021).

The rules are also not narrowly tailored. By exempting other preschools for other reasons, the Department has already shown there are less restrictive alternatives that would still accomplish the State's interests. After all, the purpose of the universal preschool program is to "provide high-quality, voluntary preschool programming through a mixed delivery system for children throughout the state." Colo. Rev. Stat. § 26.5-4-202(1)(b). This is better accomplished by permitting *more* preschools to participate, not by shutting some out because of their beliefs.

## II.    The school satisfies the other preliminary injunction factors.

Darren Patterson Christian Academy also satisfies the other preliminary injunction factors. To start, when a plaintiff shows a likelihood of success on the merits of a constitutional claim, "no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citation and

quotation marks omitted). That's because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Hobby Lobby*, 723 F.3d at 1145 (citation omitted). The school has shown such a likelihood here, which suffices for a preliminary injunction.

Besides, the school will continue to face real, practical harm absent an injunction. Parents and children matched to the school now will have to pick between state financial assistance or a Christian education. And the school has to decide whether to subsidize the cost for these families. *See* Drexler Decl. ¶ 40. Without being able to participate in the program, the school will inevitably lose students thus hurting its overall reputation and educational goals.

The balance of equities also heavily tips in the school's favor. "[W]hen [government action] is likely unconstitutional, the interests of those the government represents, . . . do not outweigh a plaintiff's interest in having its constitutional rights protected." *Hobby Lobby*, 723 F.3d at 1145 (cleaned up). Lastly, a preliminary injunction would be in the public interest because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1147 (citation and quotation marks omitted). Enjoining the Department here will still allow it to enforce the challenged rules against other preschools who do not hold sincere religious objections, like Darren Patterson Christian Academy.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and issue the requested preliminary injunction.

Respectfully submitted this 10th day of July, 2023,

s/ Jeremiah Galus
Jeremiah Galus
AZ Bar No. 30469
Ryan J. Tucker
AZ Bar No. 34382
David A. Cortman
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Email: jgalus@ADFlegal.org
        rtucker@ADFlegal.org
        dcortman@ADFlegal.org

Jacob E. Reed
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Email: jreed@ADFlegal.org

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and will serve the same on all parties via private process server. In addition, I certify that I will provide a copy of the foregoing to the following non CM/ECF participant via electronic mail:

Virginia Carreno
Second Assistant Attorney General
Colorado Department of Law
Virginia.Carreno@coag.gov

<u>s/ Jeremiah Galus</u>
Jeremiah Galus