IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:23-cv-01557-DDD-STV

DARREN PATTERSON CHRISTIAN ACADEMY,

     Plaintiff,

v.

LISA ROY, in her official capacity as Executive Director of the Colorado Department of Early Childhood; and,

DAWN ODEAN, in her official capacity as Director of Colorado's Universal Preschool Program,

    Defendants.

---

## ORDER DENYING MOTION TO DISMISS AND GRANTING PRELIMINARY INJUNCTION

---

## INTRODUCTION

This academic year Colorado implemented its new Universal Preschool Program—a program that allows certain preschoolers to attend the preschool of their choice for free. Plaintiff is a private, Christian preschool currently participating in the program. As a condition of participating in the program, schools like Plaintiff must agree not to discriminate on the basis of a number of statuses, including religion, gender, sexual orientation, and gender identity. Pursuant to its faith, however, Plaintiff refuses to hire employees who do not share its faith and

requires its staff and students to abide by certain policies determined by biological sex rather than gender identity.

After agreeing to participate in the program, Plaintiff raised concerns with Defendants—two state executives charged with overseeing the universal preschool program—that its religious policies may run afoul of the state's non-discrimination requirements. But Defendants refused to grant Plaintiff an exemption to the state's non-discrimination requirements. This suit followed.

Plaintiff seeks a preliminary injunction allowing it to continue participating in the program while abiding by its internal policies regarding hiring and student conduct. Defendants seek to dismiss all claims, sidestepping the merits in favor of arguments that Plaintiff lacks standing and that this case is not ripe. But Plaintiff has standing, this case is ready for adjudication, and Plaintiff has met its burden to obtain a narrow preliminary injunction.

## BACKGROUND

### I.  Colorado Implements the Universal Preschool Program

In 2020, Colorado voters approved proposition EE, establishing a dedicated source of funding for statewide preschool. The state legislature enacted implementing legislation in 2022. Colo. Rev. Stat. § 26.5-4-201 *et seq*.

That legislation created the "Colorado universal preschool program." *Id.* § 26.5-4-204. The stated purposes of the program are (1) to provide children with high-quality preschool services free of charge, (2) to provide access to preschool services in the year immediately preceding kindergarten for children in low-income families and children "who lack overall learning readiness due to qualifying factors," (3) to provide

access to preschool services for younger children who have disabilities, are in low-income families, or lack overall learning readiness, and (4) "to establish quality standards for publicly funded preschool providers that promote children's early learning and development, school readiness, and healthy beginnings." *Id.* § 26.5-4-204(1)(a)-(d).

To accomplish these goals, the legislature also created the Department of Early Childhood (the "Department") to oversee the program. Under the program, eligible preschool providers receive tuition reimbursement from the state for certain students. Every child is eligible for up to half-day, voluntary preschool each week for the year prior to kindergarten. *Id.* § 26.5-4-204(2); Doc. 28-1 ¶ 6. For younger preschoolers, the state may reimburse tuition if the student has a disability or is low-income and meets certain "qualifying factors." *See* Colo. Rev. Stat. § 26.5-4-204(3)(a). Under the program, students first apply for tuition coverage and list their preferred preschools. *See id.* § 26.5-4-208(3). The Department will only match students with one of their preferred preschools. Doc. 28-1 at ¶¶ 15-16.

The legislature tasked the Department with recruiting preschool providers and for establishing "quality standards" that providers must meet to remain eligible for state funding. Colo. Rev. Stat. § 26.5-4-205(1). Under state statute, those quality standards, "at a minimum," must require providers to "provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2).

But the Department may grant temporary exemptions to the quality-standards requirements as "necessary to ensure the availability of a

mixed delivery system within a community." *Id.* § 26.5-4-205(1)(b)(II). The statute defines a "mixed delivery system" as "a system for delivering preschool services through a combination of school- and community-based preschool providers, which include family child care homes, child care centers, and head start agencies, that are funded by a combination of public and private money." *Id.* § 26.5-4-203(12). The statute also includes an exception to this exemption process—a provider must meet quality standards "relating to health and safety," and the Department cannot allow temporary exemptions for such standards. *Id.* § 26.5-4-205(1)(b)(II).

The Department has not yet promulgated formal regulations setting quality standards for preschool providers but expects to by sometime in 2024. *See* Doc. 28 at pp. 4-5. In the meantime, prior rules promulgated by the Department of Human Services continue in effect until the newly-formed Department creates its own rules. *See id.*

The Department requires providers to sign a "Program Service Agreement" before allowing them to participate in the program. *See* Doc. 28-1 at ¶ 28; Doc. 1-6 (exemplary Program Service Agreement). That agreement provides, among other things, that preschools "shall not discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." Doc. 1-6 at p. 28. The agreement further provides that "Any person who thinks he/she has been discriminated against as related to the performance of the Agreement has the right to assert a claim, Colorado Civil Rights Division, C.R.S. §24-34-301, et seq." *Id.* at pp. 28-29. The Agreement also requires providers to "strictly comply with all applicable federal and State laws, rules, and regulations," including all laws "applicable to discrimination and unfair employment practices." *Id.*

at p. 27. State regulations implementing C.R.S. § 24-34-301 *et seq.* list "deliberately misusing an individual's preferred name, form of address, or gender-related pronoun" as "prohibited conduct" under the state's sexual harassment laws. 3 Colo. Code Regs. § 708-1:10.1 ("Statement of Purpose" noting that the purpose of the rules is to implement "Parts 3 through 7 of Article 34 of Title 24" of Colorado Revised Statutes), § 708-1:81.6 (addressing pronoun usage).

## II.    Plaintiff's Religious Beliefs and Practices

Darren Patterson Christian Academy is a private, Christian school located in Chaffee County. It is the only Christian school in the county that offers a preschool, but it also teaches elementary and middle school students. Its preschool enrolls approximately 30-50 students each year, many of whom continue their education at Plaintiff's elementary school. Doc. 14 at p. 7.

Plaintiff is "distinctly Christ-centered" and "teaches from a Christian worldview" yet maintains that "its doors are open to students and families of all faiths and backgrounds." *Id.* Plaintiff requires parents to sign an agreement "to support and uphold the school staff and the religious mission, intent, policies, rules, and requirements" of the school before enrolling their children. *Id.* The school holds daily prayer, offers Bible classes and lessons, and holds weekly chapel services. *Id.* at p. 8.

In accordance with its Christian focus, Plaintiff only hires employees who share its faith. *Id.* at p. 9. All employees must be a "born-again Christian" and adhere to certain lifestyle requirements, including abstinence from sexual activity outside of the context of a marriage between a man and a woman. *Id.*

The school's Christian beliefs inform other relevant policies. For instance, Plaintiff believes that there are "two unique, immutable sexes—male and female," and aligns its policies accordingly. *Id.* This includes mandating sex-separated bathrooms and dress codes based on boys' and girls' biological differences. *Id.* The school also forbids using pronouns that do not correspond to a student's or employee's biological sex. *Id.*

### III.    Plaintiff Joins the Program and Seeks an Exemption

Plaintiff applied to participate in the universal preschool program and was registered in January 2023. *See* Doc. 1 at ¶ 97. At that time, Plaintiff signed the "Program Service Agreement" that included the aforementioned prohibition on discrimination. *See id.* at ¶ 98. The Department then approved Plaintiff to participate in the program. *See id.* at ¶ 99.

