# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01557-DDD-STV

DARREN PATTERSON CHRISTIAN
ACADEMY,

<div align="center"><em>Plaintiff,</em></div>

   v.

LISA ROY, et al.,

<div align="center"><em>Defendants.</em></div>

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

# **TABLE OF CONTENTS**

Table of Authorities ....................................................................................... iii

Introduction ..................................................................................................... 1

Statement of Undisputed Material Facts ...................................................... 2

    A.  Darren Patterson Christian Academy ....................................... 2

    B.  Universal Preschool Program ...................................................... 3

    C.  The School's policies violate the nondiscrimination rules. ......................... 6

    D.  The Department enforces the nondiscrimination rules. .............................. 7

    E.  The Department refuses to grant religious exemptions. ............................ 9

    F.  The Department imposes even more barriers for faith-based participation................................................................................. 10

    G.  The Department exempts others. .............................................. 11

Argument ....................................................................................................... 13

    I.  The nondiscrimination rules violate the Free Exercise Clause. .................... 13

    A.  The rules are not generally applicable or neutral. .................... 13

        1.  The Department allows many exceptions. ............................ 13

        2.  The Department has not acted neutrally toward the School's religious beliefs........................................................ 17

    B.  The Department seeks to exclude the School from a public benefit because of its religious character and exercise.......................... 18

    II.  The nondiscrimination rules violate the Free Speech Clause by compelling and restricting speech................................................ 19

    III. The Blanket Provision violates the School's religious hiring rights and right to expressive association. ................................................... 20

A. The provision interferes with the School's autonomy to employ ministers and coreligionists. ...................................................... 20

B. The provision violates the School's right to expressive association. ......... 21

IV. The nondiscrimination rules violate the Equal Protection Clause by treating the School worse than similarly situated preschools. ...................... 22

V. The nondiscrimination rules fail strict scrutiny. ............................................. 23

A. The Department lacks a compelling interest. ........................................... 23

B. The rules are not narrowly tailored. ........................................................ 23

VI. The School is entitled to a permanent injunction. .......................................... 24

Conclusion ................................................................................................................. 25

Certificate of Compliance ......................................................................................... 26

Certificate of Service ................................................................................................. 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ................................................................................ 19

*Ashaheed v. Currington,*
  7 F.4th 1236 (10th Cir. 2021) ................................................................. 22

*Awad v. Ziriax,*
  670 F.3d 1111 (10th Cir. 2012) .............................................................. 25

*Boy Scouts of America v. Dale,*
  530 U.S. 640 (2000) .......................................................................... 19, 21

*Bryce v. Episcopal Church in the Diocese of Colorado,*
  289 F.3d 648 (10th Cir. 2002) ................................................................ 21

*Carson v. Makin,*
  596 U.S. 767 (2022) ................................................................................ 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) .......................................................................... 17, 18

*City of Lakewood v. Plain Dealer Publishing Co.,*
  486 U.S. 750 (1988) ................................................................................ 20

*Does 1-11 v. Board of Regents of University of Colorado,*
  100 F.4th 1251 (10th Cir. 2024) ............................................................ 23

*Fellowship of Christian Athletes v. San Jose Unified School District,*
  82 F.4th 664 (9th Cir. 2023) ................................................................... 16

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) ........................................................................ passim

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*,

    344 U.S. 94 (1952) ............................................................................................. 21

*Kennedy v. Bremerton School District*,

    597 U.S. 507 (2022) ......................................................................................... 23

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,

    584 U.S. 617 (2018) ......................................................................................... 18

*Our Lady of Guadalupe School v. Morrissey-Berru*,

    591 U.S. 732 (2020) ......................................................................................... 21

*Prairie Band Potawatomi Nation v. Wagnon*,

    476 F.3d 818 (10th Cir. 2007) ........................................................................ 24

*St. Mary Catholic Parish v. Roy*,

    No. 1:23-cv-02079-JLK (D. Colo. June 4, 2024) ........................................... 23

*Tandon v. Newsom*,

    593 U.S. 61 (2021) ........................................................................................... 14

*Watson v. Jones*,

    80 U.S. 679 (1871) ........................................................................................... 21

**Statutes**

C.R.S. § 26.5-4-203 ................................................................................................... 4

C.R.S. § 26.5-4-204 ................................................................................... 3, 4, 18, 24

C.R.S. § 26.5-4-205 ..................................................................................... 5, 16, 17

## INTRODUCTION

Plaintiff Darren Patterson Christian Academy (the "School") seeks to participate in Colorado's Universal Preschool Program without being excluded or penalized for its religious beliefs and practices. But the Colorado Department of Early Childhood denied the School an exemption from certain "nondiscrimination" rules that would force the School to give up (or violate) internal policies related to employment and student conduct. Thankfully, this Court stepped in, issued a preliminary injunction, and allowed the School and its families to participate in the Program's inaugural year without facing the threat of exclusion or punishment. MPI Order, ECF No. 53.

That decision was the right one. Among other things, discovery has shown that the Department exempts other Program providers from the challenged rules, giving them "the flexibility needed ... to meet their organizational requirements, or other unique situations," Statement of Undisputed Material Fact ("SUMF") ¶ 71, while steadfastly "refus[ing] to provide Plaintiff any exemptions for its policies," MPI Order 33. Such unequal treatment is unconstitutional. What's more, despite telling this Court that "[n]o facts support a credible threat of enforcement," Defs' Combined Br. 3, ECF No. 42, discovery revealed that when the School first sued, the Department had already received—and was *investigating*—two discrimination complaints alleging that preschool providers had policies much like the School's here. SUMF ¶¶ 50–54.