In February, a coalition of religious schools and organizations wrote a letter to Governor Jared Polis, expressing concern that the non-discrimination provisions of the implementing statute infringed their First Amendment rights. Doc. 1-8. In response, Defendant Lisa Roy, the Executive Director of the Department, stated that she lacked authority to create an exemption for this statutory requirement. Doc. 1-9 at p. 2. But she did note that "faith-based providers that participate in the UPK Program may give preference to members of their congregation. Unlike most other UPK providers, faith-based providers can reserve all or a portion of their seats for their members, and decline a match from a family that is not part of the congregation. However no provider may discriminate against children or families in violation of state statute." *Id.* at p. 3.

Plaintiff subsequently sought its own exemption in May by emailing Defendant Roy. Doc. 1-10 at p. 3. In that email, Plaintiff stated that the

program agreement's non-discrimination clause violated its religious beliefs, including its "policies on bathroom and locker room usage, pronoun usage, and dress codes." *Id.* Plaintiff also expressed concern that the program agreement may prohibit its hiring practice to only hire co-religionists. *Id.* at pp. 3-4. In response, Ms. Roy stated that the program agreement's non-discrimination clause is "mandated in state statute." *Id.* at p. 2. She also stated that she lacked authority to create exemptions for faith-based providers but noted that providers may reserve their seats under the program for congregants. *Id.*

## IV. Plaintiff Sues Under the First and Fourteenth Amendments

Shortly after receiving Defendant Roy's response explaining that she could not provide a religious exemption, Plaintiff brought this lawsuit. Doc. 1. Plaintiff brings five First Amendment claims: three claims under the First Amendment's religion clauses, a claim that Defendants violated its First Amendment right to free association, and a claim under the Free Speech Clause. Doc. 1 at ¶¶ 132-170. It also brings an Equal-Protection-Clause claim but does not seek a preliminary injunction on that claim. *See id.* at ¶¶ 171-177.

On July 10, Plaintiff filed a motion for a preliminary injunction. Doc. 14. Defendants responded on August 7 and concurrently filed a motion to dismiss on standing and ripeness grounds. Docs. 28, 29.

As of the hearing on its preliminary injunction motion, Plaintiff remained an active participant in the universal preschool program. Doc. 28-1 at ¶ 24. Eighteen students at Plaintiff currently participate in the program, and the state has paid Plaintiff for those student's tuition under the program. *Id.* at ¶¶ 22, 25; Doc. 42-1 at ¶¶ 20-33. Also as of the hearing on the preliminary injunction motion, the Department had not

received any complaints that Plaintiff has violated any non-discrimina-tion provisions of the program. *See* Doc. 42-1 at ¶¶ 15-16.

## LEGAL STANDARDS

Under Rule 12(b)(1), a party may move to dismiss for lack of subject-matter jurisdiction, "mounting either a facial or factual attack." *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). Factual attacks go "beyond the allegations in the complaint and adduce[] evidence to contest jurisdiction." *Id.* In such cases, the court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.* (internal quotation marks and citation omitted). Reliance on such evidence does not necessarily convert the motion to one for summary judgment. *Id.*

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).

To succeed on a motion for preliminary injunction, the moving party must show: (1) that it is "substantially likely to succeed on the merits"; (2) that it will "suffer irreparable injury" if the court denies the injunc-tion; (3) that its "threatened injury" without the injunction outweighs the opposing party's under the injunction; and (4) that the injunction is not "adverse to the public interest." *Mrs. Fields*, 941 F.3d at 1232; *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth preliminary-injunction factors "merge" when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

Plaintiff argues that the program's non-discrimination rules violate its constitutional rights to hire ministers who share its faith and co-religionists and otherwise violate its First Amendment religious and speech rights to enact policies driven by its faith, including its policies regarding bathroom usage, dress codes, and pronoun usage. Defendants do not seek at this stage of the case to argue the merits of those claims. Their motion instead is based on the premises that Plaintiff lacks standing to assert either set of claims and that no claims are ripe for adjudication. On this basis, Defendants argue that Plaintiff is not entitled to an injunction and that its claims should be dismissed under Rule 12(b)(1).

## I.    Plaintiff Has Standing To Bring Its Constitutional Claims

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). To establish standing, a plaintiff must show (1) an injury in fact, (2) a causal connection between the injury and the alleged conduct, and (3) redressability. *Id.* An "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted).

But an injury-in-fact need not amount to an "actual arrest, prosecution or other enforcement action." *Id.* (internal quotation marks omitted). For First Amendment claims, "two types of injuries may confer Article III standing to seek prospective relief," even if a plaintiff has "never been prosecuted or actively threatened with prosecution." *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003); *accord Colorado Union of*

*Taxpayers, Inc. v. Griswold*, No. 22-1122, 2023 WL 5426581, at *1 (10th Cir. Aug. 23, 2023).

The first type of injury requires only that a plaintiff intends to "engage in conduct that would . . . arguably violate the law" and that such conduct would "give rise to a credible fear of an enforcement action." *Griswold*, 2023 WL 5426581, at *1. The second type of injury occurs where a plaintiff is "chilled" from doing constitutionally protected conduct, typically speech. Under the latter theory, the plaintiff must provide (1) evidence that in the past they engaged in the type of speech or conduct affected by the challenged government action, (2) evidence that the plaintiff has a present desire, though no specific plans, to engage in such speech or conduct; and (3) a plausible claim that the plaintiff has no intention to engage in such speech or conduct because of a credible threat that the law will be enforced. *Peck v. McCann*, 43 F.4th 1116, 1129-31 (10th Cir. 2022).

Under either of these two standing theories, the third "credible threat" prong of this test is the same and includes a multi-factor analysis. *Griswold*, 2023 WL 5426581, at *3, n.4 ("We have never interpreted a 'credible fear' differently based on the plaintiff's theory of standing."). The non-exhaustive "credible fear" factors are:

- Whether there is evidence of past enforcement against the same conduct;

- Whether authority to initiate charges is not limited to a prosecutor or an agency and, instead, any person could file a complaint or grievance against the plaintiff; and

- Whether the state disavowed future enforcement.

*See id.* at 1132; *see also Griswold*, 2023 WL 5426581, at *3 (noting that courts consider "at least" these three factors).

The credible-threat prong "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1132.[1] And the "threat of prosecution is generally credible where a challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage, and the state has not disavowed any intention of invoking the provision against the plaintiff." *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 901 (10th Cir. 2016) (internal quotation marks omitted).

### A. Plaintiff's First Amendment Claims

Plaintiff first brings a set of claims arguing that the anti-discrimination provisions of state statute and the program's contract agreement violate its right to hire co-religionists or ministers sharing its faith. The First Amendment's Religion Clauses "foreclose certain employment discrimination claims brought against religious organizations" under the "so-called ministerial exception." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020). But as the name suggests, this doctrine only applies to employees who qualify as a "ministers." *See id.* at 2062-63. In making that determination, "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064. To determine who qualifies as a "minister," the Supreme Court has focused on whether an employee "performed vital religious duties," whether employment agreements laid out an expectation that the employee carry out the school's religious

---

[1] *Peck* addressed free speech which is only partly at issue here. Defendants have not provided any argument why *Peck* should not apply as to other First Amendment claims, however, such as religious freedom and association claims. Given this, the Court sees no reason not to apply *Peck*'s standard as a whole to the claims here.

mission, whether the employees were required to provide religious in-
struction, and whether the teachers prayed with their students or oth-
erwise participated in religious activities. *Id.* at 2066.