As detailed below, the undisputed facts prove the nondiscrimination rules violate the School's constitutional rights and that the School is entitled to summary judgment on all its claims. The Court should grant the motion and issue a permanent injunction.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  Darren Patterson Christian Academy

1.  The School is a pre-K–8th grade Christian school in Buena Vista, Colorado. Decl. of Joshua Drexler ("Drexler Decl.") ¶ 3 (Ex. 12); DPCA Dep. 24:18-24, 25:24-26:01 (Ex. 72).

2.  Its preschool, Busy Bees, is a licensed childcare center that enrolls 30 to 50 students each year, ranging from 2 ½ to 5 years old. Drexler Decl. ¶ 13; Lubbers Dep. 15:17-25 (Ex. 73).

3.  The School is distinctly Christ-centered and educates from a Christian worldview. Drexler Decl. ¶ 6; DPCA Dep. 37:20-38:15, 67:11-68:16.

4.  The School believes and teaches that God created two unique, immutable sexes—male and female; that the Bible teaches marriage is between one man and one woman; and that any sexual activity outside of biblical marriage contradicts God's will. Ex. 5 at 16; Drexler Decl. ¶ 19; DPCA Dep. 79:21-80:14.

5.  The School's religious beliefs guide all aspects of its curriculum, staff, and policies. Drexler Decl. ¶¶ 6, 17-26; DPCA Dep. 37:20-38:15, 67:11-68:16.

6.  The School's policies on pronoun usage, bathroom usage, dress code, and student lodging during field trips are based on its religious beliefs and therefore administered based on biological sex, not gender identity. Drexler Decl. ¶ 20; DPCA Dep. 103:13-22 (bathrooms), 110:15-111:13 (pronouns), 177:09-22 and 184:13-185:14 (dress code); Lubbers Dep. 76:22-77:04 (bathrooms), 94:12-25 (dress code); 100:05-12 (pronouns).

7.  The School's religious beliefs and mission require it to hire only those who share its faith, and it will not employ someone who disagrees with, or lives

2

contrary to, its beliefs. Ex. 5 at 3, 15-16; Drexler Decl. ¶¶ 25-26; DPCA Dep. 156:08-157:04.

8.      The School expects its teachers to disciple students, incorporate biblical teachings and principles in all classes, lead chapel services, pray for and with students, and attend devotionals. Ex. 5 at 7, 15-23; Drexler Decl. ¶¶ 21-24.

9.      Many families choose the School, including Busy Bees, because of its Christian faith and focus. DPCA Dep. 34:01-25, 45:12-25; Lubbers Dep. 22:16-23:16, 27:03-21; *see also* Joint Decl. of Jason & Sarah Tippetts ¶¶ 3, 5 (Ex. 74); Joint Decl. of Jordan & Carrie Euler ¶¶ 5-7 (Ex. 75).

10.     Because the School is evangelistic, or "missional," it welcomes students and families of all faiths and backgrounds to enroll, including non-Christians and those who identify as LGBT. Drexler Decl. ¶ 6; DPCA Dep. 70:15-71:08, 72:04-73:11, 96:18-25; Lubbers Dep. 58:15-24.

11.     The School, including Busy Bees, currently has students from non-Christian families. DPCA Dep. 75:09-76:08; Lubbers Dep. 21:02-06, 58:15-59:10.

12.     All parents must sign a parent-student agreement confirming that they "will support and uphold the school staff and the religious mission, intent, policies, rules, and requirements." Ex. 4 at 1; DPCA Dep. 73:12-74:11; Lubbers Dep. 69:04-71:07.

## B.      Universal Preschool Program

### 1. Overview

13.     Colorado's Universal Preschool Program provides children with access to "preschool services free of charge in the school year before a child enrolls in kindergarten." C.R.S. § 26.5-4-204(1)(a).

14.     The Colorado Department of Early Childhood administers the Program and enforces Program rules and requirements. *Id*. § 26.5-1-204(1) and (4); CDEC-Derocher Dep. 15:03-09 (Ex. 65).

15.     The legislature directed the Department to "establish a mixed delivery system" allowing "parents to select preschool providers ... from as broad a range as possible." C.R.S. § 26.5-4-204(2).

16.     Both public and private licensed childcare providers are eligible. *Id*. § 26.5-4-203(14).

17.     To participate, providers must sign a Program Service Agreement and agree to its terms. CDEC-Odean Dep. 8:17-21 (Ex. 66).

18.     Just under 2,000 preschools participated during the first year of the Program, and there were seats available for every child who sought to participate. *Id*. 83:04-09, 84:03-06.

19.     As of April 2024, the number of preschools participating for year two had increased to 2,300. *Id*. 83:04-09.

20.     There are multiple preschools in Chaffee County participating in the Program, including the Buena Vista School District's Early Childhood Program ("The Grove"). DPCA Dep. 46:03-13; Lubbers Dep. 23:22-24:06; *see also* Ex. 77 (list of UPK providers within 25 miles of Buena Vista).

21.     Student matching is based on parental choice: families select up to ten providers, ranking them one through ten. CDEC-Odean Dep. 50:19-51:12.