Plaintiff also invokes a separate doctrine that it terms the "coreli-
gionist exemption," citing *Bryce v. Episcopal Church in the Diocese of
Colorado.* 289 F.3d 648, 657 (10th Cir. 2002). The *Bryce* court noted that
the Supreme Court "has made clear that church autonomy doctrine" ex-
tends constitutional protection "beyond the selection of clergy to other
internal church matters." *Id.* at 656. This doctrine affirms a church's
fundamental right "to decide for themselves, free from state interfer-
ence, matters of church government as well as those of faith and doc-
trine." *Id.* at 655 (internal quotation marks and citation omitted). Plain-
tiff frames this doctrine as protecting its employment decisions as to
non-ministers but being limited to employment decisions "rooted in its
religious beliefs, practices, or observances." Doc. 1 at ¶ 139. Defendants
do not explicitly dispute this characterization.

Plaintiff's remaining religion-clauses claims focus on the school's be-
liefs and policies regarding sex and gender, including the requirement
for sex-separated bathrooms, dress codes, and pronoun usage all based
on biological sex rather than gender identity or gender expression. Pro-
hibiting these policies, Plaintiff argues, would violate its rights to free
exercise, association, and speech all under the First Amendment.

### B. Plaintiff Is "Arguably" Violating the Anti-Discrimina-
tion Provisions

The parties argue over what, exactly, Plaintiff may be chilled from
doing at this point. But it is not necessary to answer that question if it
has standing under the present-violation standing theory. To show
standing under that theory, Plaintiff must first show that it is

"arguably" violating the anti-discrimination provisions. *Griswold*, 2023 WL 5426581, at *1. In their briefing, in their proffered evidence (including declarations), and at the hearing, Defendants did not contest this directly. Nevertheless, much of Defendants' submissions suggest that they might withhold enforcement of these provisions until an aggrieved party files a complaint. Despite making this argument, Defendants never provided a clear answer on whether they view Plaintiff's policies as currently violating the statutory or contractual anti-discrimination provisions, even though they were given ample opportunity in briefing, declarations, and at the hearing.[2]

The anti-discrimination provisions themselves are pretty clear. The statute is narrower: It only prohibits discrimination against students and their families that would deny them "equal opportunity" as to "enrollment" and "receipt of preschool serviced." *See* Colo Rev. Stat. § 26.5-4-205(2)(b). The contractual language, however, is broader, barring discrimination against "any person." Doc. 1-6 at p. 28.

As Defendants note, there is no evidence in the record that any particular individual has been discriminated against under these provisions since Plaintiff joined the program. And Defendants have suggested that they do not intend to "investigate" Plaintiff unless someone files a complaint. But despite repeated opportunities and direct requests to do so, Defendants have not answered the straightforward question: Does the state believe Plaintiff is violating the law or breaching the contract? The terms of the statute and contract "arguably" cover merely having

---

[2] When asked this question repeatedly at the hearing, Defendants tended to provide ambiguous answers. *See, e.g.*, Doc. 50 at p. 41 (Court noting that its primary question for Defendants was whether Plaintiff is currently in compliance), pp. 63, 65 70 (counsel's responses to variations of this question).

discriminatory policies even if there are no instances of those policies being applied to someone who would feel aggrieved. Plaintiff therefore has met its burden to show that it is "arguably" in violation of the law for purposes of this prong.

### C. Plaintiff Credibly Fears Enforcement

Defendants focus their arguments primarily, if not exclusively,[3] on whether Plaintiff faces a credible threat of enforcement. As detailed above, multiple non-exhaustive factors inform this test, including whether there has been past enforcement against the same conduct, whether third parties can "initiate charges," and whether the enforcement agency has disavowed enforcement. *Peck*, 43 F. 4th at 1132. The ultimate question is whether Plaintiff has "an objectively justified fear of real consequences." *Id.* (internal quotation marks and citation omitted).

As to the first factor, Plaintiff argues that the program is new and therefore its "existence alone may create a threat that is credible enough to create standing." Doc. 38 at p. 13 (quoting *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012)). The program and relevant statutes

---

[3] In two sentences in their motion to dismiss, Defendants also argue that Plaintiff fails to meet the causation and redressability prongs of the standing analysis. Doc. 28 at p. 16. These extremely brief arguments, unexplored anywhere else, appear to depend on—or overlap with—Defendants' arguments regarding injury. As to causation, Defendants argue that there is no causation here because "Plaintiff has not shown that the Department has taken or intends to take disciplinary action against it." *Id.* But for the reasons discussed throughout this Order, Plaintiff credibly fears enforcement that would certainly cause the alleged First Amendment deprivations. As to redressability, Defendants make the same argument. *Id.* But the injunction here redresses the constitutional harm at issue because it prevents Defendants from taking actions against Plaintiff based on protected exercise of First Amendment rights. *See id.*

are indeed new, being implemented for the first time this academic year. Indeed, some courts have held there is a "presumption of enforcement" for non-moribund laws, such as new ones. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 336 (5th Cir. 2020. Even if that does not weigh in Plaintiff's favor, it at least seems to diminish the relevance of this factor. While Defendants theoretically could have pursued enforcement during the pendency of this litigation, no one has filed a complaint against Plaintiff to initiate the enforcement process. Given all this, this factor seems to support standing or, at the very least, appears to be neutral. Even if this factor weighed against a finding of standing, that would not torpedo Plaintiff's claims. *See Griswold*, 2023 WL 5426581, at *5 (finding that this factor weighed against standing "for the sake of argument" but holding that plaintiff had standing).

Defendants appear to argue that Darren Patterson has been subject to other non-discrimination provisions found in other government regulations or contracts due to its status as a licensed child-care provider, yet Plaintiff has not faced discipline under those regulations. *See* Doc. 28-1 at ¶¶ 30-31 (citing 12 CCR 2509-8, Section 7.701.14). But at least one of those contracts specifically included an exemption for sectarian organizations to "require that employees adhere to the religious tenets and teachings of such organization." *See* Doc. 50 at p. 35. Neither of the referenced provisions appeared to prohibit discrimination on the basis of gender identity. *See id.* at pp. 35, 39. And one only barred discrimination as to "referrals," a practice that Darren Patterson contends it takes no issue with. *See* Doc. 50 at pp. 39, 60-61. Given that the provisions at issue here contain different relevant language, are brand new, and are overseen by a newly-created agency of the state, any past non-enforcement of these other provisions bears minimal relevance.

Defendants further suggest that Plaintiff's licensure, at least as of

September 2022, required providers not to discriminate "based upon race, religion, age, gender, or disability." *See* Doc. 28-1 at ¶¶ 30-32. The Court's review of this regulation, both as implemented in September 2022 and as of the date of this Order, has not shown the language quoted by Defendants explicitly included in this regulation. 12 Colo. Code. Reg. 2509-8, Section 7.701.14. Instead, the regulation appears to incorporate federal anti-discrimination laws (which presumably include Defendants' quoted language), but not state laws, by reference. *Id.* In any event, Defendants have not shown that Plaintiff was previously subject to anti-discrimination laws that explicitly prohibited discrimination based on gender identity. The Court therefore gives little weight to the argument that there was a lack of enforcement under this separate provision.