22.     Providers may decline a match if they do not have open seats or based on certain criteria (addressed below). *Id*. 51:24-53:06.

### 2. The Nondiscrimination Rules

***Equal Opportunity Provision***

23.     The Department must "establish by rule the quality standards that each preschool provider must meet to receive [Program] funding." C.R.S. § 26.5-4-205(1)(a).

24.     The rule must, "[a]t a minimum," require providers to "provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2)(b) ("Equal Opportunity Provision").

25.     If needed "to ensure the availability of a mixed delivery system," the Department "may allow" providers to participate in the Program "for a limited time while working toward compliance with the quality standards," though such providers must still "meet all quality standards relating to health and safety." *Id.* § 26.5-4-205(1)(b)(II).

26.     Whether a quality standard relates to health and safety "may vary" and is determined by the Department case-by-case. CDEC-Odean Dep. 40:04-41:06.

27.     The Department did not adopt quality standards, by rule, before the 2023-24 school year. CDEC-Derocher Dep. 15:13-16:16.

28.     So the Department incorporated the Equal Opportunity Provision directly into the 2023-24 Agreement. Ex. 6 at 2; Cooke Dep. 30:13-31:03 (Ex. 68).

29.     The Equal Opportunity Provision has since been adopted by rule for the 2024-25 school year. Ex. 20 § 4.109(B).

30.     The Equal Opportunity Provision applies to enrollment policies and decisions, the delivery of preschool services, and everything within Program hours. CDEC-Odean Dep. 20:05-19, 22:16-23:02, 97:15-98:17.

31.     The Department testified it would investigate a complaint alleging that a faith-based provider taught students that same-sex marriage was wrong, explaining that whether such instruction violates the Equal Opportunity Provision would "depend[] on the impact" it has "on the child and the children in that classroom" because "that's what the equal opportunity clause covers, is impact on children." CDEC-Derocher Dep. 26:25-29:19.

### Blanket Provision

32.     The 2023-24 Agreement includes a provision stating that a "[p]rovider shall not discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." Ex. 6 at 27 ("Blanket Provision").

33.     The Department maintains it had the legal authority to include the Blanket Provision in the 2023-24 Agreement. CDEC-Odean Dep. 35:09-13; CDEC-Derocher Dep. 54:07-55:18.

34.     While the 2024-25 Agreement does not currently include the Blanket Provision, nothing prohibits the Department from adding the provision back into future agreements. CDEC-Derocher Dep. 57:13-19, 58:17-21.

### C.     The School's policies violate the nondiscrimination rules.

35.     The Equal Opportunity and Blanket Provisions (the nondiscrimination rules) require providers to use pronouns based on an individual's gender identity. CDEC-Odean Dep. 25:15-20, 27:13-28:07; Roy Dep. 57:15-59:07 (Ex. 69).

6

36.     The nondiscrimination rules require providers to allow individuals to use sex-separated facilities, including bathrooms, consistent with their gender identity. CDEC-Odean Dep. 25:21-26:04; Roy Dep. 57:15-59:07.

37.     The nondiscrimination rules require providers to allow individuals to dress in a manner consistent with their gender identity. CDEC-Odean Dep. 26:05-10; Roy Dep. 57:15-59:07.

38.     The Blanket Provision also prohibits discrimination against employees and prospective employees based on religion, sexual orientation, and gender identity. Ex. 6 at 27 ("any person"); *accord* CDEC-Odean St. Mary Dep. 65:13-67:13, *St. Mary Catholic Parish v. Roy*, No. 1:23-cv-2079-JLK, ECF No. 61-4 (testifying that provision applies to employees) (Ex. 70).

39.     Although Defendant Odean claimed the Department would not enforce the Blanket Provision "against religious providers who hire co-religionists in accordance with federal law," Decl. of Dawn Odean ¶¶ 26-27 (Ex. 26), she testified that she does not know which "federal law" applies, CDEC-Odean Dep. 86:21-88:17.

**D.     The Department enforces the nondiscrimination rules.**

40.     The Department is legally obligated to enforce the nondiscrimination rules. CDEC-Odean Dep. 14:25-15:04; *see also* Standard Operating Procedure for UPK Program Service Agreement Investigations, Disputes, and Enforcement (Ex. 17).

41.     The Department investigates any complaint brought to its attention, whether submitted orally, in writing, or anonymously. CDEC-Derocher Dep. 35:07-20; Ex. 17 at 2-3.

42.     The Department also can initiate an investigation by itself. CDEC-Derocher Dep. 36:20-37:01.

43.     There is no deadline for completing an investigation. *Id*. 36:17-19.

44.     If there is a violation, the Department may terminate the Agreement, suspend performance, and/or withhold or deny payment. Ex. 6 at 17-19 (2023-24 Agreement); Ex. 62 at 17-20 (2024-25 Agreement).

45.     The Department can also terminate the Agreement "in its discretion" if it "ceases to further the public interest of the State." Ex. 6 at 6; Ex. 62 at 5.

46.     The Department "need not provide notice or a cure period and may immediately terminate the Agreement in whole or in part or institute any other remedy in the Agreement in order to protect the public interest of the State." Ex. 6 at 17; Ex. 62 at 17.

47.     The Department interprets "public interest" as relating to "health and safety." CDEC-Derocher Dep. 48:03-05, 49:19-50:15, 53:10-54:06.