As to the second factor, the parties dispute whether a third party could "initiate charges" for purposes of the anti-discrimination provisions. Defendants first argue that only the Department can enforce the statutory anti-discrimination provision of C.R.S. § 26.5-4-205(2)(b). While this may be true, the program agreement itself provides that "Any person who thinks he/she has been discriminated against as related to the performance of the Agreement has the right to assert a claim, Colorado Civil Rights Division, C.R.S. §24-34-301, et seq." Doc. 1-6 at pp. 28-29. And that statute provides that "Any person claiming to be aggrieved by a discriminatory or an unfair practice as defined by parts 4 to 7 of this article 34 may" file a discrimination charge with the state that, ultimately, is reviewable by a court. C.R.S. § 24-34-306(1)(a)(I). Indeed, the Tenth Circuit held that part 6 of article 34 of the Colorado Revised Statutes allowed "any person" to file a complaint against the plaintiff in *303 Creative LLC v. Elenis*, weighing in favor of a finding that standing

existed there. 6 F.4th 1160, 1174 (10th Cir. 2021), *rev'd on other grounds*, 143 S. Ct. 2298 (2023).

Even if a private party cannot initiate a lawsuit that, on its own, would jeopardize Plaintiff's participation in the program, anyone may file a complaint with the Department that would do so. Indeed, Defendants argue that *this is the only way they would initiate an investigation*. *See* Doc. 29 at pp. 4-5. This enforcement mechanism appears to closely mirror those seen in *303 Creative*, 6 F.4th at 1174 (10th Cir. 2021) (finding that "any (would be) customer" who is refused service "may file a complaint and initiate a potentially burdensome administrative hearing," weighing in favor of standing), and *Griswold*, 2023 WL 5426581, at *4 (finding the fact that any party can file a complaint that could trigger an enforcement action by the state supported standing under this factor). A private third party's complaint made to the Department, therefore, could—or perhaps *would* under Defendants' telling—trigger an investigation that would jeopardize Plaintiff's participation in the program. Or, at the very least, such a complaint could trigger a "potentially burdensome" investigation by Defendants that Plaintiff would have to respond to. *See 303 Creative*, 6 F.4th at 1174. And the program agreement appears to invite such third-party complaints. This factor therefore weighs in favor of standing.

As to the final factor—disavowal of future enforcement—Defendant Roy has sworn, under penalty of perjury, to the following:

> The Department interprets Contractual Provision 18(B) in accordance with federal law, which allows religious organizations to prefer co-religionists and to afford religious organizations wide

> discretion to make employment decisions about its ministerial
> employees, in accordance with federal law.

And

> The Department disavows enforcement of Contractual Provision
> 18(B) against religious providers who hire co-religionists in ac-
> cordance with federal law, and against religious providers' em-
> ployment decisions involving their ministerial employees as pro-
> tected by federal law.

Doc. 28-1 at ¶¶ 26-27.

At first blush, this seems significant, at least as to the employment-
related claims. But read in the context of this lawsuit, the disavowal
falls flat.

As outlined in *Mink v. Suthers*, the Tenth Circuit has repeatedly
found a lack of credible fear (and therefore a lack of standing) where
there is a clear disavowal of intent to prosecute, sometimes even after
the filing of a complaint. 482 F.3d 1244, 1254 (10th Cir. 2007) (collecting
cases). "Where a plaintiff only seeks prospective relief, standing is de-
feated when there is evidence the government will not enforce the chal-
lenged statute against the plaintiff." *Id.* at 1255. "Assurances from pros-
ecutors that they do not intend to bring charges are sufficient to defeat
standing, even when the individual plaintiff had actually been charged
or directly threatened with prosecution for the same conduct in the
past." *Id.* at 1253 (quoting *Winsness v. Yocom*, 433 F.3d 727, 731 (10th
Cir. 2006).

But this disavowal is too limited and unclear to revoke the court's
jurisdiction. First, it is limited to employment-related issues, is limited
only to enforcement of the contract language (and not the similar statu-
tory language), and has no bearing on any of Plaintiff's policies that af-
fect student conduct. In fact, it is telling that the Department has offered

a disavowal as to only part of the claims at issue yet refuses to issue a disavowal as to the remainder.

Second, the Department provided the disavowal after the operative complaint was filed and not until Defendants filed their motion to dismiss. Indeed, "standing is determined at the time the action is brought, and we generally look to when the complaint was first filed, not to subsequent events." *Mink*, 482 F.3d at 1253-55 (internal citation omitted) (noting that the disavowal in that case came as a public announcement of non-prosecution "well before [the prosecutor's office] filed an answer or motion to dismiss.").[4] Other courts have cast doubt on such "in-court assurances" that "do not rule out the possibility that [a defendant] will change its mind and enforce the law more aggressively in the future." *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019). The disavowal's assurances weaken in this context, particularly given the Department's pre-litigation refusal to grant Plaintiff an exemption.

While the state has been coy in its filings and at the hearing with the court, its public statements go further. For instance, Plaintiff points out that the governor of the state has said, "I'm not commenting on specific

---

[4] *Mink* and other cases that found a lack of standing due in part to a post-complaint disavowal are otherwise distinguishable. In *Mink*, the disavowal came *before* the amended, operative complaint and was based on a district attorney's "review of controlling Supreme Court precedents." 482 F. 3d at 1254-55. In *D.L.S. v. Utah*, the Tenth Circuit found that any "lingering threat of prosecution" had been "snuffed out" by the Supreme Court's then-recent decision holding that anti-sodomy laws were unconstitutional. 374 F.3d 971, 975 (10th Cir. 2004). The Tenth Circuit relied on a similar fact pattern in *Winsness v. Yocom* to find a lack of standing there. 433 F.3d 727, 733-34 (10th Cir. 2006) (finding that plaintiff's "rights are protected by a recent Supreme Court decision holding unconstitutional a similar statute from another state"). While intervening law may not be necessary for a disavowal to defeat standing, it tends to bolster such a finding.

lawsuits, but obviously, if you run a preschool that doesn't receive state money, you can run it the way you want. But of course, when you are publicly funded, you have to agree with the basic values: We don't discriminate, and you can't say parents can't come here because they are gay or they are not married or whatever it is." Gabrielle Franklin, *Polis: Catholic schools that want universal pre-K must not discriminate*, FOX 31 (Aug. 17, 2023), https://kdvr.com/news/local/colorado-universal-preschool-catholic-lawsuit-polis/.

Perhaps even more telling is the fact that, hours after the hearing on these motions, the governor's office issued a comment directly in response to this case:

> We're saddened to see different groups of adults attempting to co-opt preschool for their own ends and to discriminate, rather than ensuring that all kids are welcome. Voters were clear on their support for parent choice and a universal, mixed delivery system that is independently run, that doesn't discriminate against anyone, and offers free preschool to every child no matter who their parents are. We will continue to ensure that every Colorado child and family has access to preschool, meet the needs of all learners, and will *vigorously defend* this landmark program in court so that even more families can benefit from preschool.