48.     Whether an Agreement with a provider violates the public interest "depend[s]" because "a provider could engage in conduct that simultaneously violated the public interest section and violated the equal opportunity provision, but it's also plausible that one could be in violation of the equal opportunity provision and not be in violation of the public interest." CDEC-Derocher Dep. 49:01-16.

49.     At least three discrimination complaints have been filed against Program providers, including two alleging sexual orientation and/or gender identity discrimination. Defs' Suppl. Resp. to Pl's Interrog. No. 14 (Ex. 24).

50.     On April 10, 2023, the Department received an anonymous complaint alleging that a provider "informed [a] family that unless their child ... who identifies as transgender, went by the pronouns matching their gender assigned at birth, they would not allow them to attend UPK at [the school]." Ex. 22 at 2; CDEC-Odean Dep. AEO 4:25-5:11 (Ex. 67).

51.     The Department investigated the complaint because it alleged a violation of the Equal Opportunity Provision. CDEC-Odean Dep. AEO 5:18-6:01.

52.     The Department did not inform the provider of the complaint or investigation until eleven months later in March 2024. *Id*. 7:10-8:04.

53.     On June 12, 2023, the Department received another anonymous complaint alleging that a provider "assured" the complainant "that they wouldn't find any books teaching same sex marriage concepts, and that students with differing gender identities would not be welcome as they do not accommodate different bathroom usage needs." Ex. 21 at 2; CDEC-Odean Dep. 44:24-46:02.

54.     The Department investigated this complaint because it alleged violations of the Program's nondiscrimination rules. CDEC-Odean Dep. 46:03-08.

**E.     The Department refuses to grant religious exemptions.**

55.     The Department knew by early 2023 that faith-based preschools objected to the sexual-orientation and gender-identity components of the nondiscrimination rules. Cooke Dep. 35:08-36:01; Roy Dep. 51:13-52:03.

56.     The Department rejected exemption requests from multiple faith-based providers, including the School. Exs. 8, 10; Roy Dep. 51:13-53:17; *see also* Defs' Suppl. Resp. to Interrog. No. 8 (identifying five faith-based providers that requested exemptions).

57.     In denying the School's exemption request, Defendant Roy relied on the Department's interest in "ensur[ing] that children have safe and welcoming environments." Roy Dep. 55:20-56:07.

58.     But there was no evidence that the School's religious beliefs and policies prevented it from providing a "safe and welcoming" environment for children. *Cf.* Expert Rebuttal Report of Dr. Stephen Levine ¶¶ 12, 244, 247

(explaining that affirmation of "a minor's current transgender identity" and social transition is "not the sole appropriate response" and could, in fact, lead to harm) (Ex. 76).

59.     The only research Defendant Roy conducted before denying the request was to review the School's website and ask Defendant Odean how many seats the School had in the Program. Roy Dep. 56:15–57:01.

60.     Defendant Roy did not consider any alternatives to denying the School's exemption request. *Id.* 57:09-11.

61.     The School filed this lawsuit on June 20, 2023, after the Department denied its exemption request. ECF No. 1.

62.     The School requested (and received) a preliminary injunction enjoining Defendants "from expelling, punishing, withholding funds from, or otherwise disciplining" the School for its religiously based policies. MPI Order 40.

63.     The School is participating in the Program and plans to keep doing so, but it will not be permitted to participate if the Department can enforce the nondiscrimination rules against its religious policies and practices. Suppl. Decl. of Joshua Drexler ¶¶ 4-5 (Ex. 13); *see also* DPCA Dep. 58:04-59:01.

### F.     The Department imposes even more barriers for faith-based participation.

64.     Before the 2023-24 school year, the Department issued a "Fact Sheet" stating that "faith-based preschools can participate in UPK" under the "condition" that "state funds cannot be applied during hours of religious programming." Ex. 16 at 1; CDEC-Derocher Dep. 18:15-19:11.

65.     The Department knew as early as December 2022 that faith-based providers had concerns about this condition. Ex. 64 at 3.

66.   The Department's "Fact Sheet" was incorrect: no law required providers to refrain from applying Program funds during hours of religious programming. CDEC-Derocher Dep. 19:16-21:25.

67.   But the Department never published any written document or guidance telling faith-based providers that the condition did not apply, CDEC-Derocher Dep. 22:01-25, despite receiving multiple requests for clarity, Ex. 64 at 1, 4.

68.   Instead, a Department official told a Local Coordinating Organization as late as November 2023 that "UPK funds cannot be used for religious instruction and must be used for things outside of religious time." Ex. 64 at 7.

**G.   The Department exempts others.**

69.   The Department allows providers to decline student matches based on certain characteristics, called "exception criteria" or "programmatic preferences." Ex. 20 § 4.110; CDEC-Odean Dep. 53:18-54:08.

70.   The Department created this exception criteria for the 2023-24 school year and has since implemented it by rule for the 2024-25 school year. Ex. 20 § 4.110; CDEC-Odean Dep. 53:18-54:20.

71.   For the 2023-24 school year, the Department developed a process by which "providers may submit a request for a CDEC Approved Exception if the decline reasons in the UPK Registration and Seats Verification Form do not provide the flexibility needed for a provider to meet their organizational requirements, or other unique situations." Ex. 63.