Gabrielle Franklin, *Judge hears Christian school's universal pre-K lawsuit*, Fox 31 (Oct. 5, 2023), https://kdvr.com/news/local/universal-preschool-colorado-christian-school-lawsuit/ (emphasis added). The Defendants ultimately serve "at the pleasure" of the governor. *See* Colo. Rev. Stat. § 26.5-1-104(1). And while their counsel would not or could not answer direct questions about whether the state believed Plaintiff discriminates in violation of the requirements, the governor's office publicly intimated that the state does, indeed, believe that is the case and that the state will "vigorously defend" its position in court. While there is some debate about whether these statements bear on the facts in

dispute here given Plaintiff's willingness to accept all students and families (subject to its code of conduct), the statements lend credibility to Plaintiff's fear that the state has not forsworn taking action against schools like it.

Fourth, the disavowal's language itself is not as broad as it appears, nor is it sufficient to defeat standing. As Plaintiff points out, Defendants couched the disavowal within the confines of "federal law." While one might assume that this includes the Constitution itself, Defendants appeared to suggest that their understanding of the ministerial exception was limited to how it may be described in a federal statute. *See* Doc. 50 at p. 71. More importantly, the disavowal appears to depend on Defendants' interpretation of the scope of Plaintiff's constitutional rights—a position that Defendants have refused to explain in any detail in this litigation.

In response, Defendants argue that they have taken no adverse action so far and have deposited over $20,000 into Plaintiff's bank accounts under the program. After the hearing, Defendants submitted further evidence that this amount has now exceeded $30,000. *See* Docs. 51, 51-1, 51-2. While relevant and even significant, this all has occurred in the context of pending litigation and a pending preliminary-injunction motion. Defendants' apparent position prior to litigation was that Plaintiff did not qualify for an exemption and may have been ineligible if it persisted with its policies. Perhaps that has changed. But Defendants' pre-litigation position, like the state's public proclamations, weakens their subsequent, partial "in-court assurances" of non-enforcement. *See Rodgers*, 942 F.3d at 455.

At the hearing, Defendants had an opportunity to make a clearer disavowal. But they chose not to. While Defendants noted that they have

not initiated an investigation or taken any formal action, they suggested that they might if any member of the public filed a complaint with their office. *See* Doc. 50 at p. 65. Defendants' argument appears to focus on the unlikelihood that someone would enroll or seek to enroll at Plaintiff's school, knowing the school's religious beliefs and expectations, and then ask the school to make accommodations under the state's non-discrimination provisions. But Defendants still have not stated whether they view having discriminatory policies as a violation or whether only *acting* on those policies towards a specific person amounts to a violation. If Defendants would concede that having the policies alone is not a violation, that would significantly bolster their standing argument. But they have refused to make that concession.

Defendants also raise several arguments about whether Plaintiff's speech or conduct has been chilled. While Plaintiff makes some arguments to that effect, this is not really a "chilled speech" case. At the hearing, Mr. Drexler, Plaintiff's Head of School, admitted that Plaintiff hasn't changed its policies since joining the program. Doc. 50 at 30 (Mr. Drexler admitting that Plaintiff has not changed any of its internal policies or hiring practices). It has not been chilled in meaningful ways. But that doesn't matter under Plaintiff's primary theory of standing.

The ultimate question here is whether Plaintiff faces a credible threat of enforcement. It is arguably violating the anti-discrimination provisions, and Defendants refuse to say, unequivocally, that Plaintiff is not in violation. Defendants have provided a "disavowal" of sorts, but the disavowal is ambiguous, like much of Defendants' legal position, and fails even to cover all of the relevant claims. The disavowal's assurances further fall flat in light of Defendants' past refusal to exempt Plaintiff's policies, the fact that the disavowal is a product of litigation, and the fact that the state elsewhere has suggested, quite strongly, that Plaintiff

is in violation and that the state will "vigorously defend" its position on the program. And Plaintiff credibly fears that third party complaints could jeopardize its participation in the program or subject it to burdensome investigations.

In view of the relevant factors, Plaintiff credibly fears any number of consequences under the program, including expulsion, termination of the program agreement, withholding of future funds, payment of damages owed to the state, or even simply an investigation of its practices. *See, e.g.*, Doc. 1-6 at pp. 18-20; *see also SBA List*, 573 U.S. at 165-66 (finding that having to respond to administrative proceedings bolsters finding of injury). Plaintiff therefore meets the "not . . . difficult bar" and "extremely low" evidentiary standard for demonstrating standing. *See Peck*, 43 F.4th at 1133 (quoting, in part, *Mangual v. Rotger-Sabat*, 317 F.3d 45, 47 (1st Cir. 2003)).

## II.    Plaintiff's Claims Are Ripe

"Standing and ripeness are closely related in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention." *Peck*, 43 F.4th at 1133 (internal quotation marks and citation omitted). "But unlike standing, ripeness issues focus not on whether the plaintiff was in fact harmed, but rather whether the harm asserted has matured sufficiently to warrant judicial intervention." *Id.* (internal quotation marks omitted). "The two central factors in ripeness inquiries are [1] the fitness of the issue for judicial resolution and [2] the hardship to the parties of withholding judicial consideration." *Id.* (internal quotation marks omitted). Tenth Circuit "case law encourages particular lenience in First Amendment ripeness inquiries." *Id.* at 1134 (collecting cases). In pre-enforcement challenges, moreover, standing and

ripeness often "boil down to the same question." *303 Creative*, 6 F.4th at 1175-76 (quoting *SBA List*, 573 U.S. at 157 n.5).

Given that standing and ripeness tend to rise and fall together in these situations, Defendants' ripeness arguments largely fail for the same reasons as their standing arguments. As to the first factor, Defendants suggest that, before they could discipline Plaintiff for non-compliance with either the statutory or contractual non-discrimination provisions, a lengthy chain of events must run its course. In Defendants' view, a family must enroll in the program, select Plaintiff, enroll at Plaintiff's school, learn about Plaintiff's policies, request an exemption from those policies from Plaintiff, be refused by Plaintiff, and then file a complaint with the Department. Doc. 29 at pp. 8-9. Then the Department would have to investigate, find a violation, offer Plaintiff an opportunity to cure the violation, and then file a breach-of-contract claim in court. Only then, Defendants seem to argue, would the case be ripe. *Id.*

First, Defendants fail to explain why each of those events *must* occur (or why they would really be lengthy) before the Department could withhold funds or expel Plaintiff from the program. If Defendants stated unambiguously that this is the *only* way one could violate the anti-discrimination provisions, they may have a point. But they have not said that. In any event, the implementing statute gives the Department the authority to "establish by rule the quality standards that each preschool provider *must meet* to receive funding" through the program. C.R.S. § 26.5-4-205(1)(a) (emphasis added). The statute also provides that "the department shall ensure that" participating providers meet the quality standards and "may prohibit a preschool provider that fails to meet one or more of the quality standards from participating in the preschool program." *Id.* § 26.5-4-205(1)(b)(I). Nothing in the statute suggests that a lengthy investigation of a third-party complaint *must* happen before the

Department can "prohibit" a provider for violating the quality standards. Indeed, Defendants assert that the "Department has exclusive authority to enforce the Quality Assurance Provision," so it remains unclear why the Department *must* rely on third-party complaints to expel or otherwise punish Plaintiff for non-compliance. Doc. 42 at p. 10.