72.   As examples of the "types of exceptions" it would approve through this process, the Department identified providers that "only serve[] a specific subgroup of the population," such as "teen moms" and "refugees," and situations in which a

11

family "has failed to previously comply with [the] provider's policies and procedures," including "behavioral policies." Ex. 63.

73.    More than 1,000 providers used at least one exception for the 2023-24 school year. CDEC-Odean Dep. 54:21-25.

74.    The Department allows faith-based providers to reserve some or all of their seats for "members of their congregation," as the provider defines that community. Ex. 20 §§ 4.103(L), 4.110(A)(1); Cooke Dep. 60:23-61:05.

75.    This would allow a Catholic provider to reserve seats for Catholics and a Lutheran provider to reserve seats for Lutherans. Trial Tr. 239:13-240:1, *St. Mary Catholic Parish v. Roy*, No. 1:23-cv-2079-JLK (Ex. 71).

76.    The Department allows providers to reserve some or all of its seats for children of employees. Ex. 20 § 4.110(A)(6); CDEC-Odean Dep. 60:22-61:25.

77.    The Department allows providers with Head Start programs to consider a family's income level in deciding whether to enroll a child. Ex. 20 § 4.110(A)(5); CDEC-Odean Dep. 57:21-58:21; *see also* Ex. 19 (Addendum to Adams County Head Start Agreement).

78.    The Department allows providers with multilingual programs to decline students who do not adequately speak a certain language. Ex. 20 § 4.110(A)(9); CDEC-Odean Dep. 62:04-63:03.

79.    The Department allows providers to prefer a child based "on the child and/or family being a part of a specific community; having specific competencies or interests; having a specific relationship to the provider, provider's employees, students, or their families; receiving specific public assistance benefits; or participating in a specific activity." Ex. 20 § 4.110(A)(10).

80.     Whether the Department allows a provider to use this specific preference is determined case-by-case. CDEC-Odean Dep. 71:03-72:03.

81.     Defendant Odean has testified that a provider could use this preference to prefer gender-nonconforming children, children of color from historically underserved areas, and children and/or families from the LGBTQ community. Ex. 71 at 244:15-246:08 (*St. Mary* Trial).

82.     The Department also will not require a provider to enroll a student if it cannot accommodate the student's disability. CDEC-Odean Dep. 65:02-66:19; Cooke Dep. 57:02-58:04.

83.     And the Department has admitted that the Equal Opportunity Provision does not prohibit providers from limiting enrollment to all boys or all girls, nor does it prohibit providers from limiting enrollment to children with married parents. CDEC-Odean Dep. 29:04-30:20.

## ARGUMENT

## I.     The nondiscrimination rules violate the Free Exercise Clause.

### A.     The rules are not generally applicable or neutral.

Strict scrutiny applies because the nondiscrimination rules burden the School's religious exercise and are neither "generally applicable" nor "neutral." MPI Order 31-32.

#### 1.  The Department allows many exceptions.

A law is not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or if it includes "a mechanism for individualized exemptions." *Fulton v. City of Phila.*, 593 U.S. 522, 533–34 (2021) (cleaned up).

Here, the Department asserts interests in "eliminating discrimination in hiring as well as in educational access," Defs' Resp. to MPI 17, ECF No. 29, and "ensur[ing] that children have safe and welcoming environments," SUMF ¶ 57. But the record reveals many exceptions undermining these interests.

Consider the "congregation" exception. That exception allows faith-based providers to reserve some or *all* of their seats for members of their "congregation," as the provider defines that community. SUMF ¶ 74. This allows a Catholic provider to reserve seats for Catholics and a Lutheran provider to reserve seats for Lutherans. *Id.* ¶ 75. It also allows a church-operated preschool to limit enrollment to congregants even if the church conditions membership on adherence to its beliefs about marriage and sexuality—i.e., "the same sorts of rules that [the School] imposes on its staff and students." MPI Order 33. So the exception permits otherwise prohibited religious-affiliation, sexual-orientation, and gender-identity discrimination, making the rules not generally applicable.

The same is true of the "employee" exception, which allows providers to restrict enrollment to children of employees, SUMF ¶ 76, because many faith-based schools require employees to share their beliefs—including those related to marriage, sexuality, and gender.[1]

While either exception is enough to trigger strict scrutiny, *see Tandon v. Newsom*, 593 U.S. 61, 62 (2021), there are many more.

For example, despite Program rules broadly prohibiting discrimination based on "income level," "socio-economic status," "disability," "ethnicity," and "citizenship status," the Department allows providers: (1) to make enrollment decisions based on

---

[1] Neither exception alleviates the School's burden here because it (1) welcomes students and families of all faiths and backgrounds, and (2) enrolls students who are not children of employees. SUMF ¶¶ 10–11.

14

family income if they have a Head Start program; (2) to prefer families who "receiv[e] specific public assistance benefits"; (3) to decline a student if they cannot accommodate the student's disability; (4) to decline students who do not speak a certain language if the provider has a multilingual program; and (5) to serve only "refugees." SUMF ¶¶ 72, 77–82.

The Department also has admitted that the Equal Opportunity Provision does not forbid providers from limiting enrollment to all boys or all girls. *Id.* ¶ 83. Nor does it prohibit providers from limiting enrollment to children with married parents. *Id.* So sex and marital-status discrimination are fine, but Program rules forbid the School—which welcomes *everybody*—from operating consistently with its beliefs about sexuality and gender.