As to the program agreement, it states that "Either CDEC or Provider may terminate this Agreement with 20 Business Days' written notice to the other Party." Doc. 1-6 at p. 5. The agreement further provides that the "State" may terminate the agreement if "in its discretion" the agreement no longer serves "the public interest." *Id.* at p. 7. This, also, is *separate* from a "termination of the Agreement by the State for Breach of the Agreement by Provider." *Id.* The contract *further* provides that "Notwithstanding any provision of the Agreement to the contrary, the State, in its discretion, need not provide notice or a cure period and may *immediately terminate* the Agreement in whole or in part" to protect the "public interest of the state." *Id.* at p. 18 (emphasis added). So while there is some limited opportunity for Plaintiff to "cure" any alleged "breach" of the contract, the State or Department retain seemingly extensive, bordering on exclusive, authority and discretion to terminate the contract should they determine such an action is in the state's public interest. *See id.* And that termination could be effective *immediately*.

Second, it is unclear how the culmination of Defendants' alleged process for enforcement would render this case more fit for review. Indeed, this is largely the same argument raised and rejected in *303 Creative*. 6 F.4th at 1176. As the circuit court held:

> Certainly, the record would be better developed, and the legal issues would be clearer, if Appellants had denied services to a customer, that customer filed a complaint, and that complaint was adjudicated through the appropriate administrative and judicial

channels. Yet, as discussed above, Article III does not require a pre-enforcement plaintiff to risk arrest or actual prosecution before bringing claim in federal court. Any prudential considerations presented in this case do not prevent us from exercising our "virtually unflagging" obligation to hear cases within our jurisdiction.

*Id.* (quoting *SBA List*, 573 U.S. at 167).

So, too, here. While facts developed in the course of a third-party complaint may further reinforce Plaintiff's credible fear of enforcement, the legal dispute on the merits would remain relatively unchanged by these factual developments. And, as *303 Creative* and *SBA List* admonish, district courts have a "virtually unflagging" obligation to hear cases within our jurisdiction. While ripeness may derive from jurisdictional sources to a degree, as Defendants note, the arguments raised here seem far more prudential.

At bottom, this case appears to present purely legal questions that need little fact development—cases that are "an ideal fit for judicial review." *Peck*, 43 F.4th at 1133. Everyone agrees on what Plaintiff's policies allow and disallow. The statute is quite clear, as is the program agreement. And the Department has left open the door—or at least not closed the door—to enforcement of the anti-discrimination provisions against Plaintiff on the basis of its school policies.

Defendants also argue that this case is not ripe because they have only begun the rulemaking process as contemplated by the implementing statute. Doc. 42 at pp. 14-15. But the statutory anti-discrimination provision remains in effect, as does the contract entered into between the parties. This argument, therefore, is unavailing.

As to the second "hardship" factor, Defendants argue that Plaintiff would face no hardship should the Court withhold judgment here. But, for this factor, the Court focuses "on whether the challenged action creates a direct and immediate dilemma for the parties." *Peck* at 1134. Here, Plaintiff has shown such a dilemma. As explained above regarding standing, the specter of enforcement looms, and the State or Department could terminate the agreement with little notice, particularly if they think such termination furthers the "public interest of the State."

This puts Plaintiff in a pickle. It can continue implementing its policies, as it has, but with the specter of enforcement, perhaps even immediate termination of the agreement, looming each day. For the reasons discussed above, Defendants have not shown that any student or parent must file a complaint before the State or the Department takes enforcement action either contractually or otherwise. This, it seems, presents a "direct and immediate dilemma" for Plaintiff: continue implementing the school's policies, but only at the risk of immediate termination from the program. The ripeness analysis therefore aligns with the standing analysis, and this case is ready for adjudication.

## III.   Plaintiff Is Entitled to a Narrow Injunction

### A.  Likelihood of Success on the Merits

Plaintiff bears the burden of persuasion of showing it is entitled to an injunction, including on the likelihood-of-success factor. But Defendants have presented no merits arguments other than the standing and ripeness arguments disposed of above. While that may not completely absolve Plaintiff of its burden on this factor, the Court's role is not to make Defendants' arguments for them. *See United States v. Allen*, 603

F.3d 1202, 1209 (10th Cir. 2010) ("It is not the task of this court to make a party's argument for her."); *see also Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1199 (10th Cir. 2000) (finding that "district court was not obligated to comb the record in order to make [plaintiff's] arguments for him" and granting motion for summary judgment in favor of defendant). In the face of this effective concession, Plaintiff has done more than enough to show it is entitled to a narrow injunction pending trial.

In the context of a preliminary injunction, at least some courts have found in favor of the movant under this factor simply because the to-be-enjoined party raised no arguments on a particular issue. *See Novartis Pharms. Corp. v. Accord Healthcare Inc.*, No. CV 18-1043-LPS, 2019 WL 2588450, at *2 (D. Del. June 24, 2019) (entering preliminary injunction in patent case, noting that "[i]nfringement is not contested for purposes of the preliminary injunction motion, so I need not address it any further" and only addressing contested invalidity issues); *see also New York State Bar Ass'n v. Reno*, 999 F. Supp. 710, 716 (N.D.N.Y. 1998) ("At this time, however, it does not appear that the government contests the unconstitutionality of [the relevant statute]. Therefore, the Court *must find* that Plaintiff will likely succeed on the merits of its claims." (emphasis added)) (enjoining government in First Amendment case). Indeed, the Tenth Circuit has deemed arguments on the merits of an injunction motion forfeited or waived at the appellate level if not made with sufficient clarity or thoroughness. *See Fish v. Kobach*, 840 F.3d 710, 729-30 (10th Cir. 2016) (finding argument on merits of injunction motion "effectively waived" due to failure to raise it in district court briefing on injunction motion); *see also Verlo v. Martinez*, 820 F.3d 1113, 1131-332 (10th Cir. 2016) (upholding district court's entry of injunction that was based in part on defendant's failure to raise merits argument below).

Here, Defendants have made *no* argument on the substance of *any* of
Plaintiff's First Amendment claims. In their response to the prelimi-
nary-injunction motion, Defendants' arguments regarding this first in-
junction factor exclusively focused on standing and ripeness. Doc. 29 at
pp. 8-18 (section titled "Plaintiff cannot establish standing and ripeness
and thus cannot show a likelihood of success on the merits"). The same
is true in their reply. Doc. 42 at pp. 2-16. While Defendants *assert* that
they "absolutely do not concede the merits and are prepared to defend
the merits should this case move forward," *id.* at p. 16, they've provided
no *argument* on the merits for purposes of the preliminary injunction
motion. Thus, it seems, Defendants have effectively stipulated to Plain-
tiff's characterization of the law for purposes of the preliminary injunc-
tion motion for "merits" issues other than ripeness and mootness. *See
Verlo*, 820 F.3d at 1130-31, 1137 (finding that defendant "acquiesced in
the district court's acceptance" of plaintiff's characterization of a legal
issue and that "[u]nder that assumption, we can easily conclude the dis-
trict court did not abuse its discretion in finding Plaintiffs were likely to
succeed on their claim" for purposes of preliminary injunction).

In any event, Plaintiff has met its burden not only to show standing
and ripeness but also a likelihood of success on the substance of its First
Amendment claims as discussed below.