What's more, the Department has considered and granted individualized exception requests to give providers the "flexibility needed" to "meet their organizational requirements, or other unique situations." SUMF ¶¶ 71–73. And it has formally adopted, by rule, an exception allowing providers to grant preferences based on the child or family "being a part of a specific community," "having specific competencies or interests," or "participating in a specific activity." *Id.* ¶ 79. This broadly worded exception necessarily "invites the government to decide which reasons for not complying with the policy are worthy of solicitude," so the rules are not generally applicable for this reason as well. *Fulton*, 593 U.S. at 537 (cleaned up). Indeed, Defendant Odean has testified that providers could use this exception to prefer gender-nonconforming children, children of color from historically underserved areas, and children or families from the LGBTQ community. SUMF ¶ 81.

On top of all that, the statute underlying the Equal Opportunity Provision "itself empowers the Department to grant exemptions from the quality standards (including standards pertaining to non-discrimination) if doing so is 'necessary to ensure the availability of a mixed delivery system.'" MPI Order 33 (quoting C.R.S. § 26.5-4-205(1)(b)(II)). This, too, destroys general applicability. *Fulton*, 593 U.S. at 537 (mere discretion enough "regardless whether any exceptions have been given").

The Ninth Circuit's recent en banc decision in *Fellowship of Christian Athletes v. San Jose Unified School District* is on point. 82 F.4th 664 (9th Cir. 2023) ("*FCA*"). There, a public school district stripped a Christian student group of official status because the group—which "welcome[d] all students" to join—required its leaders to affirm its "core religious beliefs." *Id*. at 672. The school district asserted interests in "prohibiting discrimination" and "ensuring equal access for all students." *Id*. at 689. But the court held that the nondiscrimination policies were not neutral or generally applicable. First because other clubs could "discriminate expressly—even on otherwise protected grounds." *Id*. The South Asian Heritage Club and Senior Women Club, for example, could restrict membership based on ethnicity and sex. *Id*. at 688–89. And second, because student groups could "discriminate based on other 'non-discriminatory' criteria," decided by the district "on a case-by-case basis." *Id*. at 688.

Same here. The Department, in its discretion, crafted the above exceptions for the 2023-24 school year and has enshrined them in rule for the 2024-25 year. The Department's "broad discretion to grant exemptions on less than clear considerations removes its non-discrimination policies from the realm of general applicability and thus subjects the[m] to strict scrutiny." *Id*.

### 2. The Department has not acted neutrally toward the School's religious beliefs.

Strict scrutiny also applies because the Department "proceed[ed] in a manner intolerant of religious beliefs" and "restrict[ed] practices because of their religious nature." *Fulton*, 593 U.S. at 533. Because the Free Exercise Clause "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs," the Court "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (cleaned up).

The Department exhibited a lack of neutrality in several ways.

First, the Department refused to accommodate the School's religious objections while allowing exceptions for many secular reasons. Such unequal treatment "devalues religious reasons ... by judging them to be of lesser import than nonreligious reasons" and "single[s] out" the School's religious practice "for discriminatory treatment." *Id.* 537–38; *see also id.* at 531 ("failure to satisfy" general applicability "likely an indication that" neutrality "has not been satisfied").

Second, the Department needlessly enforced the Equal Opportunity Provision against faith-based providers for the 2023-24 school year before any quality standards were established "by rule," as required by statute. C.R.S. § 26.5-4-205(1)(a); SUMF ¶¶ 26–27. The Department then conditioned participation on compliance with another, more onerous nondiscrimination rule (the Blanket Provision) that the Department now concedes was unnecessary. SUMF ¶¶ 32–34. This led to religious schools and families being put to the choice of giving up their beliefs and participating the Program, while other schools could continue "doing what they were doing under the standards they were currently operating under." Cooke Dep. 32:06-07.

17

Third, rather than alleviate burdens for faith-based providers, the Department fabricated even more. The Department falsely told faith-based providers in a "Fact Sheet" that they could participate in the Program only if "state funds" were not "applied during hours of religious programming." SUMF ¶ 64 (Ex. 16 at 1). This not only flouted the legislature's mandate to ensure a "mixed delivery system," C.R.S. § 26.5-4-204(2), but it imposed a "gratuitous restriction on religious conduct," *Lukumi*, 508 U.S. at 538 (cleaned up). Worse, the Department never corrected the error despite being told as early as December 2022 that the "condition" hindered faith-based participation. SUMF ¶¶ 65–67. Department officials instead continued to repeat it as late as November 2023, telling those who asked that "UPK funds cannot be used for religious instruction and must be used for things outside of religious time." *Id*. ¶ 68.

All of this, taken together, shows the Department did anything but give "full and fair consideration" to faith-based providers' "religious objection[s]." *Masterpiece Cakeshop, Ltd. v. Colo. C. R. Comm'n*, 584 U.S. 617, 640 (2018).

### B. The Department seeks to exclude the School from a public benefit because of its religious character and exercise.

The Department violates the Free Exercise Clause a second way by forcing the School "to choose between adhering to [its] religious beliefs and risking exclusion from the program or complying with the Department's rules." MPI Order 31. As this Court correctly explained, "the Supreme Court has thrice held that a state may not exclude religious observers from receiving otherwise available educational funding because of a school's religious status or practice." *Id*. at 31–32 (citing cases). That's because the Free Exercise Clause "protects against indirect

18

coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin,* 596 U.S. 767, 778 (2022) (cleaned up).