### i.    Religion Clause Claims

Plaintiff is likely to succeed on its claims arising from the First
Amendment religion clauses. *First,* the Department's non-discrimina-
tion policy likely violates Plaintiff's rights by interfering with the
school's selection of key employees in accordance with its religious con-
victions under the "ministerial exception." *See Our Lady of Guadalupe
Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). "Among other things,

the Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Id.* at 2060 (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC.*, 565 U.S. 171, 181 (2012)). One such area protected from government intrusion is the selection, employment, or dismissal of those "entrusted with the responsibility of 'transmitting the [Christian] faith to the next generation.'" *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 192). The Supreme Court has twice applied this ministerial exception in the context of teachers at religious schools. See *Our Lady*, 140 S. Ct. at 2064; *Hosanna-Tabor*, 565 U.S. at 192. In those cases, the Court held that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission" of a religious school. *Our Lady*, 140 S. Ct. at 2064. Those responsibilities, therefore, tend to render an employee a "minister" for purposes of this exception to anti-discrimination laws.

Plaintiff's teachers, like the teachers in *Our Lady* and *Hosanna-Tabor*, are likely to qualify as religious ministers. *See* Doc. 14 at pp. 14-15. Its teachers are "committed to mentoring and discipling students in the Christian faith" and "expected to integrate Biblical principles I the study of all subjects in all reason the curriculum and in all co-curricular activities." *Id.* (internal citations omitted). Defendants make no argument challenging this characterization. Plaintiff explicitly bases its hiring decisions on religious criteria and cannot put aside those criteria without abandoning its religious beliefs. Requiring the school to hire its teachers or other ministers without discriminating on the basis of religion, therefore, would likely violate Plaintiff's free exercise of religion, as protected by the ministerial exception.

*Second*, Plaintiff has the right to expressive association which the

State's hiring rules likely violate. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). The First Amendment protects the rights of a group to "associate with others in pursuit of . . . educational [and] religious . . . ends." *Id.* The freedom to associate with others also includes the freedom not to associate with others if doing so would compromise the associating group's expression of beliefs. *Id.*; *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 at 572–73 (1995).

Under *Dale* an expressive association cannot be made to associate with a person or group espousing contrary views. *Dale*, 530 U.S. at 655 (holding that the Boy Scouts, as an expressive association, could not be forced to accept a gay scoutmaster); *Hurley*, 515 U.S. at 572–3 (holding that St. Patrick's Day parade organizers could not be forced to accept a gay pride group). Plaintiff here argues that, as an "evangelistic school," it is an expressive organization. Doc. 14 at 11–12. Plaintiff further argues that the Department's non-discrimination hiring policies would require that the school hire those who disagree with its religious expression and evangelistic mission. This is likely a significant burden on the Plaintiff's religious expression and triggers strict scrutiny. *See Slattery v. Hochul*, 61 F.4th 278, 289 (2nd Cir. 2023) (holding that state law disallowing hiring discrimination based on employee's "reproductive health decision making" violated anti-abortion non-profit's free association right to hire only anti-abortion employees).

*Third*, the Department's rules also force Plaintiff to choose between adhering to religious beliefs and risking exclusion from the program or complying with the Department's rules. In the specific context of excluding religious schools from participation in educational benefits programs, the Supreme Court has thrice held that a state may not exclude religious observers from receiving otherwise available educational

funding because of a school's religious status or practice. *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) ("By condition[ing] the availability of benefits in that manner, Maine's tuition assistance program . . . effectively penalizes the free exercise of religion.") (internal quotation marks omitted); *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020) ("A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) ("To condition the availability of benefits upon a recipient's willingness to surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties.") (cleaned up).

Plaintiff seeks to hire only coreligionists, and to continue internal policies related to gender distinctions rooted in religious beliefs. These polices violate the Department's non-discrimination standards for participating preschools. Like in *Trinity Lutheran*, Plaintiff asserts its "right to participate in a government benefit program without have to disavow its religious character." *Id.* at 463. But the Department's policies infringe on that right, which forces Plaintiff into the unconstitutional choice of abandoning religiously motivated practices or foregoing otherwise available public funding. *Espinoza*, 140 S. Ct. at 2261. The First Amendment forbids imposing such a choice.

*Fourth,* the State's rules are likely not neutral and generally applicable. *Cf, Employment Div., Dept. of Hum. Resources v. Smith*, 494 U.S. 872, 878–82 ("laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable."). They allow both categorical and individualized exemptions that would undermine the government asserted interests, and thereby trigger strict scrutiny. *See Fulton v. City*

*of Philadelphia,* 141 S. Ct. 1868, 1877 (2021) ("A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.") (internal quotation marks omitted).

As explained above, the Department allows categorical exemptions from its admission policies for preschools operated by houses of worship that seek to reserve seats for members of the school's "congregation." Because such houses of worship can impose requirements on their congregations—including, presumably, the same sorts of rules that Darren Patterson imposes on its staff and students—"congregations" may be able to exempt themselves from the anti-discrimination rules in this way. There appears to be some disagreement about whether Plaintiff can qualify as a "congregation" under this exemption process as discussed at the hearing, but so far the Department has refused to provide Plaintiff any exemptions for its policies.

The statute itself empowers the Department to grant exemptions from the quality standards (including standards pertaining to non-discrimination) if doing so is "necessary to ensure the availability of a mixed delivery system within a community." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). Such a broad grant of discretion to provide exemptions, standing alone, may be sufficient to render the anti-discrimination laws no longer generally applicable. *See Fulton*, 141 S. Ct. at 1878 (holding that law granting "sole discretion" to city commissioner to exempt anti-discrimination laws was not generally applicable even where city never granted an exemption). Here, seemingly in contrast with *Fulton*, the Department *has* provided exemptions to others—or expressed a willingness to do so—while denying an exemption for Plaintiff. The fact that the state recognizes conditions could exist in which it would exempt a preschool from the quality standards, but does not consider Plaintiff's

religious convictions sufficiently compelling to do so here, triggers strict scrutiny. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) ("government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise").

In light of these unrefuted arguments, the Department's policies must survive strict scrutiny. The policies fail that exacting standard. "[H]istorically, strict scrutiny requires the State to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.'" *Id.* at 1298 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993). At this stage, the state has not really attempted to proffer a compelling interest of the highest order, nor has it shown that it narrowly tailored its policies to pursue any interest.

Defendants argue, in the context of a separate preliminary-injunction factor, that "Colorado has a compelling interest in eliminating discrimination in hiring as well as in educational access." Doc. 29 at p. 21. Even assuming that this is true, such an interest is not "of the highest order" such that the anti-discrimination rules can survive. In *Fulton*, the Supreme Court analyzed a city non-discrimination policy that excluded a Catholic organization from matching foster children with prospective foster parents. 141 S. Ct. at 1879–81. The Court held that the city could not rely on "broadly formulated" interests in equal treatment or maximizing the number of foster parents. *Id.* The Court asked "not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception" to the plaintiff. *Id.* As in this case, the City of Philadelphia had created a system of individualized exemptions but could provide no compelling reason why it denied the plaintiff's specific request for one.

*Id.* at 1882 ("The creation of a system of exceptions under the contract undermines the City's contention that its non-discrimination policies can brook no departures."). Here, the Department has not, and likely cannot, provide an interest sufficiently compelling to justify an infringement on Plaintiff's Free Exercise rights. The laws therefore likely would not survive strict scrutiny, and Plaintiff is likely to succeed on its religion-based First Amendment claims.

### ii.   Free Speech Claim

Plaintiff is also likely to succeed on the merits of its Free Speech claim, at least to the extent that the state would require Plaintiff and its staff to use a student's or employee's preferred pronouns as a condition of participating in the program.