Yet the Program's rules impose such a penalty. The School "seeks to hire only coreligionists, and to continue [its] internal policies related to gender distinctions rooted in religious beliefs." MPI Order 32. Those policies violate the challenged rules, thus triggering all the enforcement mechanisms under the Program. *Id.* So the School can keep its religious policies and practices and risk complaints, investigations, and the threat of getting sued. Or it can eliminate that threat by abandoning its religious exercise or not participating altogether. "The First Amendment forbids imposing such a choice." MPI Order 32.[2]

## II. The nondiscrimination rules violate the Free Speech Clause by compelling and restricting speech.

The Supreme Court has held that anti-discrimination laws cannot censor or compel private speech. *E.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000). That same rule applies here: the Department cannot "require [the School] and its staff to use a student's or employee's preferred pronouns as a condition of participating in the [P]rogram." MPI Order 35. But that is what the Program's nondiscrimination rules would do. They forbid "gender identity" discrimination and thus require pronoun usage based on gender identity, not biological sex. SUMF ¶ 35.

The Department does not dispute this. It has instead been "coy" about whether the School's policies violate the Program's rules, MPI Order 19, saying only that the School "points to nothing but imagined enforcement," Defs' Combined Br. 5,

---

[2] Without a permanent injunction, the School will be excluded because it cannot agree to comply with the Program Service Agreement since it incorporates the nondiscrimination rules. *See* SUMF ¶ 63.

ECF No. 42. There is nothing imaginary about it. In fact, discovery revealed that when the School sued, the Department was investigating not one, but two, discrimination complaints alleging providers had policies much like the School's. SUMF ¶¶ 50–54. One complaint concerned pronoun usage for a transgender-identifying child; the other bathroom usage for "students with differing gender identities." *Id*. ¶¶ 50, 53. And the Department admitted that it investigated both because they alleged violations of the Equal Opportunity Provision. *Id*. ¶¶ 51, 54.

Beyond pronouns, the nondiscrimination rules also threaten to censor the School's religious instruction. The Department testified that it would investigate a faith-based school for teaching students that same-sex marriage is wrong if it received a complaint, explaining that such instruction could violate the Equal Opportunity Provision "depend[ing] on the impact" it has "on the child and the children in that classroom." *Id*. ¶ 31. In other words, the School's religious instruction violates the nondiscrimination rules if *the Department decides* it is harmful to a particular child. Such "unbridled discretion" is unconstitutional; the government may not "decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 763–64 (1988).

### III. The Blanket Provision violates the School's religious hiring rights and right to expressive association.

#### A. The provision interferes with the School's autonomy to employ ministers and coreligionists.

By prohibiting employment discrimination, the Blanket Provision further infringes the School's religious autonomy. This autonomy, which is rooted in both Religion Clauses, gives the School "independence" to decide "matters of [internal] government," *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.*

*Am.*, 344 U.S. 94, 116 (1952), and to require "conformity of [its] members ... to the standard of morals required of them," *Watson v. Jones*, 80 U.S. 679, 733 (1871). Two separate but similar protections apply here.

First, the Religion Clauses prevent any interference with employment decisions for "ministers." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020). The School's teachers and leadership fit comfortably within this "ministerial exception" because they are "entrusted with the responsibility of transmitting the [Christian] faith to the next generation." *Id*. at 754 (cleaned up); *see* MPI Order 30; SUMF ¶¶ 7–8.

Second, the Religion Clauses protect the School's freedom to prefer coreligionists as employees. This applies to all employees, not just ministers, but shields only religiously based employment decisions. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657–58 (10th Cir. 2002); Suppl. Drexler Decl. ¶ 18 (Ex. 13) (explaining that some school employees would not be considered "ministerial"). Here, the School's mission is to provide "a nurturing, distinctively Christian school environment that emphasizes knowing Christ, imitating His character, [and] integrating the Bible in all of life and learning." Ex. 5 at 4. Because the School has determined that every position is essential to this mission, Drexler Decl. ¶ 22-26 (Ex. 12), that decision is entitled to deference under the First Amendment, *see Dale*, 530 U.S. at 653 (deference given "to an association's view of what would impair its expression").

## B. The provision violates the School's right to expressive association.

The Blanket Provision similarly violates the School's right "to associate with others in pursuit of ... educational [and] religious ... ends." *Dale*, 530 U.S. at 647.

21

"The freedom to associate with others also includes the freedom not to associate with others if doing so would compromise the associating group's expression of beliefs." MPI Order 31. This Court already held that the School is an expressive association and that the Blanket Provision mandates employment of "those who disagree with [the School's] religious expression and evangelistic mission." *Id*. Because such a mandate places a "significant burden on [the School's] religious expression," the Blanket Provision "triggers strict scrutiny" for this reason too. *Id*.

## IV. The nondiscrimination rules violate the Equal Protection Clause by treating the School worse than similarly situated preschools.

The unequal treatment also violates the Equal Protection Clause. *See Ashaheed v. Currington,* 7 F.4th 1236, 1249 n.11 (10th Cir. 2021) (free exercise and equal protection claims often overlap). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Id*. at 1249 (cleaned up). So when the government discriminates based on "a suspect classification or a deprivation of a fundamental right such as free exercise of religion, strict scrutiny applies." *Id*. at 1250.