"[T]he First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief. *303 Creative, LLC v. Elenis*, 600 U.S. 570, 586 (2023) (citations and quotation marks omitted). "Generally, too, the government may not compel a person to speak its own preferred messages." *Id.* (citations and quotation marks omitted). Indeed, the Court held in *303 Creative* that Colorado could not compel a wedding-website designer to create websites that did not discriminate on bases similar to those at issue in this case. *See id.* at 582-83, 587-96.

In an even more on-point case, the Sixth Circuit held that a public university's requirement that professors use a student's preferred pronouns in the classroom amounted to a Free Speech violation. *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021). That case involved a professor plaintiff at a public university who declined to use a student's preferred pronouns, instead seeking to refer to that student in name

only while referring to other students with pronouns corresponding to their biological sex. *See id.* at 500-503. That plaintiff faced even more obstacles than Plaintiff would here in proving a Free Speech claim given the various doctrines limiting the ability of public-school teachers to bring First Amendment claims. *See id.* at 504-511. Even still, the Sixth Circuit held that compelling such speech violated the professor's free-speech free exercise rights. *Id.* at 511-12.

The Ninth Circuit has also arrived at a similar conclusion in a related context. They held that an Oregon anti-discrimination law requiring a "natural-born-female-only" beauty pageant to allow transgender contestants violated the pageant's expressive free-speech rights. *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 783 (9th Cir. 2022). As the Ninth Circuit noted, this accorded with its "long-standing hesitation to enforce anti-discrimination statutes in the speech context." *Id.* at 792.

Given these authorities and Defendants' failure to rebut the substance of this claim at all, the Court finds at this time that Plaintiff is likely to succeed on the merits of its Free Speech claim at least as to part of its policies. The anti-discrimination provisions at issue here mirror those found in *303 Creative*, *Meriwether*, and *Green*. And, if applied to Plaintiff in the ways it credibly fears (*i.e.*, at least as to its policy regarding pronoun usage), those anti-discrimination provisions would likely be unconstitutional, as the similar provisions were found to be in the aforementioned cases.

### B. Irreparable Harm

"When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (internal quotation marks and citation omitted) (upholding finding of irreparable harm in pre-enforcement First

Amendment case). Indeed, the "loss of First Amendment freedoms, for even minimal periods of time, *unquestionably* constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis added). This principle applies in pre-enforcement cases as well. *See Awad*, 670 F.3d at 1131; *Verlo*, 820 F.3d at 1127 (upholding irreparable harm holding in pre-enforcement First Amendment case); *Citizens United v. Gessler*, 773 F.3d 200, 218-219 (10th Cir. 2014) (same).

In response, Defendants reiterate their arguments about standing. But Plaintiff has sufficiently alleged injury as discussed above. If Defendants enforce the anti-discrimination provisions against Plaintiff—which they have left open the door to do—that will likely violate Plaintiff's First Amendment rights. That is sufficiently irreparable.

Defendants' cited cases on this issue are all distinguishable or unhelpful to their position. In *Heideman v. S. Salt Lake City*, the Tenth Circuit noted that its "precedents dictate that we treat alleged First Amendment harms gingerly" and that the irreparable harm factor "tips slightly in favor of the Plaintiffs" in a First Amendment case. 348 F.3d 1182, 1190 (10th Cir. 2003). Defendants' other cases, many of which arose in the commercial litigation context and implicated no claims based on constitutional rights, are inapposite. *E.g.*, *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (denying injunction for Christian television station but for contract, not constitutional, claims against satellite company); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (upholding injunction, including finding of irreparable harm, in commercial dispute).

### C. Balance of Equities and the Public Interest

As to the balance of equities and the public interest, these factors "merge" when the government is the party opposing the injunction.

*Nken*, 556 U.S. at 435. But where a law is likely unconstitutional, the interests of the government "do not outweigh" the plaintiff's rights to have its constitutional rights protected. *See Awad*, 670 F.3d at 1131.

Defendants argue that they and the public have an interest in the "equitable" and "universal" provision of preschool services and that these interests outweigh Plaintiff's interests. But Defendants' suggestion that the voters *directly* approved an "equitable" and "universal" program is belied somewhat by the text of Proposition EE, which contains neither of those terms. The statute does, however. But even still, it remains unclear whether these broad interests of "equity" and "universality" are even served by potentially denying Plaintiff eligibility to participate in the program due to its religious beliefs. Indeed, exclusion of a preschool is inherently anti-universal, and denying participation based on one's protected beliefs or speech is not equitable.

Defendants also argue that they have an interest in "eliminating discrimination in hiring as well as in educational access." Doc. 29 at p. 21. Indeed, such an interest stands in tension with some of Plaintiff's policies. But the narrow injunction here will not prevent students from enrolling at the school solely based on the enumerated protected statuses, including gender identity, religion, or sexuality. And even if those interests would be served by denying an injunction here, they cannot outweigh the violation of the First Amendment. *See Awad*, 670 F.3d at 1131. Defendants' cases, cited for the proposition that the right of the public or the voters can trump Plaintiff's First Amendment rights, are either unhelpful or distinguishable. *E.g.*, *Fish*, 840 F.3d at 755-56 (upholding injunction in favor of party *claiming violation of constitutional right* to vote in part based on the public's interest in "broad exercise of the right to vote"); *Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020) (finding plaintiffs were not likely to succeed on the merits and that

enjoining defendant state official from conducting state's elections pursuant to a statute would irreparably harm the state). To the contrary, "when a law is likely unconstitutional, the interests of those the government represents, such as voters, do not outweigh a plaintiff's interests in having its constitutional rights protected." *Citizens United*, 773 F.3d at 218 (internal punctuation and quotation marks omitted).

### D. Security Is Not Necessary to Enter an Injunction Here

Under Rule 65(c), the Court may issue an injunction "only if" the moving party provides security sufficient to cover damages sustained by the enjoined party if that enjoined party were wrongly enjoined. The parties have not briefed this issue. In the Tenth Circuit, district courts have "wide discretion" in determining "*whether* to require security." *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (emphasis added). Where there is "an absence of proof showing a likelihood of harm" to the enjoined party, failing to require a bond is permissible. *See id.*

Defendants have not suggested that enjoining them would cause any monetary damages. Defendants might have argued that forcing them to allow Plaintiff's continued participation in the program would require them, against their will, to pay tuition reimbursement that they otherwise would not. But they have not. Given the current record, therefore, I find no evidence that a bond is appropriate, so it is waived. If Defendants believe a bond is necessary, however, they may file a motion promptly to address this issue.

### CONCLUSION

Plaintiff has provided sufficient evidence to survive Defendants' factual attack on standing and ripeness grounds. Defendants' Motion to

Dismiss, Doc. 28 is therefore **DENIED**.

Plaintiff has also met its burden for a narrow injunction as discussed above. Plaintiff's Motion for a Preliminary Injunction, Doc. 14, is **GRANTED** as follows:

Defendants, their officers, agents, servants, employees, and attorneys, and any others who are in active concert or participation with any of the above, are **ENJOINED** from expelling, punishing, withholding funds from, or otherwise disciplining Plaintiff under the Universal Preschool Program on the basis that Plaintiff's policies, as alleged in the verified complaint, violate the program's statutory or contractual anti-discrimination provisions.

DATED: October 20, 2023          BY THE COURT:

Daniel D. Domenico
United States District Judge