Here, the Department's many exceptions allow other providers to skirt the nondiscrimination rules, "but so far the Department has refused to provide Plaintiff any exemptions for its policies." MPI Order 33. Because the Department's impermissible line-drawing treats the School worse than similarly situated preschools and deprives the School of a fundamental right, strict scrutiny applies. *See Ashaheed*, 7 F.4th at 1251 ("similarly situated" entities must only be "alike in 'all relevant respects'—not all respects").

### V.   The nondiscrimination rules fail strict scrutiny.

Now the "burden shifts" to the Department to prove the challenged rules "serve a compelling interest and are narrowly tailored to that end." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 531–32 (2022). It cannot.[3]

### A.   The Department lacks a compelling interest.

The Department asserts interests in preventing discrimination and ensuring equal treatment in the Program. Neither justify burdening the School's constitutional rights. The Department cannot rely on "broadly formulated interests," but must instead show a compelling interest in "denying an exception" to the School. *Fulton*, 593 U.S. at 541.

And on that point, *Fulton* is dispositive. There, Philadelphia advanced a nearly identical interest in equal treatment of foster parents and children to justify excluding Catholic Social Services. *Id.* But the city's "system of exceptions" undermined any "contention that its non-discrimination policies can brook no departures." *Id.* at 542. So too here: the exceptions to the nondiscrimination rules prove the Department's interests are "not of the highest order." MPI Order 34.

### B.   The rules are not narrowly tailored.

The exceptions are also fatal to narrow tailoring. The Department cannot "explain why its interest[s] [are] served by granting exemptions" to some providers "but not others." *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1273 (10th Cir. 2024). Indeed, the Department never even *considered* whether less restrictive alternatives were available. Defendant Roy said she denied the School's

---

[3] Nor does the recent decision in *St. Mary Catholic Parish v. Roy*, No. 1:23-cv-02079-JLK (D. Colo. June 4, 2024), ECF No. 116, change the analysis. The court there said the "two cases differ materially," *id.* p.61 n.32, and that its "conclusion d[id] not contradict" this Court's preliminary-injunction ruling, *id.* p.83 n.44.

exemption request based on the Department's interest in "ensur[ing] that children have safe and welcoming environments," SUMF ¶ 57, but later admitted that all she did was review the school's website and never considered any alternatives to denying the request, *id.* ¶¶ 59-60.

And make no mistake: there are alternatives to trampling on religious freedom. For example, the Department could better tailor its matching and placement process to ensure that those families who desire an "affirming" environment for transgender-identifying children are placed *only* in preschools willing to take an "affirming" approach (*e.g.*, by using preferred pronouns and allowing restroom use based on gender identity). This would allow those families to have the desired environment for their children, while still allowing other families—like the Eulers and Tippetts—to choose an educational environment that reinforces their beliefs and values to their children. *See* SUMF ¶ 9. And, of course, it would allow religious preschools like Darren Patterson to participate in the Program without sacrificing their religious beliefs and practices. Such an alternative is far more respectful of religion, ensures that everyone who wants to participate in the Program gets to, and better facilitates the "mixed delivery system" that the legislature said it wanted. C.R.S. § 26.5-4-204(2).

## VI. The School is entitled to a permanent injunction.

The elements required for a permanent injunction are the same as for a preliminary injunction, except that it "requires showing actual success on the merits." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007). This Court held these factors were met at the preliminary injunction stage, MPI Order 36–39, and the School still satisfies them now.

First, the School has proven actual success, so "no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). That's because a First Amendment violation "*unquestionably* constitutes irreparable injury." MPI Order at 37.

Second, a permanent injunction will benefit the public interest. When a law is "unconstitutional, the interests of the government 'do not outweigh' the plaintiff's rights to have its constitutional rights protected." *Id.* at 38 (quoting *Awad*, 670 F.3d at 1131). The public interest also is not served by excluding faith-based providers because of their sincere religious beliefs and practices, thereby reducing the number of Program providers ultimately available to students and families. "Indeed, exclusion of a preschool is inherently anti-universal, and denying participation based on one's protected beliefs or speech is not equitable." *Id.* The Department has been enjoined for eight months now, and everyone has benefitted: the School has participated in the Program while remaining true to its religious convictions; children and families have benefitted by using Program funds at the school of their choice; and the Department lacks any evidence of harm to it or the public.

## CONCLUSION

For all these reasons, Plaintiff requests that the Court grant its motion for summary judgment and issue an order awarding the declaratory and injunctive relief requested in its Complaint.

Respectfully submitted this 21st day of June, 2024,

<div style="display:flex; justify-content:space-between;">

Philip A. Sechler, VA Bar #99761
Jacob E. Reed, VA Bar #97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Email: psechler@adflegal.org
      jreed@adflegal.org

</div>

s/ Jeremiah Galus
David A. Cortman, AZ Bar #029490
Ryan J. Tucker, AZ Bar #034382
Jeremiah Galus, AZ Bar #030469
Bryan Neihart, AZ Bar #035937
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Email: dcortman@adflegal.org
      rtucker@adflegal.org
      jgalus@adflegal.org
      bneihart@adflegal.org

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1), as modified by Court Order dated June 17, 2024 (ECF No. 76).

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  June 21, 2024

<div align="right">

s/ Jeremiah Galus
Jeremiah Galus
Attorney for Plaintiff

</div>