# EXHIBIT 66

**DAWN ODEAN - April 10, 2024**

```
            THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

Civil Action No:  1:23-cv-1557
_____

Plaintiff:

DARREN PATTERSON CHRISTIAN ACADEMY,

v.

Defendant:

LISA ROY, et al.
_____


        VIDEOTAPED DEPOSITION OF DAWN ODEAN

_____

        PURSUANT TO NOTICE, the above-titled

videotaped deposition was taken on behalf of the Plaintiffs,

on April 10, 2024, at 10:42 a.m., at the Colorado Department

of Early Childhood, 710 S. Ash Street, Building C, Denver,

Colorado 80246, before Sandra Schramm, Registered

Professional Reporter, Certified Realtime Reporter, and

Notary Public.
```

**Exhibit 66**
**Page 1**

**DAWN ODEAN - April 10, 2024**

```
 1   APPEARANCES:

 2   Attorneys for Plaintiff:

 3   JEREMIAH GALUS, ESQ.
     BRYAN NEIHART, ESQ.
 4      ALLIANCE DEFENDING FREEDOM
        15100 N. 90th Street
 5      Scottsdale, Arizona 85260
        Telephone:  480-444-0020
 6      E-mail:  Jgalus@ADFlegal.org

 7   Attorneys For Defendant:

 8   JAMES GREGORY WHITEHAIR, ESQ.
     MICHELE MULHAUSEN, ESQ.
 9   JANNA FISCHER, ESQ.
     VIRGINIA CARRENO, ESQ.
10      COLORADO ATTORNEY GENERAL'S OFFICE
        1300 Broadway, 6th Floor
11      Denver, CO 80203
        Telephone:  720-508-6000
12      E-mail:  Greg.whitehair@coag.gov

13
     Also Present: Walter Mathern, Videographer
14                 Bonnie Smith
                   Timothy Derocher
15

16

17

18

19

20

21

22

23

24

25
```

## DAWN ODEAN - April 10, 2024

```
 1                    EXAMINATION INDEX

 2                                              PAGE

 3  By Mr. Galus                                  4

 4                     EXHIBIT INDEX

 5                                            INITIAL
    FOR IDENTIFICATION                        REFERENCE
 6

 7  20 - Universal Preschool Program Rules       14
         and Regulations
 8
    21 - Colorado Department of Early Childhood:  44
 9       Universal Preschool Program Complaint
         Report, Intake date 6/12/23
10
    24 - Defendant's Supplemental Responses to    76
11       Plaintiff's First Set of Interrogatories
         to Defendants
12
    25 - E-mail chain from Michael Cooke dated 2/8/23  80
13
    26 - Declaration                             86
14

15  PREVIOUSLY MARKED EXHIBITS

16  14 - Plaintiff's Amended Notice of 30(b)(6)    6
         Deposition
17
    6 - UPK Provider Service Agreement for        8
18      the '23, '24 school year

19

20

21

22

23

24

25
```

**DAWN ODEAN - April 10, 2024**

```
 1              P R O C E E D I N G S

 2            *      *      *      *      *

 3            THE VIDEOGRAPHER:  We are back on the record.  The

 4    time now is 10:42.  It is April 10th, 2024.  We're proceeding

 5    with the videotaped deposition of Colorado Department of

 6    Early Childhood's 30(b)(6) representative, Dawn Odean.

 7            Please swear in the witness.

 8                        DAWN ODEAN,

 9    having been first duly sworn to state the whole truth,

10    testified as follows:

11                        EXAMINATION

12    BY MR. GALUS:

13      Q    Hi, Ms. Odean, my name is Jeremiah Galus, I'm the

14    attorney for plaintiff, Darren Patterson Christian Academy.

15            If you wouldn't mind just stating your name

16    and spelling it for the record.

17      A    Dawn Odean.  D-a-w-n, O-d-e-a-n.

18      Q    Ms. Odean, have you been deposed before?

19      A    I have.

20      Q    How many times?

21      A    One other time.

22      Q    And would that have been for the St. Mary's case?

23      A    Yes.

24      Q    Have you testified in court before?

25      A    I have.
```

Exhibit 66
Page 4

**DAWN ODEAN - April 10, 2024**

1      Q    And just one time?

2      A    I had testified in court in a previous role before

3  I worked for the Department of Education.

4      Q    Okay.  And what did that pertain to?

5      A    That was in administrative -- when I was a

6  principal of an elementary school and it was in

7  Administrative court regarding an employee's performance.

8      Q    All right.  You've also testified in court related

9  to the St. Mary litigation?

10     A    Yes.

11     Q    And that would have been this past January?

12     A    Yes.

13     Q    So you understand you're under the same oath today

14  as if you were testifying in a courtroom?

15     A    I do.

16     Q    Is there anything that would prevent you from

17  thinking clearly or testifying truthfully today?

18     A    No.

19     Q    All right.  So I know you've done this, but just a

20  few kind of reminders, ground rules.

21          The court reporter is trying to transcribe

22  everything, so let's do our best to not interrupt one

23  another, talk over each other; do you understand that?

24     A    Yes.

25     Q    And then the second thing, the reporter is not able

**DAWN ODEAN - April 10, 2024**

1 to indicate of indicate the head nods or hand gestures or

2 uh-huh, huh-uh, so I'd ask that you provide clear, verbal

3 answers to the questions; do you understand that?

4      A    Yes.

5      Q    Of course we'll take a break any time you'd like

6 to, the only thing I would just ask is if we're in the middle

7 of a question or line of questions, that we finish those

8 before taking a break; is that fair?

9      A    Yes.

10     Q    Ms. Odean, what did you do to prepare for today's

11 deposition?

12     A    I worked with our attorneys on reviewing exhibit

13 documents, submitted documents, my declaration, and reviewing

14 those again and again to ensure that I had clarity on the

15 work that's been done and that I was able to answer

16 accurately.

17     Q    Did you talk to anyone besides legal counsel?

18     A    I did not.

19     Q    And I just want to be clear, at any point if I ask

20 you a question that seems to be suggesting you disclose

21 conversations with counsel, that is not my intent.  So I just

22 want to make that clear.

23          If we could start with what's already been

24 marked as Exhibit 14.  Exhibit 14 is Plaintiff's Amended

25 Notice of 30(b)(6) Deposition.

**Exhibit 66**
**Page 6**

**DAWN ODEAN - April 10, 2024**

1              Have you seen this document before?

2       A    Yes.

3       Q    Okay.  And you've been -- my understanding is

4  you've been designated to cover topics 7 through 10, 15

5  through 22, I believe, or is it 21 and 23; is that accurate?

6       A    As I recall, yes.

7       Q    And you're knowledgeable about those topics?

8       A    Yes.

9       Q    And prepared to testify about them today?

10      A    Yes.

11      Q    All right.  Ms. Odean, could you describe your

12  current position at the Department?

13      A    I'm the director of the Universal Preschool.

14      Q    And how long have you been in that position?

15      A    About a year and a half.

16      Q    And you're the inaugural director --

17      A    I am.

18      Q    -- of the Universal Preschool Program?

19      A    Yes.

20      Q    Could you describe your job duties and

21  responsibilities as the director?

22      A    My role is to implement Universal Preschool as set

23  forth for us in statute.  Universal Preschool is the program

24  that is defined as a minimum of ten hours of preschool

25  services for all children in the year before their

Exhibit 66
Page 7

**DAWN ODEAN - April 10, 2024**

1  eligibility for kindergarten.  And to define the program as

2  set forth for us in law and to work with families, providers,

3  stakeholders on the implementation of the program.

4       Q    And is Dr. Lisa Roy your direct report?  Do you

5  report to her?

6       A    Yes, she is my direct supervisor.

7       Q    And is Ms. Roy the ultimate decision-maker for the

8  department?

9       A    She is.

10      Q    And that would include decisions for the Universal

11  Preschool Program as well?

12      A    Yes.

13      Q    I'm handing you what's already been marked as

14  Exhibit 6, and this is the UPK program service agreement for

15  the '23, '24 school year; is that accurate?

16      A    Yes.

17      Q    Okay.  And to participate in the Universal

18  Preschool Program for the '23, '24 school year, a provider

19  would have had to sign this agreement and agree to its terms

20  and conditions?

21      A    Yes.

22      Q    And you're familiar with this document?

23      A    I am, yes.

24      Q    All right.  If we could turn to page 2 of the

25  exhibit, you see there's a section entitled Quality

Exhibit 66
Page 8

**DAWN ODEAN - April 10, 2024**

```
 1  Assurance?

 2      A    Yes.

 3      Q    And this section of the agreement requires

 4  participating providers to agree to certain quality

 5  standards?

 6      A    It does.

 7      Q    All right.  Now, the agreement says that those

 8  quality standards will be developed with UPK Colorado

 9  providers and adopted into CDEC's rules prior to the '23-'24

10  launch of UPK Colorado.  Do you see that language?

11      A    I do.

12      Q    The Department didn't adopt any rules or

13  regulations before the '23-'24 school year, did it?

14      A    It didn't.

15      Q    When did the Department realize it wasn't going to

16  be able to adopt those rules and regulations?

17      A    I don't recall a specific date that was determined,

18  but fairly quickly as we began to have conversations with

19  providers around the statutory expectations of what the

20  quality standard rule would be.

21           There wasn't a specific date set forth for

22  that in statute, so there wasn't a specific timeline tied to

23  quality standards.  And certainly recognized through those

24  conversations with providers that we wanted to have a very

25  inclusive process in the development of those where we had
```

**DAWN ODEAN - April 10, 2024**

1  authentic stakeholder feedback and input so that we could

2  ensure that we could be consistent and continue to work

3  together in that inclusive culture of the quality standards.

4              So we knew we had things set forth for us in

5  statute that were already in place, but that for the rule we

6  needed to slow down.  We had been starting, as you know, the

7  development of the program on a fairly compressed timeline

8  and this was a place that because there wasn't a specific

9  date tied to it, was an opportunity for us to go through that

10  authentic process to determine the standard draft, have

11  conversations, review what's happened in Colorado so far

12  around quality review, other national frameworks, and really

13  dig in together to develop the initial rule set.

14      Q    So you said you realized pretty early on you

15  weren't going to be able to do it, and I understand you can't

16  give a specific date, but can you give a general time frame

17  when you realized this?

18      A    I could look back.  I would say prior to the start

19  of the program here.  So it was probably in the spring ahead

20  of the fall start of the program year.

21      Q    Spring of 2023?

22      A    Uh-huh.

23      Q    All right.  So as you know, there's a requirement

24  there, it's the fourth kind of sub-bullet point down.  It

25  says the requirement that each preschool provider provide

## DAWN ODEAN - April 10, 2024

1  eligible children an equal opportunity to enroll and receive

2  preschool services regardless of race, ethnicity, religious

3  affiliation, sexual orientation, gender identity, lack of

4  housing, income level, or disability as such characteristics

5  and circumstances apply to the child or the child's family.

6           Are you aware that throughout this litigation

7  the parties have sometimes referred to this provision as the

8  quality assurance provision?

9      A    I haven't heard it called that, but yeah.

10     Q    If I slip into that and call it the quality

11  assurance provision, that's what I'm referring to.  If you

12  have questions as to what I'm referring to, please ask.

13     A    I will.

14     Q    So even though the Department didn't adopt quality

15  standard rules for the '23-'24 school year, the start -- the

16  Department still expected compliance with this quality

17  assurance provision, correct?

18     A    Yes, as it ties to statute.  So a rule isn't

19  intended to change the law, which is why that's cited here,

20  so any language that's pulled directly from statute, any rule

21  wouldn't change that either way.  It might reiterate what's

22  in statute, but if I recall correctly, that is language that

23  was written from the law.

24     Q    I'm going to hand you what's been marked as

25  Exhibit 15.  Take a second to look at that.

**DAWN ODEAN - April 10, 2024**

1          So this is an -- Exhibit 15 is a printout of

2    Colorado Statute 26.5-4-205; do you recognize this statute?

3        A    Yes.

4        Q    Okay.  And if you could turn to the second page,

5    and at the top of the second page, it's subsection 2, this

6    starts, At a minimum.  Do you see that?

7        A    I do.

8        Q    Says, at a minimum, the quality standards

9    established in rule must include.  And then if you go down to

10   subsection B, it says, a requirement that each preschool

11   provider provide eligible children an equal opportunity.  Is

12   that what you were referring to previously?

13       A    Yes.

14       Q    Okay.  What was the Department's understanding of

15   the statute language, say quality standards established in

16   rule?

17            MR. WHITEHAIR:  Object to the extent it calls for a

18   legal conclusion.  You can answer.

19            THE DEPONENT:  The Department's understanding was

20   that we create a quality standards rule through our rule

21   process that was inclusive of at least these things that are

22   listed.

23       Q    (By Mr. Galus) Was it the Department's view that it

24   could establish quality standards in the absence of rule

25   making?

**DAWN ODEAN - April 10, 2024**

1          MR. WHITEHAIR:  Object to the extent it calls for a

2   legal conclusion.  You can answer.

3          THE DEPONENT:  As I recall, there wasn't a

4   Department understanding of creating expectations around any

5   quality standards outside of what was set forth in statute

6   until the rule was established.

7   Q     (By Mr. Galus) Okay.  If we could go back to the

8   program services agreement, Exhibit 6.

9          If a participating preschool or an applicant

10  preschool did not agree to comply with the quality assurance

11  provision, would it have been allowed to participate in the

12  Universal Preschool Program?

13  A     They would have had to sign the agreement.

14  Q     And agree to comply with that provision?

15  A     Uh-huh.

16  Q     Is that a yes?

17  A     Yes.

18  Q     All right.  The Department has since included this

19  particular provision in the annual adopted rules and

20  regulations; is that right?

21  A     Yes.

22  Q     And that was finalized on March 28th, 2024?

23  A     Yes.

24  Q     And those new rules and regulations will go into

25  effect July 1, 2024?

**DAWN ODEAN - April 10, 2024**

1    A    I believe that's the date the rule officially goes

2  in -- if you review the rule, there's a phased approach to

3  implementation for different parts of the quality standards,

4  but the rule is in effect I believe on July 1.

5         MR. GALUS:  If you could mark that as 20, please.

6         (Whereupon, Exhibit No. 20 was marked for

7  identification.)

8    Q    (By Mr. Galus) Do you recognize Exhibit 20?

9    A    Yes.

10   Q    Are these the new rules and regulations that we

11 were just discussing?

12   A    Yes.

13   Q    If I could direct your attention to Rule 4.109-B

14 that would be on page 5 of the exhibit.  Are you there?

15   A    Yes.

16   Q    Okay.  Do you see Subsection B?  It says, Eligible

17 preschool providers must ensure that children receive an

18 equal opportunity to enroll and receive Universal Preschool

19 services.  Do you see that provision?

20   A    Yes.

21   Q    And that's the same as the quality assurance

22 provision that we just discussed and was included in the

23 '23-'24 agreement?

24   A    Yes.

25   Q    Is the Department legally obligated to enforce this

Exhibit 66
Page 14

**DAWN ODEAN - April 10, 2024**

1   provision?

2         MR. WHITEHAIR:  Object to the extent it calls for a

3   legal conclusion.  You can answer.

4         THE DEPONENT:  Yes.

5   Q    (By Mr. Galus) Okay.  This provision lists certain

6   protected characteristics, do you see that?  Race, ethnicity,

7   religious affiliation, sexual orientation.  Do you see the

8   list of protected characteristics?

9   A    Yes.

10  Q    Does the Department view some those characteristics

11  as being more important than others?

12  A    No.

13  Q    So discrimination based on religion is just as bad

14  as discrimination based on race?

15        MR. WHITEHAIR:  Object to the form of the question.

16        THE DEPONENT:  I don't know what you define as bad,

17  but we would review any complaints in regards to any of those

18  in the same -- with the same procedure.

19  Q    (By Mr. Galus) How would you define the word

20  "bad"?

21  A    It would depend on how it's being used.  So I would

22  say we would address this particular -- with any concerns

23  that were elevated regarding any of those on the list, in the

24  same manner.

25  Q    One wouldn't be treated more favorably or less

Exhibit 66
Page 15

**DAWN ODEAN - April 10, 2024**

1  favorably than the other listed protected characteristics?

2    A    That's the intention of the standard operating

3  procedure, yes.

4    Q    So discrimination based on disability is just as

5  bad as discrimination based on sexual orientation?

6          MR. WHITEHAIR:  Object to form.

7          THE DEPONENT:  Again, those on the list would be

8  treated with the same process.

9    Q    (By Mr. Galus) Okay.  The Department has the same

10 interests in prohibiting discrimination based on disability

11 as it does in -- prohibiting discrimination based on sexual

12 orientation?

13   A    The Department has concern over the treatment of

14 the children in the program.

15   Q    Is the interest the same?

16   A    It is the same.

17   Q    Do you think this provision is clear about what is

18 expected of participating providers?

19          MR. WHITEHAIR:  Object to form.

20          THE DEPONENT:  I can't speak for all providers.

21 It's clear.  We also intend to, with providers, create an

22 administrative guide to implementation of the standard.

23   Q    (By Mr. Galus) Do you agree that a provider needs

24 to know what they can and cannot do in order to comply with

25 this agreement?

**DAWN ODEAN - April 10, 2024**

1    A    I believe it's fairly clear, but yes.

2    Q    Are you responsible, in your position as director,

3  for interpreting what this requirement means?

4    A    Not in isolation.  So it's not only the director,

5  it's with the work of our Department team, of our senior

6  leadership team, and if counsel is needed, counsel.

7    Q    But you're part of that conversation?

8    A    Absolutely, yes.

9    Q    And Ms. Roy as well?

10    A    Yes.

11    Q    And Ms. Roy, would she have the final say?

12    A    Dr. Roy would, yes.

13    Q    Dr. Roy.  And that includes interpreting what equal

14  opportunity means?

15    A    Yes.

16    Q    And that would include interpreting what race,

17  ethnicity, and the other characteristics mean?

18    A    That would be with legal counsel and in alignment

19  with the expectation of the law.

20    Q    Does the Department have any written guidance on

21  how to interpret this provision?

22    A    No.

23    Q    Any informal guidance?

24    A    The guidance would be to follow the procedure.

25  This is what's in statute for us to follow, and so if we had

**DAWN ODEAN - April 10, 2024**

1   any question about how to interpret that, we would seek

2   counsel to ensure that we were within the law.

3      Q   I have some questions related to the reference to

4   gender identity in the provision.

5           How does the Department go about deciding if a

6   child is not receiving an equal opportunity to enroll or

7   receive services based on gender identity?

8      A   We would address any concerns or allegations around

9   actual treatment of a child or of a family.  There's no

10   presumption of what that might be until there's an actual

11   mistreatment.

12      Q   Are there any particular things the Department

13   would look for?

14      A   We would follow the standard operating procedure

15   that Mr. Derocher shared with you to investigate any concerns

16   or allegations and determine what steps would be taken.

17      Q   Okay.  And again, there's not any written guidance

18   on -- that the Department would consult beyond the standard

19   operating procedure?

20      A   There is no written guidance outside of that.

21      Q   Are you familiar with the Colorado

22   Antidiscrimination Act?

23      A   A little bit.

24      Q   Would that inform some of the Department's

25   decisions about gender identity discrimination?

**DAWN ODEAN - April 10, 2024**

1          MR. WHITEHAIR:  Question -- object to the form.

2  Object to the extent it calls for legal conclusion and not

3  clear what topic you're describing.

4          MR. GALUS:  The enforcement and interpretation of

5  the non-discrimination provisions.

6          MR. WHITEHAIR:  Rules?

7          MR. GALUS:  Yeah.

8          MR. WHITEHAIR:  Rules?

9          MR. GALUS:  Rules.

10          MR. WHITEHAIR:  You're talking about statute?

11          MR. GALUS:  I'm asking whether the statute would

12  inform how they interpret and apply the non-discrimination

13  rules.

14          MR. WHITEHAIR:  I don't think she's designated or

15  prepared to answer that other than her personal capacity.

16          MR. GALUS:  Okay.

17          MR. WHITEHAIR:  Subject to my other objections, you

18  may answer.

19          THE DEPONENT:  I'm -- as I'm not a lawyer and I'm

20  not -- I don't intimately understand that statute to the

21  letter of the law, I would seek counsel to use that or not

22  use that if it's appropriate or not appropriate to use in our

23  process.

24    Q    (By Mr. Galus) So you'd consult with your

25  attorneys?

**Exhibit 66**
**Page 19**

**DAWN ODEAN - April 10, 2024**

1    A    I would.

2    Q    Okay.  And the Department's attorneys are the

3  attorneys in the Attorney General's Office?

4    A    Yes.

5    Q    If we can go back to Rule 4.109 Subsection B.  That

6  rule says that eligible preschool providers must ensure the

7  children receive an equal opportunity to enroll regardless of

8  those listed characteristics.

9         Does that cover the provider's admissions and

10  enrollment policies?

11    A    It might.  So again, we wouldn't -- we're not

12  reviewing the policies of all of our participating providers

13  unless there's an allegation or a complaint filed with the

14  Department to review.

15    Q    If you learned of an admissions or enrollment

16  policy that appear to violate that provision or rule, would

17  the Department look into that?

18    A    If a complaint was filed, we would follow the

19  standard operating procedure to review.

20    Q    What if you learned of it outside of a complaint?

21    A    I can't speculate how I would learn of it outside

22  of a complaint.  So we're not reviewing every participating

23  provider's policies.

24    Q    So let's say if a news report reported on a

25  participating UPK provider that appeared to have admissions

**DAWN ODEAN - April 10, 2024**

1  in enrollment policies that violated this provision, would

2  the Department investigate that?

3      A    Since it's hypothetical, I can't say for sure how

4  we would react.  It would depend on the actual situation and

5  the facts.

6              We certainly could review policies and

7  procedures, and there are some expectations of policies and

8  procedures in the new quality standards, but really what our

9  focus would be primarily on is treatment in a situation.

10             So the actions were taken would be our

11  priority to ensure that these were being met.  And in that

12  case we would follow the outlined standard operating

13  procedure.

14     Q    Okay.  So could a preschool have a policy of not

15  admitting children of a certain race and still participate in

16  the program?

17     A    If that was elevated to us, we would follow those

18  procedures to determine what exactly is said and what

19  situation and how that pertains to the Universal Preschool

20  Program and follow that process to determine whether they

21  were able to participate or not.

22     Q    If a provider came up to you and asked the same

23  question, can our school have a policy of not admitting

24  children of a certain race, what would your answer be?

25             MR. WHITEHAIR:  Object to the form.  You can

**DAWN ODEAN - April 10, 2024**

```
 1  answer.
 2          THE DEPONENT:  If a provider said this is our
 3  policy, can we participate?  We would -- as the director, I
 4  would follow the same standard operating procedures to ensure
 5  that as a director I'm not not including a provider that
 6  wasn't -- so I would bring that to our senior leadership team
 7  and to counsel if necessary to determine what the next steps
 8  might be for that provider to participate or not.
 9      Q    (By Mr. Galus) So it's possible a school with that
10  policy could participate in UPK?
11      A    Well, a lot of things are possible.  That could be
12  possible.
13      Q    All right.  Rule 4.109-B also says that eligible
14  providers must ensure that children receive Universal
15  Preschool services regardless of the listed characteristics.
16          Preschool services covers more than admissions
17  and enrollment, correct?
18      A    Yes.
19      Q    What all does it cover?
20      A    It covers the time frame that is Universal
21  Preschool and the delivery of preschool services.  That's
22  inclusive of the expectations that are in licensing for
23  safety and that is inclusive of the newly implemented quality
24  standards and the phased approach we have outlined there.
25      Q    That would include everything that occurs within
```

**DAWN ODEAN - April 10, 2024**

1  the UPK preschool hours?

2      A    Yes.

3      Q    Do you understand that in this case the plaintiff

4  has raised concerns about its pronoun usage, bathroom usage,

5  and dress code policies potentially violating the

6  non-discrimination rules?

7      A    Yes.

8      Q    And you received an e-mail from Darren Patterson

9  Christian Academy in May 2023 asking about those provisions;

10  do you recall that?

11      A    Do you have that as an exhibit I can refer to?

12      Q    I do, I'm just asking generally, do you recall it?

13      A    I can't recall if it was directly to me or if it

14  was to someone in the Department.

15      Q    Were you included on it?

16      A    I believe I was.

17      Q    Okay.  And do you remember that being in May of

18  2023?

19      A    I don't remember, that's why I asked to see it.

20      Q    All right.  I'm just trying to save us time here.

21      A    Sure.

22      Q    You mentioned that you were deposed in the St. Mary

23  Catholic Parish case?

24      A    Yes.

25      Q    And that happened in November 2023; does that sound

**DAWN ODEAN - April 10, 2024**

```
 1  right?
 2       A    That sounds right.
 3       Q    And you testified at the trial in that case?
 4       A    Yes.
 5       Q    And that would have been in January 2024?
 6       A    Yes.
 7       Q    Have you thought about those cases, this one and
 8  the St. Mary case since then?
 9       A    Yes.
10       Q    Okay.  After having thought about those cases, does
11  it violate the non-discrimination provision for a school to
12  only refer to children by pronouns that correspond to the
13  child's biological sex?
14            MR. WHITEHAIR:  Object to the extent it calls for a
15  legal conclusion.  You can answer.
16            THE DEPONENT:  Could you state that again?
17       Q    (By Mr. Galus) Sure.  Does it violate the
18  non-discrimination provision for a school to only refer to
19  children by pronouns that correspond to the child's
20  biological sex?
21            MR. WHITEHAIR:  Same objection.
22            THE DEPONENT:  It depends on the treatment of the
23  child.  And so as the director of the program, and for the
24  program, it's our charge to ensure that children are treated
25  equitably in the program, that they're in a safe environment
```

**DAWN ODEAN - April 10, 2024**

1  so that they can learn and thrive.

2        And so the -- just the statement of that, I

3  wouldn't presume that those things have occurred, but would

4  have to follow the procedures to ensure that children do have

5  that access to preschool services in a safe way so that they

6  can learn and thrive.  And that's the priority of the

7  program.

8     Q     (By Mr. Galus) So is that a yes or a maybe?  What's

9  the answer?

10    A     It depends.  It depends, I think.  We -- it's hard

11 to speculate the impact that that might have on a child's

12 feelings of safety or how that treatment plays out in a

13 specific scenario.  So we would have to be able to address a

14 specific treatment of a child to say yes or no.

15    Q     If the Department learned that a participating

16 provider had a policy of only referring to children by

17 pronouns that correspond to the child's biological sex, would

18 the Department investigate that?

19    A     If a complaint was filed, we would investigate

20 that.

21    Q     Same question, if the school has a policy of

22 maintaining sex-separated bathrooms and requires students to

23 use the bathroom that aligns with their biological sex, would

24 the Department investigate that?

25        MR. WHITEHAIR:  Object to the extent it calls for a

**DAWN ODEAN - April 10, 2024**

1  legal conclusion.  You can answer.

2       THE DEPONENT:  If a complaint was filed in regards

3  to equitable treatment of the child in the program, the

4  Department would investigate that.

5     Q    (By Mr. Galus) Same question with respect to dress

6  code.  If the school had a dress code that was enforced based

7  on student's biological sex rather than gender identity,

8  would the Department look into that?

9       MR. WHITEHAIR:  Same objection.

10       THE DEPONENT:  Yes.

11     Q    (By Mr. Galus) If we go back to the pronoun

12  question, is it the Department's position that using pronouns

13  based on biological sex would not be harmful to a transgender

14  student?

15     A    I want to make sure I'm answering the question that

16  you're asking.  Could you say it again?

17     Q    Yes.  So my question, because you said you'd look

18  into it and it depends, is it the Department's position that

19  a participating preschool could use a transgender child's

20  pronouns based on biological sex in a way that's not harmful

21  to the child?

22       MR. WHITEHAIR:  Object to the form of the question.

23  You can answer it.

24       THE DEPONENT:  Can you restate it?  I think I'm

25  having a hard time on the double-negative on the not harmful.

**DAWN ODEAN - April 10, 2024**

1  I want to make sure I'm answer what you're intending to ask.

2      Q    (By Mr. Galus) Is it harmful for a preschool to use

3  pronouns based on the child's biological sex if the child

4  identifies as transgender?

5      A    It's incumbent upon the Department to investigate

6  that child's treatment.  I'm -- it's not the Department's

7  expectation to determine how that treatment might impact a

8  particular child for any of the things listed here.

9              Our priority is to ensure that child feels

10  safe and can equitably access learning and develop as any

11  child in the preschool program does.  And so that's what we

12  would be investigating.

13      Q    I think that's -- the question that I'm trying to

14  ask is, would the Department's position be that violates this

15  non-discrimination provision for a participating school to

16  insist on using pronouns based on a child's biological sex

17  when the child identifies as transgender and requests

18  different pronouns?

19      A    And what I'm -- I'm not trying to be evasive.  What

20  I'm trying to say is that the Department's position is that

21  our priority is the treatment, equitable treatment of

22  children.  How that may or may not be violated would have to

23  occur for us to investigate the impact or the how or why or

24  what next steps might be.

25      Q    But you would investigate a situation like that?

## DAWN ODEAN - April 10, 2024

1    A    We would investigate any concern or complaint that
2  was elevated in that regard.

3    Q    So it's possible a determination could be made that
4  it violates the non-discrimination provision?

5    A    Again, there are a lot of possibilities of how that
6  might play out depending on the actual -- how the
7  investigation plays out, but yes, that is possible.

8    Q    How are you doing?  Would you like a break?  I have
9  a few more questions along this line, but are you okay?

10    A    I am okay.  Thank you.

11    Q    Okay.  So if we could go back to the same rule,
12  4.109 Subsection B, that provision doesn't prohibit
13  discrimination based on sex, does it?

14        MR. WHITEHAIR:  Object to the extent it calls for a
15  legal conclusion.

16        THE DEPONENT:  I'm not a lawyer, I don't see that
17  called out specifically, but if there was a complaint that
18  was elevated in regards to the treatment of a child, we would
19  follow the same standard operating procedure there and
20  include counsel if necessary.

21    Q    (By Mr. Galus) So you would investigate a complaint
22  alleging that a provider discriminates based on sex?

23    A    We'll investigate complaints that are elevated to
24  the Department.

25    Q    Even if the complaint is about sex discrimination?

**DAWN ODEAN - April 10, 2024**

1     A     It could be -- I can't anticipate what all of the

2   complaints may or may not be, but if that was elevated, we

3   would investigate it.

4     Q     But there's nowhere in that provision that

5   specifically references sex, is there?

6           MR. WHITEHAIR:  Object to the extent it calls for a

7   legal conclusion.  You can answer.

8           THE DEPONENT:  I'm not an attorney, but I would --

9   I don't see sexual discrimination called out in that

10  statement.

11    Q     (By Mr. Galus) Can a preschool provider participate

12  in the UPK program if it's an all-boys or all-girls

13  preschool?

14    A     Again, I think we would have to understand the

15  particular provider or what their -- what they may or may not

16  have in place, and then we would have the conversation about

17  whether that fits within the expectations of the agreement

18  and the statute.

19    Q     Are you aware of anything in the UPK program rules

20  and regulations that would prohibit that?

21          MR. WHITEHAIR:  Object to the extent it calls for a

22  legal conclusion.  You can answer.

23          THE DEPONENT:  Not that I'm aware of.

24    Q     (By Mr. Galus) All right.  This provision also

25  doesn't prohibit discrimination based on marital status or

**DAWN ODEAN - April 10, 2024**

1  familial status, does it?

2       MR. WHITEHAIR:  Object to the extent it calls for a

3  legal conclusion.

4       THE DEPONENT:  No.

5    Q    (By Mr. Galus) Okay.  So a provider could

6  participate in the preschool program even if it requires a

7  child's parents to be married?

8       MR. WHITEHAIR:  Same objection.

9       THE DEPONENT:  There -- they may participate.

10  Again, we're not reviewing all of the policies of all of our

11  providers ahead of participation.  Certainly they would need

12  to sign the agreement to participate and agree to follow the

13  rules that are put in place.  And if there was any

14  mistreatment of children that was elevated to us, we would

15  investigate.

16    Q    (By Mr. Galus) Is there anything in the

17  non-discrimination provision that we're discussing that would

18  prohibit a school from limiting enrollment to children who

19  have parents who are married?

20    A    Not as I understand it.

21    Q    All right.  Some UPK providers provide more than

22  preschool, right?  They might have an elementary school or

23  middle school as well?

24    A    Yes.

25    Q    Okay.  The non-discrimination provision we're

**DAWN ODEAN - April 10, 2024**

1   discussing at 4.109 Subsection B, that applies only to

2   preschool services?

3       A    Yes.

4       Q    So it doesn't apply to kindergarten services or

5   elementary services?

6       A    If a complaint was elevated to us, again, I think I

7   would ask attorneys, counsel to ensure that I have that

8   understanding.  I haven't had that question yet as the

9   director.

10           What I'm responsible for is the Universal

11  Preschool Program, but if this extended outside of that, I

12  would have to seek counsel.

13      Q    So you don't know whether the non-discrimination

14  provision applies to a school's -- elementary school's

15  decisions?

16      A    I know what I'm charged with, which is Universal

17  Preschool.  I would ask our attorneys if that fell outside of

18  the program age group for our authority.

19      Q    Would this provision prohibit a provider from

20  denying enrollment to let's say a first grader based on

21  religion?

22           MR. WHITEHAIR:  Object to the extent it calls for a

23  legal conclusion.

24           THE DEPONENT:  Again, as the director of Universal

25  Preschool, that's -- that's my current purview.  If that was

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

Exhibit 66
Page 31

**DAWN ODEAN - April 10, 2024**

1 elevated as a concern, I would seek counsel.

2     Q   (By Mr. Galus) So help me understand this, because

3 it says right there in the rule that it references Universal

4 Preschool services.

5         And so my question is, if there's a complaint

6 of discrimination occurring outside of the preschool, is it

7 governed by this provision?

8         MR. WHITEHAIR:  Object to the extent it calls for a

9 legal conclusion.

10         THE DEPONENT:  I don't believe so, but I would seek

11 counsel and make a determination with our senior leadership

12 team of whether we had any authority or if there were any

13 next steps we needed to take.

14     Q   (By Mr. Galus) So sitting here today, you can't say

15 one way or the other whether the Department would investigate

16 a complaint that alleges a UPK provider did something

17 discriminatory with let's say a first grader?

18     A   I don't believe that we have that authority, but I

19 would have to confirm that.

20     Q   So you can't confirm today that there would be no

21 investigation?

22     A   I can't.

23     Q   So it's possible there might be?

24     A   It's possible.

25         MR. GALUS:  Why don't we take a break.

Exhibit 66
Page 32

**DAWN ODEAN - April 10, 2024**

1          THE VIDEOGRAPHER:  The time now is 11:28.  We're

2    off the record.

3          (Whereupon, a break was taken from 11:28 a.m. to

4    11:34.)

5          THE VIDEOGRAPHER:  The time now is 11:34.  We're

6    back on the record.

7                    EXAMINATION (Cont'd)

8    BY MR. GALUS:

9      Q    Ms. Odean, we just took a break, did you speak with

10   your attorneys about the testimony you just gave?

11     A    I did.

12     Q    All right.  I think you have Exhibit 6 still in

13   front of you.  It's the UPK provider agreement.

14     A    Yes.

15     Q    If you could turn to page 27.  The numbers I'm

16   referencing are on the bottom right-hand corner of the

17   document.  And we're going to section 18 that's entitled

18   Department of Early Childhood Provision.  Do you see that?

19     A    Yes.

20     Q    All right.  And Section 18-B of the agreement,

21   terms and conditions, states that the provider shall not

22   discriminate against any person on the basis of gender, race,

23   ethnicity, religion, national origin, age, sexual

24   orientation, gender identity, citizenship status, education,

25   disability, socioeconomic status or any other identity.

**DAWN ODEAN - April 10, 2024**

1      Does the Department have an interest in

2  ensuring the preschool's participating in the UPK program not

3  discriminate based on any of those listed categories?

4      MR. WHITEHAIR:  Object to the extent it calls for a

5  legal conclusion, and object to the form.

6      THE DEPONENT:  Yes.

7  Q   (By Mr. Galus) So it's important that providers

8  don't discriminate based on race?

9  A   Yes.

10  Q   Gender?

11  A   Yes.

12  Q   National origin?

13  A   Yes.

14  Q   Religion?

15  A   Yes.

16  Q   Age?

17  A   Yes.

18  Q   Sexual orientation?

19  A   Yes.

20  Q   All of the characteristics listed in section 18-B?

21  A   Yes.

22  Q   Did the Department have the authority to include

23  this section in the program service agreement?

24      MR. WHITEHAIR:  Object to the extent it calls for a

25  legal conclusion.

**DAWN ODEAN - April 10, 2024**

1    THE DEPONENT:  This was part of -- as Mr. Derocher

2  described, part of the standard contract language that the

3  program was operating under to write the agreement.

4    What the program's purview is or authority is, is

5  around ensuring that children have equitable access to

6  Universal Preschool, and then once they're enrolled in a

7  program, have equitable access and a safe environment to

8  preschool services.

9    Q    (By Mr. Galus) So is it the Department's position

10 that this was -- it was lawful to include this provision?

11    MR. WHITEHAIR:  Object to the extent it calls for a

12 legal conclusion.

13    THE DEPONENT:  Yes.

14    Q    (By Mr. Galus) Similar question, but coming from

15 kind of a different direction here.

16    Was the Department legally obligated by any

17 statute or regulation to include section 18-B in the

18 agreement?

19    MR. WHITEHAIR:  Same objection.

20    THE DEPONENT:  As it's written differently than the

21 Universal Preschool statute, I believe it was through the

22 contracts -- the State contracts office to ensure that this

23 was included.  It wasn't -- it wasn't consideration of the

24 director at the time that it wasn't legally founded.

25    Q    (By Mr. Galus) So is it legally required?

**DAWN ODEAN - April 10, 2024**

```
 1              MR. WHITEHAIR:  Same objection.

 2              THE DEPONENT:  My understanding in working with the

 3    contracts team and their attorneys is that it was required.

 4        Q    (By Mr. Galus) All right.  If you could go back to

 5    the statute, Colorado Revised Statute 26.5-4-205, which I

 6    believe has been marked Exhibit 15.  Do you have that in

 7    front of you?

 8        A    Yes.

 9        Q    All right.  Could I direct you to the last section?

10    It's B -- excuse me, it's subsection 1-B-2 that starts, If

11    necessary.  Do you see that on the first page?  It's at the

12    very bottom.

13        A    Yes.

14        Q    Okay.  And that reads, If necessary to ensure the

15    availability of a mix delivery system within a community, the

16    Department may allow a preschool provider that does not meet

17    the quality standards to participate in the preschool program

18    for a limited time while working toward compliance with the

19    quality standards, except that each preschool provider must

20    meet all quality standards relating to health and safety as a

21    condition of participating in the preschool program.

22              How does the Department decide whether quality

23    standard relates to health and safety?

24              MR. WHITEHAIR:  Object to the extent it calls for a

25    legal conclusion.
```

**DAWN ODEAN - April 10, 2024**

1          THE DEPONENT:  Safety is clearly defined in the

2    alignment with licensing expectations as far as the

3    environmental safety of the program.  The program and the

4    Department also considers safety where a child feels safe in

5    a setting to be able to learn and thrive.

6        Q    (By Mr. Galus) How does the Department determine

7    whether a child feels safe?

8        A    That they're able to typically develop, that

9    they're able to learn and grow.

10          We certainly aren't creating a program to

11    hinder a child's development, we want to ensure that we're

12    supporting providers and educators in that growth and

13    development of a child and that we have positive child

14    outcomes.

15        Q    Are there any written guidelines the Department has

16    for determining this health and safety standard?

17        A    Through the quality standards rule is the first

18    step, and then we will continue to provide resources that --

19    resources, materials, educator expectations to ensure that

20    providers have what they need for child development and

21    positive child outcomes.

22        Q    All right.  So my question more relates to how the

23    Department goes about determining whether a standard relates

24    to health and safety that you reference to include whether a

25    child feels safe, I'm wondering whether there are any written

**DAWN ODEAN - April 10, 2024**

1  guidelines to help the Department determine that?

2      A    Only at this point in time we absolutely have the

3  regulations in place with licensing, and then the quality

4  standards begin to build out that safe environment for child

5  outcomes.  And that's a phased approach to ensure we're

6  supporting providers and educators in creating that safe

7  environment and optimizing child development.

8              So there will be, now that the rule has been

9  established, additional guidelines set forth in support of

10  providers being able to meet those expectations as well as a

11  resource bank to be able to meet those child's expectations

12  not inclusive of materials, professional learning, coaching

13  opportunities and so forth.

14      Q    Okay.  So you would look to the rules and

15  regulations that were recently enacted?

16      A    As the foundation, uh-huh, yes.

17      Q    And do those rules and regulations specify which

18  quality standards relate to health and safety?

19      A    I think they're all encompassing.  I don't know

20  that each particular expectation is defined specifically in

21  that regard.

22      Q    So which quality standards do relate to health and

23  safety that you're aware of?

24      A    Let's go to the standards.

25              MR. WHITEHAIR:  Object to the extent it calls for a

**DAWN ODEAN - April 10, 2024**

1  legal conclusion.

2          THE DEPONENT:  I haven't gone through and defined

3  them in this specific way that you're requesting, but I

4  certainly would refer back to what's expected for us in the

5  statute and then review with our team the expectations if

6  there was a request for that.

7      Q    (By Mr. Galus) So you're referring to Section 2 in

8  the Statute 26.5-4-205 that sets out the minimum quality

9  standards; is that what you're referring to?

10     A    Yes, that and as well as the section for healthy

11 development requirements and the quality standards rule.

12     Q    Are all of the quality standards that are listed in

13 this minimum provision considered health and safety

14 standards?

15         MR. WHITEHAIR:  Object to the extent it calls for a

16 legal conclusion.

17         THE DEPONENT:  It's not as simple as a yes and no,

18 it's complex.  So I appreciate the question.

19         What I would say is when we're talking about a safe

20 environment for children to access quality preschool

21 programs, health and safety covers -- is covered to some

22 extent in all of the minimum expectations set in the statute.

23     Q    (By Mr. Galus) Whether -- is it fair to say whether

24 quality standard relates to health and safety is going to be

25 like a fact-intensive analysis?

**DAWN ODEAN - April 10, 2024**

1       MR. WHITEHAIR:  Object to the extent it calls for a
2  legal conclusion.
3       THE DEPONENT:  Could you say it again?
4    Q    (By Mr. Galus) What I'm trying to understand is,
5  how does the Department determine whether a quality standard
6  relates to health and safety?  Does that depend on -- is that
7  case-by-case based on the facts?
8       MR. WHITEHAIR:  Same objection.
9       THE DEPONENT:  So the quality standards -- all of
10  the quality standards have an impact on health and safety and
11  child outcomes.  To, you know, what level each component of
12  the standards is considered health and safety, may vary.  Are
13  you speaking to a specific incident?
14    Q    (By Mr. Galus) No, just generally how the
15  Department approaches it.
16    A    Yes.  So I would say generally we approach it that
17  health and safety can be elevated or impacted based on the
18  total quality standards or anything within that.
19       So we want to ensure that we have a safe and
20  healthy environment where preschool services are delivered
21  for children to be able to equitably develop and grow and
22  learn.
23    Q    Who is responsible for making that determination?
24    A    Which determination?
25    Q    Whether a quality standard relates to health and

DAWN ODEAN - April 10, 2024

1  safety.

2         MR. WHITEHAIR:  Object to the form.

3         THE DEPONENT:  That would be the program team and

4  executive director.

5      Q    (By Mr. Galus) And that would include you?

6      A    Yes.

7         MR. GALUS:  Greg, I'm going to use an exhibit here

8  that's been marked Attorneys' Eyes Only.  This relates to the

9  -- on one of the discrimination complaints, so I don't know

10 if you want to --

11        MR. WHITEHAIR:  Yeah.  So, for the record, we have

12 some documents that are designated "Attorneys' Eyes Only."

13 We have some documents that are designated "Confidential,"

14 and then the remainder to the public.

15        We haven't spoken before, I haven't spoken to the

16 court reporter, we haven't spoken before, but it is my

17 understanding and practice in the past that we would close

18 the folio on the present deposition, because it is public and

19 available for public review, that we would begin a new folio

20 that would be designated Attorneys' Eyes Only on each page,

21 and that it would be separately bound and separately signed.

22        We haven't had a chance, Counsel, to talk through

23 that.  I'm always interested in, if it's possible, to combine

24 all -- anything that would be outside of the primary folio so

25 that we did it just once and we only had essentially an

**DAWN ODEAN - April 10, 2024**

1  uninterrupted folio that was Attorneys' Eyes Only, an

2  uninterrupted folio that was confidential and then the master

3  folio that would show, you know, testimony now is offline and

4  in a different transcript, in a different folio.

5          So I'm open to sort of how you want to proceed.

6  It's possible that the questions you ask wouldn't necessarily

7  go AEO, based on our protective order, there's no one present

8  in the room that would be violative of the protective order

9  so that everybody hear can see it, I just want to make sure,

10  A, that we need to go through all that; and B, that it is

11  most -- it's segregated to the extent we can.  And we can

12  talk more over lunch if you want, but if that makes sense, do

13  you see this as just a single portion?

14          MR. GALUS:  Yes, I think this will be very isolated

15  and I'm going to try to ask questions so that it's doesn't

16  get into AEO, but I wanted to alert you that I was going into

17  this area, but I think it would be a very limited period of

18  time and then we could proceed the rest of the deposition

19  without separating it.

20          MR. WHITEHAIR:  Okay.  So would it make sense for

21  us to go off and start a new folio, or are you wanting to

22  test how far it's going to go?

23          I mean, I'm happy to take a break and even have you

24  and me talk about whether we need to break the folio.

25          MR. GALUS:  What if we do this, what if we have one

**DAWN ODEAN - April 10, 2024**

1 question that is not confidential, AEO, one line of

2 questions, we can continue there, and then I want to get into

3 the topic that might bring in AEO stuff, so we can do a

4 separate folio there until lunch time, and then when we come

5 back after lunch, is that okay?

6        MR. WHITEHAIR: That sounds good. I do want to

7 make the official break so we don't have to keep the entire

8 transcript trapped inside an AEO review.

9        MR. GALUS: Sure.

10        MR. WHITEHAIR: So if we can break the folio, then

11 we can have different binders.

12        And regarding the tape, I think you'll need to roll

13 a different tape.

14        THE VIDEOGRAPHER: I concur.

15        MR. WHITEHAIR: So we'll need to go to that extent.

16        And just for people who don't do this for a living,

17 AEO is Attorneys' Eyes Only and it's a designation that's

18 been made at this point in the discovery that we believe --

19 and I'll just speak on behalf of the Department -- we believe

20 contains information that either is from a third party, and

21 thus we don't want to redistribute it if it's perhaps false,

22 but also it could be all the way to personal identifying

23 information, which is mostly redacted, but also information

24 around investigations that could identify a child simply by

25 describing them in some detail.

**DAWN ODEAN - April 10, 2024**

1    So we have made those designations.  Counsel has

2  the right at some later point to move to remove those

3  designations or modify those designations, but we've agreed

4  for now that we will go with these protections, keep them

5  sort of out of the public view until it's decided how they'll

6  be used at trial.  Is that a fair recapitulation?

7         MR. GALUS:  Yes.

8         MR. WHITEHAIR:  So with that in mind, if you've got

9  a couple of questions that you think are still in the old

10  folio?

11         MR. GALUS:  Yes.

12         MR. WHITEHAIR:  Let's go ahead and do those, then

13  we'll take a break, we'll start a new tape, transcript and

14  testimony.

15         I don't think we'll need to re-swear the witness,

16  but that's a conversation -- can we simply say this is a new

17  folio, you remain under oath?

18         MR. GALUS:  Yes, that's fine.  Good?

19         MR. WHITEHAIR:  Yes.

20         MR. GALUS:  Okay.  Can you mark that as Exhibit 21,

21  please?

22         (Whereupon, Exhibit No. 21 was marked for

23  identification.)

24    Q    (By Mr. Galus) Exhibit 21 is a complaint report for

25  Castle Rock Christian Learning Center.

**DAWN ODEAN - April 10, 2024**

```
 1              Are you familiar with this complaint report,
 2   Ms. Odean?
 3       A    Yes.
 4       Q    Okay.  And as I understand the report, it indicates
 5   that the Department received this complaint in June of 2023;
 6   is that right?
 7       A    Yes.
 8       Q    Okay.  And if you look down to the section that
 9   says, Reporting party and persons involved, says that the
10   reporter name wishes to remain anonymous.  So this was an
11   anonymous complaint?
12       A    Yes.
13       Q    If you can turn to the second page of this
14   document, you'll see at the top it says, The reporter had
15   brought her three-year-old child.  Do you see that?
16       A    Yes.
17       Q    And it reads, The reporter had brought her
18   three-year-old child to tour the school upon being matched,
19   and before accepting the match.  The mother was assured by
20   the school's director that they wouldn't find any books
21   teaching same sex marriage concepts and that students with
22   different gender identities would not be welcome as they do
23   not accommodate different bathroom usage needs.
24              So these were allegations that were made
25   against a preschool that was participating in the Universal
```

Exhibit 66
Page 45

**DAWN ODEAN - April 10, 2024**

```
1  Preschool Program; is that right?

2       A    Yes.

3       Q    And the Department investigated this complaint?

4       A    Yes.

5       Q    And it investigated the complaint because the

6  allegations could allege violations of non-discrimination

7  rules we were discussing?

8       A    Yes.

9       Q    Is that investigation complete or ongoing?

10      A    That investigation was determined unfounded.

11      Q    What does that mean, unfounded?

12      A    That further investigation wasn't needed.

13      Q    And why did the Department determine that?

14      A    If I recall, for this specific complaint, there was

15 a question of the family who reported the age eligibility of

16 their child to participate and their understanding of what

17 providers might be available and who they might work with our

18 Local Coordinating Organization to determine.

19      Q    So was a determination made that these allegations

20 were inaccurate?

21      A    It was determined that they were unfounded.

22      Q    Did the Department speak with the complainants,

23 those who reported this?

24      A    The Department didn't.  It was through, as noted,

25 the Local Coordinating Organization, so Local Coordinating
```

**DAWN ODEAN - April 10, 2024**

1  Organization works directly with families and providers to

2  navigate the system.

3  　　　　The complaint was brought to them and then

4  they had asked the family and the provider further questions

5  to determine what the extent of the complaint was.

6  　　Q  　Did the Department reach out to the provider?

7  　　A  　No.

8  　　Q  　And why not?

9  　　A  　Because it was determined that there was

10 misunderstanding or miscommunication of the process or the

11 selection of providers and what the provider -- what the

12 provider was -- what the conversation or the interaction

13 between the family and the provider.

14 　　Q  　Help me understand how you could determine that

15 without speaking with the provider?

16 　　A  　So our Local Coordinating Organizations are our

17 partners in implementing Universal Preschool, and so

18 typically they are, you know, locally more engaged directly

19 with providers and with families to help support the

20 navigation, as that's their role.

21 　　　　And so we work in partnership with them around

22 the state where they have those relationships in their local

23 communities to implement Universal Preschool including

24 complaints that may arise.

25 　　Q  　So you mentioned age, was a determination made that

**DAWN ODEAN - April 10, 2024**

1  this child wasn't eligible for the Universal Preschool

2  Program?

3      A    That's what I recall.

4      Q    And is that the basis on which the unfounded

5  determination was made?

6      A    That was part of it.

7      Q    And what was the other part?

8      A    I think the other part was that the -- there

9  weren't any specific expectations around the curriculum or

10  instruction components and there was no mistreatment of the

11  family or the child.

12      Q    What about the reference to different bathroom

13  usage needs, was that relevant to the determination?

14      A    I would have to look back.  My recollection is

15  that -- I'd -- I'd have to look back at that specifically.

16          I do know we have providers who have one

17  bathroom per classroom, for example, is not a gender-specific

18  bathroom.  I can't recall if that was particularly aligned

19  with this question, but there was no -- there was no

20  mistreatment of the child.  And my understanding in

21  conversations with our LCO is that this family had other

22  choices that they were making in the system for providers and

23  for care related to the age of the child and their family's

24  choice.

25      Q    Were those other providers, was that outside the

**DAWN ODEAN - April 10, 2024**

1  context of the UPK program?  Because I'm trying to

2  understand, I thought this child wasn't eligible for the UPK

3  program?

4       A    Yeah.  So there is some State funding for -- that's

5  not Universal Preschool, that is for children two years

6  before kindergarten, that's distributed through the school

7  district setting.  School districts manage those funds.  They

8  do come through our Department to a school district to

9  manage.

10           And this particular LCO serves their community

11  outside of their Universal Preschool charge in birth through

12  school-age licensed childcare, navigation in their community.

13       Q    All right.  But at no point did the Department

14  reach out to the provider and ask questions about what was

15  submitted in this report?

16       A    No, this was determined unfounded and no action was

17  needed further by the Department at this time.

18       Q    Okay.  And would that determination have been made

19  on July 26?  Do you see the date at the bottom?

20       A    Yes.

21           MR. GALUS:  I think we can stop here and then open

22  up the new folio.

23           MR. WHITEHAIR:  Does it make sense to do lunch now?

24           MR. GALUS:  It's going to be like probably 15

25  minutes.

**DAWN ODEAN - April 10, 2024**

```
 1           MR. WHITEHAIR:  Okay.

 2           MR. GALUS:  It's not going to be long.

 3           MR. WHITEHAIR:  Sure.

 4           THE VIDEOGRAPHER:  The time now is 12:02.  We're

 5  off the record.

 6           (Whereupon, further testimony was given and

 7  designated as Attorneys' Eyes Only and is contained within a

 8  separate transcript.)

 9           THE VIDEOGRAPHER:  The time now is 12:17.  We're

10  off the record.

11           (Whereupon, a lunch break was taken from 12:17 p.m.

12  to 1:30 p.m.)

13           THE VIDEOGRAPHER:  The time now is 1:30.  We're

14  back on the record.

15           (Whereupon, the Attorneys' Eyes Only portion was

16  concluded and the testimony continued.)

17                   EXAMINATION (Cont'd)

18  BY MR. GALUS:

19     Q    Ms. Odean, I had some questions I wanted to ask you

20  about the process by which children are matched to schools

21  through the UPK program.  Would you be able to describe that

22  process generally for me?

23     A    Yes.  So a family can go to our online application

24  and they can search participating providers, complete the

25  application, and make selections of providers that they're
```

**DAWN ODEAN - April 10, 2024**

1  interested in attending from one to ten providers and rank

2  them.

3      Q    You said one to ten, did it used to be just five?

4      A    It was.  It did start out as five.

5      Q    And when did it change to ten?

6      A    I don't recall.  But as the seats started to get

7  limited through the process of enrollment leading up to the

8  program year, we increased the number of providers they might

9  be able to choose from.

10     Q    Okay.  So the placement ultimately, though, is

11  based on the family's choice?

12     A    Yes.

13     Q    So a child will be placed with a provider only when

14  their family agrees to accept the match?

15     A    Yes.  So once the families have submitted it and we

16  do what's called a round, and all of the applications that

17  are submitted during that round go through matching.  They --

18  the system only matches them to one of their choices, it

19  doesn't match them to any other provider.

20     Q    Okay.  So there wouldn't be a situation where a

21  child was matched with a provider that the family didn't

22  select?

23     A    Correct.

24     Q    Are you aware of any situations where a child

25  didn't get one of the selections, meaning there weren't any

**DAWN ODEAN - April 10, 2024**

1  available?

2      A    Yes.  So as the programs filled up and families

3  continued to apply, there were situations where they may have

4  only selected one provider or one program within that

5  provider that was full.

6      Q    And in that situation they would have to

7  reselect --

8      A    Correct.

9      Q    -- for a new round?

10     A    Yes.  So if they had only selected one provider and

11  it was full, they would have to -- we would alert them to

12  that and then ask them to choose -- revise their application

13  and choose any other providers.

14              If they had multiple providers, and let's say

15  their first choice was full, the system, during that round,

16  would try to match to the next available provider that they

17  chose.

18     Q    All right.  So the parent or the family, they're

19  notified of the match?

20     A    Yes.

21     Q    Is the school also notified of the match?

22     A    Yes.

23     Q    All right.  Who learns of it first?

24     A    The provider.

25     Q    Why is that?

**DAWN ODEAN - April 10, 2024**

```
1       A    Just to confirm that they have the availability to

2  serve, and because the algorithm is industry standard

3  algorithm for matching, but it doesn't take into account a

4  mixed delivery system.  And so we have a process in place

5  where the provider may decline the match based on preferences

6  to that algorithm.

7       Q    Okay.  And when that happens, when a school

8  declines a match, what information is provided to the family?

9       A    No information yet.  So again, it's -- if they have

10  another choice that they can be matched to, then that would

11  occur.  If not, and the provider declines, then the family

12  would know that they didn't get a match.  They'd be notified

13  that they didn't get a match and that the provider declined.

14       Q    They would be told the provider declined?

15       A    Yes.

16       Q    Would they be given the reason for the decline?

17       A    No.

18       Q    If you could go back to Exhibit 20, this is the

19  finalized UPK rules and regulations.

20       A    Okay.

21       Q    All right.  If you could turn to Rule 4.110, that

22  would be on page 7 of the exhibit.  It's entitled Provider

23  Matching Criteria.  Do you see that?

24       A    Yes.

25       Q    And then in Subsection A it says, Eligible
```

**DAWN ODEAN - April 10, 2024**

1  preschool providers may utilize the following programmatic

2  preferences to the deferred acceptance algorithm component of

3  the matching process.  Is this what you were just referring

4  to?

5      A     Yes.

6      Q     Are you aware the Department previously referred to

7  these as exception criteria?

8      A     Yes.

9      Q     Now, I understand that these were adopted in the

10  rules and regulations, but these listed preferences or

11  exceptions, they're not new, are they?

12      A     For the most part, yes.

13      Q     Are there some that are new?

14      A     I think we just defined it further.

15      Q     But they were already being used for the current

16  '23-'24 school year?

17      A     Yes, that's correct.

18      Q     Okay.  The rules and regulations here just

19  memorialized what was already taking place in practice?

20      A     Yes, and further defined.

21      Q     Okay.  My understanding is that for the '23-'24

22  school year, there's over 1,000 providers that have used one

23  or more of these preferences or exceptions; is that

24  consistent with your understanding?

25      A     Yes.  And I would say that's predominantly school

Exhibit 66
Page 54

**DAWN ODEAN - April 10, 2024**

1   districts because of their boundary expectations.

2       Q    Okay.  So I do want to talk about some of these in

3   a little bit more detail.

4                So if we could start with Subsection 2, which

5   is the cooperative preschool providers requiring

6   participation in the cooperative; do you see that?

7       A    Yes.

8       Q    And is this for preschools that have a specific

9   model that requires a certain level of family participation?

10      A    Yes.

11      Q    And the level and type of participation varies by

12  school?

13      A    Yes.

14      Q    Some preschools, for instance, could require the

15  parents to teach a course or to lead field trips; is that the

16  types of examples?

17      A    They vary.

18      Q    It varies?

19      A    Yes.

20      Q    Okay.  Is the preschool able to define the

21  participation that they're looking for and then if the family

22  is not able to provide that level of participation, the

23  provider can decline the match?

24      A    Yes.

25      Q    Does the Department inquire into the type of family

DAWN ODEAN - April 10, 2024

```
 1  participation being required by the provider before allowing

 2  the provider to use this reference?

 3      A    Not to review specific policy.

 4      Q    It doesn't look into it?

 5      A    Huh-uh.

 6      Q    Does the Department consider whether a particular

 7  preference might disparately impact certain children or

 8  families?

 9          MR. WHITEHAIR:  Object to the extent it calls for

10  legal conclusion.  You can answer.

11          THE DEPONENT:  The Department understands that in

12  mixed delivery, we want to be able to provide these

13  programmatic preferences to be able to support family's

14  choice of the just-right provider.

15          Our approach has been to be inclusive first.  If

16  there were any concerns that were elevated regarding lack of

17  access for something specific that might go against the law

18  that's set forth for us, then we would investigate that.

19      Q    (By Mr. Galus) But the Department is not inquiring

20  into that beforehand?

21      A    No, it's an attestation by the provider.

22      Q    You mentioned the school district boundaries?

23      A    Uh-huh.

24      Q    And I think this is outlined in Subsection A-3 of

25  Rule 4.110.  Could you explain why the Department allows for
```

CALDERWOOD-MACKELPRANG, INC.
(303) 477-3500

Exhibit 66
Page 56

**DAWN ODEAN - April 10, 2024**

1  this preference or exception?

2       A    School districts have mandate from their local

3  school board in regards to serving within their boundaries

4  and the capacity they have to serve as well as with the

5  Colorado Department of Education.  So there are designated

6  boundaries are established and their expectation is to serve

7  those within their boundaries first.

8                 Some school districts have capacity to open

9  enroll, if you will, outside of those boundaries and some

10 districts do not have that capacity.

11      Q    Okay.  So could a school district participate in

12 the UPK program if it requires a student to reside within the

13 district's boundaries?

14      A    Yes.

15      Q    And it would do so through this preference?

16      A    Uh-huh.

17      Q    Similar question to the co-op, does the Department

18 evaluate or look into the school district's enrollment

19 criteria before allowing it to use the preference?

20      A    No.

21      Q    If you could look at Subsection 5, it references

22 Head Start programs; do you see that?

23      A    I do.

24      Q    And this is a preference that -- well, let me just

25 ask you generally.  Why is this preference included in the

**DAWN ODEAN - April 10, 2024**

1   rule?

2       A    It's included because the deferred acceptance

3   algorithm doesn't consider that Head Start has federal

4   obligations to meet.  And so they have specific requirements

5   for enrollment that allows for the grantee to serve the

6   intended families that those funds are set aside for.

7       Q    And this is because Head Start providers serve

8   children who are families from -- with incomes below poverty

9   guidelines?

10      A    Yes.

11      Q    Are Head Start providers required to participate in

12  UPK?

13      A    They are not.

14      Q    It's voluntary?

15      A    Yes.

16      Q    So by using this preference, could a Head Start

17  provider prioritize the placement of low-income children into

18  the preschool?

19      A    Yes.

20      Q    And still participate in UPK?

21      A    Yes.

22      Q    What if there's a preschool provider that doesn't

23  participate in Head Start, could they prioritize the

24  placement of low-income children?

25          MR. WHITEHAIR:  Object to the extent it calls for a

**DAWN ODEAN - April 10, 2024**

1 legal conclusion.  You can answer.

2           THE DEPONENT:  They -- some preschool providers may

3 have priorities in place for serving low-income children, but

4 that would not exclude them from also serving families who

5 may choose and be matched to them that weren't low income.

6      Q    (By Mr. Galus) So even if they're not a Head Start

7 provider, what I'm wondering is, could they prioritize the

8 placement of low-income children?

9           MR. WHITEHAIR:  Same objection.

10           THE DEPONENT:  They may have a policy in place to

11 prioritize, but that wouldn't allow them to decline a family

12 who is not living within poverty.

13      Q    (By Mr. Galus) Could they reserve all of their

14 seats for low income?

15      A    No, there's no way for them to do that.

16      Q    Why not?

17      A    Because they may be matched to a family who isn't

18 low income.

19      Q    And what would be the problem with that?

20      A    It's again that equitable access to a participating

21 provider.  If they had federal law mandating the program

22 measures as a Head Start, that would be different.

23      Q    When you're referring to equitable access, are you

24 referring to the non-discrimination provisions we've been

25 discussing today?

**DAWN ODEAN - April 10, 2024**

1    A    Yes.

2    Q    Would you agree that low-income families have

3  historically been discriminated against?

4         MR. WHITEHAIR:  Object to the form of the question.

5         THE DEPONENT:  My -- what I understand is --

6    Q    (By Mr. Galus) Just to be clear, I'm asking you as

7  the 30(b)(6) deponent representing the Department.

8    A    Sure.

9    Q    Does the Department believe that low-income

10  families have historically been discriminated again?

11    A    The Department recognizes that as a protected

12  class.

13    Q    Okay.  So why couldn't a non-Head Start provider

14  prioritize the placement?

15    A     It would be to ensure that all families have access

16  and equitable treatment.  And again, it would be speculative

17  of me to speak to any one specific situation without knowing,

18  you know, a little more detail about the family and the

19  provider and the scenario.  And then if there was a question

20  or a concern, that would go through the process that we've

21  outlined.

22    Q    Okay.  If you could look at Subsection 6, and this

23  is a preference that says participating preschool providers

24  granting preference to an eligible child of one of their

25  employees.  So this is a preference for employers?

**DAWN ODEAN - April 10, 2024**

1        A       For an employee's child, yes.

2        Q       Okay.  So the participating preschool as the

3    employer can use this preference to prioritize placement of

4    an employee's child?

5        A       Yes.

6        Q       Why did the Department agree to include this

7    preference or exception?

8        A       We heard very early on from families and providers

9    that this was a common practice and that this was critical to

10   ensuring workforce.

11              So many of our providers had employees who

12   would only be able to work if their child had service --

13   services as well, or supervision as well.

14              And then we have employer-based providers.

15   For example, an organization has a childcare for their

16   employees, a licensed childcare for their employees.  And

17   again that's just to ensure workforce, have that benefit, and

18   that's not -- that's not a detriment to them being able to be

19   employed.

20       Q       Can this preference be used by any type of

21   preschool provider?

22       A       Yes.

23       Q       Okay.  So any preschool could limit some or all of

24   their seats to children of employees?

25       A       Yes.

**DAWN ODEAN - April 10, 2024**

1    Q    Could a church-run preschool limit its UPK seats to

2  children of employees.

3    A    Yes, who are eligible.  Yes, age-eligible, yep.

4    Q    All right.  If we could look at the preference set

5  forth in Subsection 9, it says participating preschool

6  providers granting preference to an eligible child who is

7  multilingual to ensure proper delivery of services to that

8  child.

9         Would you be able to explain why the

10  Department allowed for this preference or exception?

11    A    Sure.  So again, this came specifically from

12  providers as a request because particular providers might

13  have expectations of delivery for multilingual in a native

14  language in a dual-language program, specific staff, specific

15  expectations.  Specifically school districts have very clear

16  expectations on how those classrooms are set up and

17  instruction is delivered.

18    Q    Okay.  So the Department learned that some

19  dual-language programs require children to be at a certain

20  level in their language to enroll?

21    A    It might be a certain English language acquisition

22  level, it might be a balance of the classroom of

23  native-language speakers other than English or native

24  speakers who are English.  There's a variety that we heard

25  from providers about.

**DAWN ODEAN - April 10, 2024**

1    Q    Would this allow a provider to decline a match if a

2  student did not adequately speak a specific language?

3    A    Yes.

4    Q    If we could look at the preference outlined in

5  Subsection 4, say participating preschool providers reserving

6  placements for students with individualized education

7  program, IEP, to ensure conformity with obligations incurred

8  pursuant to the Individuals with Disability Education Act.

9            Could you explain the reason for this

10 preference or exception?

11   A    Sure.  So administrative units have federal

12 expectations on how an individualized education program is

13 delivered, including the determination of location, including

14 determination of aligned specialized services, including

15 hours that are appropriate for a child with an IEP ratios of

16 those classrooms as outlined in IDA.

17   Q    Are there some UPK providers who are not equipped

18 to handle students with certain disabilities?

19   A    Likely there may be, yeah.

20   Q    And in those situations would the provider be able

21 to decline the match because it's not able to accommodate the

22 child's disability?

23   A    No, they wouldn't be able to decline the match, but

24 we have guidelines in place for how a child can be referred,

25 how a child can be connected with their administrative unit

**DAWN ODEAN - April 10, 2024**

1  or school district to determine the need or next steps that

2  might be in place.  And that's also in alignment with IDA.

3      Q    So a preschool could refer a child to a different

4  preschool?

5      A    The child (sic) could refer the family to a process

6  to determine if they have a need for an individualized

7  education program or not.  And that's -- that language is

8  very specific to IDA.

9      Q    And if it was determined that the child did have

10  that need, would the Department require the provider to

11  accept the match or would it be allowed to decline it?

12      A    To -- if a child has an IEP?

13      Q    Yes.

14      A    If a child as an IEP, then IDA is very clear on the

15  expectations of the placement of that child.  And that's not

16  for the Department to question.

17      Q    Okay.  And if a provider couldn't meet those

18  expectations, they could decline the match?

19      A    The only providers who are able to administer the

20  IEP are designated by the administrative unit.

21          So what that means is in order to have an IEP,

22  the services or the placement of that child where the

23  location is, is determined with the family and the

24  administrative unit.  The Department doesn't stand between

25  that.  It isn't any given program, it's where the IEP can be

**DAWN ODEAN - April 10, 2024**

1  delivered.

2      Q    Okay.  I guess my question is, if you had a

3  provider who came to the Department and said, we were matched

4  with a child who has a disability that we're not able to

5  accommodate, would the Department require the preschool to

6  accept that match?

7      A    If a child has an IEP, they can only be matched

8  when verified by the administrative unit.  So they wouldn't

9  be placed in a provider that can't accommodate the IEP.

10      Q    Okay.  What about a situation where there's not an

11  IEP, but the provider comes and says the child that was

12  matched to me has a disability that I'm not able to

13  accommodate, would the Department require the provider to

14  accept the match?

15      A    We would have a conversation with the provider to

16  determine if that child does need to follow through with the

17  referral.

18          Referrals can be given at any time to execute

19  the IEP, but the expectation is that we're working together

20  to ensure the best program for that child and not decline

21  services based on what might or might not be a diagnosis of a

22  disability.

23          And we are not -- Universal Preschool Program

24  doesn't diagnose disabilities and nor do most providers.

25      Q    So when you reference referral, you're talking a

**DAWN ODEAN - April 10, 2024**

1  referral to a preschool that could accommodate that?

2      A    A referral to an evaluation process that may or may

3  not lead to an IEP.

4      Q    The objective, though, would be to get the child in

5  the preschool environment that meets his or her needs?

6      A    Yes.

7      Q    And if the provider that was initially a match was

8  determined to be unable to meet that child's needs, would

9  they be in violation of program rules and requirements?

10     A    If the -- if they were determined not to be able to

11 meet that child's needs through the evaluation process, they

12 would be -- they would -- the administrative unit and the

13 family would go through a process to determine the best

14 placement for that child, which likely wouldn't be a provider

15 who couldn't meet their needs.

16     Q    Right.  So what I'm wondering is what then about

17 the provider who couldn't meet the needs, are they in

18 violation of the --

19     A    They are not.

20     Q    Okay.  If we could look at the first preference

21 listed, the faith-based providers granting preference to

22 members of their congregation.  Do you see that?

23     A    I do.

24     Q    Could you describe the reason for this preference

25 or exception?

**DAWN ODEAN - April 10, 2024**

1    A    Yes.  So again, as we operationalize the program

2  very early on, we heard from many providers that a priority

3  for those who are part of their community would be critical

4  to them being able to participate or not.  And so in an

5  effort to be inclusive and mixed delivery, this preference

6  was given.

7    Q    Okay.  And these newly adopted rules and

8  regulations, they define congregation?

9    A    Yes.

10    Q    Okay.  And I believe that can be found 4. -- Rule

11  4.103 Subsection L, should be page 2 of the regulations.  Do

12  you see it?

13    A    Yes.

14    Q    And it's defined, congregation means members of the

15  community that the faith-based provider serve as the

16  faith-based provider defines that community.

17          Are you aware that some religious groups

18  believe they have a religious duty to care for the poor?

19    A    Yes.

20    Q    Could a church-run preschool define its

21  congregation to include individuals or families who are below

22  a certain income level?

23          MR. WHITEHAIR:  Object to the extent it calls for a

24  legal conclusion.  You can answer.

25          THE DEPONENT:  That may be the case.  I certainly

**DAWN ODEAN - April 10, 2024**

1  am not an expert on all different faith-based providers and

2  the communities that they serve, so this is an attestation.

3  We haven't had that one questioned or asked about by any

4  particular provider, but --

5       Q    (By Mr. Galus) My question, looking at the

6  definition of congregation, it says, congregation means

7  members of the community that the faith-based provider serves

8  as the faith-based provider defines that community.

9            My question is whether faith-based preschool

10 could define its congregation to include individuals or

11 families who are below a certain income level?

12      A    We don't tell faith-based providers how to define

13 their community.  So a faith-based community may have that as

14 part of their definition of community.

15           What I'm saying is that hasn't been an

16 experience that we've had.

17      Q    But they would be allowed to define it in that way?

18      A    It's the provider attests to serving their

19 community, so our intention with this specific definition and

20 preference is to be inclusive of those communities and not --

21 not put providers in a situation where they are unable to

22 serve the community that they are set forth to serve.

23      Q    Okay.  So same question, would they be able to

24 define the community in the way I described, individuals and

25 families below a certain income level?

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

Exhibit 66
Page 68

**DAWN ODEAN - April 10, 2024**

```
1           MR. WHITEHAIR:  Same objection.

2           THE DEPONENT:  They may be.  I -- again, we haven't

3  heard of anything faith-based, typically it's aligned to the

4  faith that they're community believes in, which isn't

5  specific to income level.  It's -- we haven't had that

6  situation.  So I would ask more questions, is what I'm

7  saying.

8      Q    (By Mr. Galus) Could you give me an example of a

9  situation that you have encountered with how they define the

10 community?

11     A    I don't have anything specific that I recall.  It

12 was an understanding that, for example, a provider might have

13 a group of families that they're in regular community with

14 around their faith-based activities, but nothing specific to

15 a specific religion other than the cases that we have before

16 us.

17     Q    All right.  If you could go back to Rule 4.110, and

18 go down to the preference listed in subsection 10.  Do you

19 see that?

20     A    Uh-huh.  Yes.

21     Q    And this refers to preschool providers granting

22 preference to an eligible child based on the child and/or

23 family being part of a specific community.  And it goes on

24 and lists other things.

25           Could you describe why the Department allowed
```

**DAWN ODEAN - April 10, 2024**

1  for this preference or exception?

2      A    Yes.  So again, as we started to register with

3  providers and providers work and considering participating in

4  Universal Preschool, we heard from some providers who have

5  specific communities that they serve.  Some of those are

6  listed here under number 10.

7              One comes to mind of high school that offered

8  preschool for their high school students who have children,

9  offered childcare inclusive of kids who might be eligible for

10  preschool in the year before kindergarten.

11      Q    How does the Department define the term "specific

12  community"?

13      A    It follows there, after being a part of a specific

14  community, having specific competencies or interests, having

15  a specific relationship to the provider, provider's

16  employees, students or their families, receiving specific

17  public assistant benefits or participating in a specific

18  activity.

19      Q    Okay.  So the clauses that follow provide

20  definition to a specific community?

21      A    Yes.

22      Q    Are there any other written definitions or

23  guidelines beyond what's set forth in this rule?

24      A    No.

25      Q    So there's nothing else that the Department would

Exhibit 66
Page 70

**DAWN ODEAN - April 10, 2024**

1   look to?

2       A     Not at this time.

3       Q     I just want to get a better understanding, if I

4   can, of how this preference could be used.

5             Would a preschool provider that's

6   participating in UPK be able to use this preference to limit

7   enrollment to children who are from families that are

8   registered as Republicans or Democrats?

9             MR. WHITEHAIR:  Object to the extent it calls for a

10  legal conclusion.  You can answer.

11            THE DEPONENT:  Yes.  So again, this is put into

12  rule to be inclusive first.  So we certainly want families to

13  have access in their communities where they have participated

14  with providers previously.  We want providers to be able to

15  participate to the best of their ability so that families

16  have choice.

17            So the intent of this is to ensure that we have as

18  much inclusivity as possible without making presumptions.

19            And so any scenario that might come forth where a

20  provider is asking, does this count for this particular

21  preference or criteria, would be determined not just by the

22  director of the program, but with senior leadership and if

23  counsel is needed to do so.

24      Q     (By Mr. Galus) And that would be determined as they

25  came case-by-case?

**DAWN ODEAN - April 10, 2024**

| | | |
|---|---|---|
| 1 | A | Potentially, yes. |
| 2 | Q | Is that a yes? |
| 3 | A | That's a yes. |

4    Q    You mentioned as an example high school that had

5 preschool for their students; am I characterizing that

6 correctly?

7    A    Yes, they had childcare available for the students

8 attending -- the high school students attending.

9    Q    And they used the preference outlined in

10 subparagraph 10 for that?

11    A    Well, that's new.  That's new.  So that was a

12 request to be able to serve their students first so that they

13 could attend school and have supervision of their children.

14            So 10 was not in place for year one, but we

15 had a process for providers to ask for a particular

16 preference and that was one.

17    Q    Okay.

18    A    And that led to 10.

19    Q    Okay.  What about the reference to specific public

20 assistance benefits, can you describe a little bit more what

21 is meant by that?

22    A    Sure.  So that's similar to Head Start.  So there

23 are different federal public assistance benefits that

24 families might receive and that providers might prioritize.

25            And so again, it doesn't conflict with any

**DAWN ODEAN - April 10, 2024**

1  other provisions that we have in statute, but it is to ensure

2  that we aren't stepping between what those federal supports

3  might be or the expectations of supports aligned to those

4  benefits.

5      Q    All right.  So kind of an example, would a provider

6  be able to prefer or prioritize families that receive say a

7  housing assistance?

8      A    That might be a criteria like, for example, that a

9  Head Start might use to determine.  There's also the Colorado

10  Childcare Assistance Program.  So they have different federal

11  expectations on providing access and qualifying families for

12  those.

13      Q    I just want to be clear, though, this is different

14  than the Head Start preference, correct?

15      A    The Head Start preference is also stated, yes.

16      Q    Right, but number 10 --

17      A    I'm just trying to explain it further.

18      Q    Sure.  But number 10 is different.  So the provider

19  doesn't need to be a Head Start provider to define the

20  community as families that receive specific public

21  assistance?

22      A    That's right.  Head Start can meet their federal

23  obligation with their own preference.

24      Q    Right.  So a non-Head Start program could say,

25  well, we're going to prioritize preferred families who

**DAWN ODEAN - April 10, 2024**

1  receive a specific public assistance benefit?

2      A    Can you restate the question?

3      Q    Well, so I'm looking at 10 --

4      A    Yes.

5      Q    -- and it says, participating preschool providers

6  may grant preference to an eligible child based on the child

7  and/or family being a part of a specific community.  And you

8  said the clauses that follow specific community give

9  definition to it?

10     A    Uh-huh.

11     Q    And one of those is receiving specific public

12 assistance benefits?

13     A    Uh-huh.

14     Q    So talking about non-Head Start providers that are

15 participating in UPK, could they grant preference to an

16 eligibility child based on the child's family receiving a

17 specific public assistance benefit?

18     A    Yes.

19     Q    And are you aware of -- you've already mentioned

20 one, I guess, so do you have an estimate as to how many

21 providers might be using this preference?

22     A    No.

23     Q    All right.  You mentioned -- we talked a little bit

24 about the high school that is providing preschool for the

25 children, and you said that number 10 wasn't in place before

**DAWN ODEAN - April 10, 2024**

1  the Department approved that; did I understand that testimony

2  correctly?

3       A    Yes.

4       Q    Okay.  So there is a process by which the

5  Department would consider preferences or exceptions that

6  weren't outlined in rule and regulation?

7       A    Yes.

8       Q    And would consider that, based on the nature of the

9  request, the facts on a -- take it case by case?

10      A    Yes.

11      Q    Are there any other preferences or exceptions that

12  you're aware of that the Department has allowed that aren't

13  reflected in this Rule 4.110?

14      A    Not that I recall.

15      Q    If the need arises in the future, does the

16  Department have the authority to allow for additional

17  preferences that aren't outlined in 4.110?

18      A    The rule would have to be revised to consider

19  anything outside of these criteria stated.

20      Q    Okay.  Well, there wasn't a rule before this and

21  the Department was considering them before --

22      A    Yes.

23      Q    -- is it the position the Department will no longer

24  consider any request outside of what's set forth in 4.110?

25      A    Yes, I think that's the evolution of a brand-new

**DAWN ODEAN - April 10, 2024**

1   department.  So we didn't have this rule in place and we were

2   working again to ensure access for providers and for families

3   until the rule was in place.  Now it is.

4        Q    So if a provider came to you and said there's a

5   problem with your matching algorithm, I don't have a

6   preference that I can point to in 4.110 that addresses that

7   concern, the Department's answer is there's no solution?

8        A    The Department would refer back to these that we do

9   have set forth in rule, in writing, and consider whether they

10  fit within any of the existing.  And if they didn't, there

11  wouldn't be any other preferences defined unless the rule was

12  revised and rewritten.

13       Q    So they -- the provider in that case would have to

14  accept the match?

15       A    Correct.

16            MR. GALUS:  What are we on, 24?

17            THE COURT REPORTER:  24.

18            (Whereupon, Exhibit No. 24 was marked for

19  identification.)

20       Q    (By Mr. Galus) Okay.  Exhibit 24 is Defendant's

21  Supplemental Responses to Plaintiff's First Set of

22  Interrogatories to Defendants.

23            Have you seen this document before --

24       A    Yes.

25       Q    -- Ms. Odean?  I think -- and if you look at the --

**DAWN ODEAN - April 10, 2024**

1  page 13 of the supplemental responses, I have a verification

2  page; do you recall signing the verification for these

3  responses?

4      A    Yes.

5      Q    If you could look at Interrogatory Number 8, this

6  would be found on page 8 of the document.  And Interrogatory

7  8 asks the Department to identify all licensed Colorado

8  Preschool providers that requested an exemption from any law,

9  rule, or terms and conditions governing the UPK program or

10  from any other aspect of the UPK program.

11          If you go down to the Department's response,

12  it identifies some schools who have made those requests,

13  Darren Patterson Christian Academy, Hillel Academy,

14  St. Mary Parish of Littleton, Castle Kids Early Learning

15  Center, and St. Bernadette Catholic Parish in Lakewood.

16          To your knowledge, as we sit here today, are

17  those the only licensed preschool providers that have

18  requested an exemption?

19      A    Yes.

20      Q    There's no other providers or schools that have

21  requested an exemption?

22      A    Correct.

23      Q    If we could look -- talk about the request made by

24  St. Mary first and St. Bernadette, these are the two schools

25  that have also filed a lawsuit challenging the

**DAWN ODEAN - April 10, 2024**

1  non-discrimination rules; is that right?

2      A    Yes.

3      Q    And did they request an exemption before filing the

4  lawsuit or is the exemption request referring to the lawsuit

5  exemption?

6      A    I don't recall the timing of each.  They had

7  inquired about participating, but hadn't signed the provider

8  agreement when they made the request.

9           I apologize, I don't recall if that was

10 outside of the lawsuit prior.

11     Q    Do you recall if the request was made in writing?

12     A    I do believe the request was made in writing.

13          MR. GALUS:  Okay.  And Greg, do you know if that

14 was produced to us?

15          MS. CARRENO:  I think it would have been in the

16 coalition letter.

17          MR. GALUS:  That's what this is referring to?

18          MS. CARRENO:  Yeah, the coalition letter that the

19 Archdioceses signed off on.

20     Q    (By Mr. Galus) Okay.  And the Department's response

21 to that request was no exemption could be made, correct?

22     A    Correct.

23     Q    And those two schools are not currently

24 participating in the UPK program?

25     A    Correct.

**DAWN ODEAN - April 10, 2024**

```
 1      Q    All right.  Could you describe the nature of
 2  Hillel's request, Hillel Academy?
 3      A    I believe that one is a co-op.  I would have to
 4  look at the request specifically to not mix it up with the
 5  other.
 6      Q    Do you remember if that request came in writing as
 7  well?
 8      A    I do believe it came in writing.
 9      Q    And would that have been the coalition letter too
10  or was that separate?
11      A    No, that may have been separate.  I apologize, I'm
12  not recalling that --
13      Q    Okay.
14      A    -- specifically.
15           MR. GALUS:  Virginia, do you know if that was
16  produced?
17           MS. CARRENO:  Yes, they were one of the parties
18  that signed off on the coalition letter, Hillel Academy.
19           MR. GALUS:  Okay.  All right.
20      Q    (By Mr. Galus) So I'll ask the question again.
21      A    Okay.
22      Q    And I understand --
23      A    I apologize, I didn't memorize everyone who signed
24  the letter.
25      Q    I understand interrogatories, even though you're
```

**DAWN ODEAN - April 10, 2024**

1  signing them, you are doing it in consultation with counsel.

2       A     And I likely had it in front of me when I was doing

3  this, but it was in February.

4       Q     Is it your understanding that the written request

5  would have been one in the same as the coalition letter?

6       A     Yes.

7       Q     And the response to that was the same, no exemption

8  can be given?

9       A     Yes.

10      Q     And is Hillel Academy currently participating in

11 the UPK program?

12      A     Not that I'm aware.

13            MR. GALUS:  Can mark that 25, please?

14            (Whereupon, Exhibit No. 25 was marked for

15 identification.)

16      Q     (By Mr. Galus) Exhibit 25 appears to be an e-mail

17 chain related to Castle Kids and the exemption request

18 referenced in the interrogatory response.  Do you recall

19 seeing this -- these e-mails?

20      A     I wasn't on the e-mails, but I do recall reviewing

21 this e-mail string.

22      Q     You reviewed them in preparation for this

23 deposition?

24      A     Yes.

25      Q     Okay.  Were you personally, as UPK director, aware

**DAWN ODEAN - April 10, 2024**

1   that Castle Kids had asked for an exception from the

2   non-discrimination rules?

3      A   At some point I was likely made aware.  You'll see

4   that Michael Cooke, who is on this e-mail correspondence, she

5   was a transition director in place and we divided tasks

6   between us to be able to operationalize Universal Preschool

7   in the compressed timeline that we had set before us.  So

8   this was a process.  This particular one she managed.

9      Q   And if you look at the second page it has Bates

10   numbering at the bottom of 1743, there's the e-mail from the

11   director at Castle Kids and there's -- it's raising concerns

12   about the quality assurance provision, which is

13   non-discrimination provision, and it says, my questions to

14   you are, and the first question is, do you make exception to

15   these requirements if this is against our religious beliefs

16   allowing us to be open and honest with any families that we

17   enroll.

18           Did anyone from the Department ever follow up

19   on this request or answer this request?

20      A   I can't speak on behalf of Michael, but it sounds

21   like opportunities were given to engage regarding the

22   questions that she had.

23      Q   So based on the e-mail chain, you think that

24   Michael Cooke may have responded, but you don't know for

25   sure?

**DAWN ODEAN - April 10, 2024**

1    A    I don't know for sure.

2    Q    Do you know what -- well, I guess if you don't know

3  if there was a response, do you know what the response would

4  have been if there was one?

5    A    I don't.  Certainly Michael would know, but I don't

6  specifically recall anything other than what I see here.

7    Q    Okay.  So you don't have any additional knowledge

8  outside of --

9    A    I don't.

10    Q    -- what's in this e-mail chain?

11    A    I don't.  Not that I recall.

12    Q    Do you know if Castle Kids is currently

13  participating in the UPK program?

14    A    I don't.  I can look it up.

15    Q    You don't know as you sit here today?

16    A    No, I don't.  We have about 2,000 providers, so I'd

17  have to confirm that.

18    Q    All right.  Are you aware of any other requests for

19  exemptions from UPK's non-discrimination requirements either

20  for the '23-'24 school year or this upcoming '24-'25 school

21  year?

22    A    I'm not aware of any other requests for an

23  exemption.

24    Q    And you would be the person who would know,

25  correct?

**DAWN ODEAN - April 10, 2024**

1   A   Yeah, I would expect that per our operating

2   procedures, that it would be elevated to me as the director

3   of the program.

4   Q   You said there's over 2,000 providers participating

5   in UPK?

6   A   For year one currently in process, I believe it's

7   just under 2,000.  I don't know the exact number.  I could

8   get that for you as well.  I know for year two we've

9   increased to 2,300 at this particular point in time.

10   Q   Okay.  Do you know the total number of seats that

11   would be offered by those providers?

12   A   I could look it up.  I could find out.  I don't

13   have it memorized.

14   Q   Do you have a ballpark?

15   A   I wouldn't want to -- I wouldn't want to

16   misrepresent the actual number, so I'd want to look that up

17   and confirm it for you.

18   Q   All right.  Do you have a sense for how -- the

19   number of UPK seats that are available compares to the number

20   of four-year-olds or eligible children in the state?

21   A   Yes.  So the state demographer says there's about

22   63,000 eligible children and we have about 38,000

23   participating in year one in seats in programs.

24   Q   And are those seats maxed out or are there still

25   available seats?

**DAWN ODEAN - April 10, 2024**

1     A     No, there's still available seats.  The application

2   is still open.

3     Q     So as far as you know, every child who sought to

4   participate in UPK, there was a seat available for that

5   child?

6     A     Yes.

7     Q     Is there a fixed number of providers that can

8   participate in the UPK program?

9     A     No.

10    Q     So if a new provider starts, that doesn't knock an

11  old provider out?

12    A     Correct.

13    Q     Couple of questions going back to the matching

14  process.

15    A     Sure.

16    Q     The situations where a provider may decline a

17  match, does the Department look into every one of the

18  situations where a provider has declined a match?

19    A      In year one we have a process in place where the

20  Local Coordinating Organization reviews the declines to make

21  sure they're in alignment with the agreed-upon preferences

22  and then elevates any questions or concerns to the provider

23  about how it might be used or why.

24            If there was a specific concern from a family,

25  that would go through that standard operating procedure

DAWN ODEAN - April 10, 2024

1  process for us to review.

2       Q    So LCOs are responsible for reviewing the declines?

3       A    Yes.

4       Q    Are they required to review every decline?

5       A    The expectation is they review them all.

6       Q    Where does that expectation come from?  Is it in

7  writing, part of their agreement?

8       A    It wasn't a part of their originally contemplated

9  agreement.  The agreement was written with LCOs prior to the

10 Department, but it's part of the practices that we agreed to

11 as the system and the processes evolved.

12           So we have certain things that we do at the

13 State level, we have certain things that our vendor does, we

14 have certain things that our Local Coordinating Organization

15 as partners do to ensure that we can be responsive and timely

16 in the process.

17      Q    Has the Department ever overridden a provider's

18 decline decision?

19      A    The Department has had conversations with providers

20 where things were not aligned to the preferences that a

21 provider was connected to, and typically those are mistakes

22 that have been made, because the process for the provider is

23 also new and the portal, and how they use the portal is new,

24 and so we did have several that I'm aware of that were

25 mistakenly used.  And so those declines might be reversed,

**DAWN ODEAN - April 10, 2024**

1  for example.

2              In that process is when we had providers

3  elevate to us, hey, does this fit for that or does this fit

4  for that, and the conversation is had about whether it may or

5  may not be appropriate to use.

6       Q    Okay.  And do those situations come to you through

7  the LCOs?

8       A    Yes.  We had a help desk as well.  The e-mail that

9  you -- Exhibit 25 is an example of that.  Says Istonish

10 Service Desk, so there may be some that came directly where

11 providers engaged or families engaged with the help desk.

12      Q    Okay.

13             MR. GALUS:  26, please.

14             (Whereupon, Exhibit No. 26 was marked for

15 identification.)

16      Q    (By Mr. Galus) Okay.  Do you recognize Exhibit 26?

17      A    Yes.

18      Q    Okay.  And this is your -- one of your declarations

19 that you submitted in this case?

20      A    Yes.

21      Q    If you could look at paragraph 26 of the

22 declaration, it's on page 3, says the Department interprets

23 contractual provision 18(B) in accordance with federal law

24 which allows for the disorganizations to prefer

25 co-religionists and to afford religious organization wide

**DAWN ODEAN - April 10, 2024**

 1 | discretion to make employment decisions about its ministerial

 2 | employees in accordance with federal law.

 3 |             And contractual provision 18(B) was one of the

 4 | non-discrimination provisions that we discussed earlier that

 5 | was in the '23-'24 agreement?

 6 |     A    Uh-huh.

 7 |     Q    Do you remember that?

 8 |     A    Yes.

 9 |     Q    Okay.  Could you tell me what reference to federal

10 | law -- what the reference to federal law means?

11 |             MR. WHITEHAIR:  Object to the form of the question.

12 | Object to the extent it calls for a legal conclusion.  And

13 | caution the witness to be careful about disclosing

14 | attorney-client communications.

15 |             THE DEPONENT:  When we were speaking about 18(B)

16 | earlier, I was referring to children and families.  What I

17 | understand the in accordance with federal law to mean is that

18 | the Universal Preschool Program wouldn't tell religious

19 | organizations who or how or what their policies might be for

20 | hiring workforce.

21 |     Q    (By Mr. Galus) And what federal law would give them

22 | that freedom?

23 |             MR. WHITEHAIR:  Same objections.  You can answer.

24 |             THE DEPONENT:  I don't recall the specific citation

25 | to a specific law.

**DAWN ODEAN - April 10, 2024**

```
 1      Q    (By Mr. Galus) Was there a specific citation to a

 2  specific law when you signed this declaration that you were

 3  aware of?

 4           MR. WHITEHAIR:  Same objections.

 5           THE DEPONENT:  I don't recall.

 6      Q    (By Mr. Galus) So you don't know, sitting here

 7  today, which specific federal law this is referencing?

 8      A    I don't recall, huh-uh.

 9      Q    Today you don't know which federal law it refers

10  to?

11      A    The -- I don't -- I don't know the -- my

12  understanding is that the program isn't -- doesn't have the

13  authority to tell religious organizations who or how to hire.

14  And that as the program we're required to abide by that

15  expectation that's already set forth in federal law.

16           Do I know the specific citation of that

17  federal law?  I do not.

18      Q    When did you come to that understanding?

19      A    I came to that understanding in conversations with

20  our senior leadership team and our counsel.

21      Q    Would it have been after this lawsuit was

22  identified?

23      A    I don't -- I don't recall the timing of that.

24  Certainly the statement was written after, but I believe we

25  had conversations as we were operationalizing about the 18(B)
```

**DAWN ODEAN - April 10, 2024**

1  and what that meant.

2      Q    Do you remember prior discussions about whether

3  18(B) applied to employment practices or decisions?

4      A    I don't recall outside of the conversations about

5  the cases we're involved in.

6           MR. GALUS:  All right.  Take maybe a five-minute

7  break and I might be done.  So does that work for everybody?

8           MR. WHITEHAIR:  Yes.

9           MS. CARRENO:  When you say done, you mean with the

10  30(b)(6)?

11           MR. GALUS:  I might be done done.

12           MR. WHITEHAIR:  Give you six minutes if that would

13  help.

14           THE VIDEOGRAPHER:  The time is 2:31.  We're off the

15  record.

16           (Whereupon, a break was taken from 2:31 p.m. to

17  2:37 p.m.)

18           THE VIDEOGRAPHER:  The time now is 2:37.  We're

19  back on the record.

20      Q    (By Mr. Galus) Ms. Odean, just a few more questions

21  for you.

22                You were in the room when Mr. Derocher was

23  testifying about situations or being asked questions about

24  situations where there were mutual terminations of the

25  program services agreement; do you recall those questions?

**DAWN ODEAN - April 10, 2024**

```
 1      A    Yes.
 2      Q    Okay.  And Mr. Derocher said that you'd be a better
 3 person to ask about those.
 4              And my question to him was, are you -- he
 5 referenced mutual terminations and my question was, what
 6 situations have there been where the Department and a
 7 provider have mutually terminated the program services
 8 agreement?
 9      A    I'm not aware of a specific termination of the
10 agreement once it was signed.
11              And so we did have providers, providers were
12 allowed in year one to register in the system prior to the
13 provider agreement being signed because of the compressed
14 timeline we were in, really are still in, but so we do have
15 providers who register in the system, but never participated
16 in the enrollment process, if that makes sense.  But I don't
17 recall any who signed the agreement who then said, we're not
18 -- we want to shred the agreement or no longer abide by the
19 agreement.
20      Q    Okay.  So some preschools registered to participate
21 in the UPK program --
22      A    Right.
23      Q    -- had not yet signed the agreement, and ultimately
24 decided that they weren't going to proceed in the Universal
25 Preschool Program?
```

**DAWN ODEAN - April 10, 2024**

1      A     Yes.

2      Q     Did any of those providers do so over concerns

3   related to the non-discrimination provisions?

4      A     The -- I believe there were some in relation to the

5   Archdiocese.  I'd have to look specifically at who is listed

6   in the system as registering and not enrolling.  I could

7   confirm that.

8      Q     Are there any outside or beyond the Archdiocese

9   schools that you can recall?

10      A     No, not that I'm aware of.

11      Q     Did those providers have any conversations or

12   communications with the Department related to those concerns?

13      A     No, just through the coalition letter and then as

14   the case was filed.

15      Q     Okay.  So how did you learn that those providers --

16   the reason those providers decided not to continue?

17      A     I'm trying to recall.  I believe they never signed

18   the agreement and never went beyond the initial phases of

19   registration in the system.

20           And so in the system a provider can register.

21   We have all of the licensed providers that are able to

22   participate, and they may have chosen to register, but then

23   there's specific steps they have to take in the system to put

24   in the number of seats, for example, or participate in the

25   process.  And it didn't go further than that initial

**DAWN ODEAN - April 10, 2024**

1  registration.

2      Q     Right.  But so how did the Department learn as to

3  the reasons those providers, the Archdiocese, chose to not

4  continue?

5      A     We learned through the coalition letter and then

6  through the case that was filed.

7      Q     Okay.  So you pieced it together after the fact?

8      A     Yeah.  I don't recall any specific conversation.  I

9  certainly didn't have any direct conversations with any of

10 those providers directly, not aware of any that might have

11 happened with the LCO, with the Local Coordinating

12 Organization, or that Michael may have had, but I didn't have

13 specific conversations with those providers because it is

14 voluntary.

15     Q     Okay.  Mr. Derocher, in answering some of these

16 questions, said there's a difference between signing the

17 agreement and enrolling children --

18     A     Uh-huh.

19     Q     -- could you speak to that?  Is that the same thing

20 we're talking about here or is that different?

21     A     I think that's a little different.  If I understand

22 what you're asking, a provider could sign the agreement,

23 register in the system, define their program and their seats

24 in the system, but families may not choose them.

25     Q     And have you had situations where that has

**DAWN ODEAN - April 10, 2024**

1  occurred?

2      A    Yes, we have.

3      Q    And that's what you understood Mr. Derocher to be

4  referring to?

5      A    I -- that's what I understood.

6      Q    Okay.

7          MR. GALUS:  I have no further questions from me.

8  Thank you very much, Ms. Odean, for your time today.

9          THE DEPONENT:  Thank you.

10                        EXAMINATION

11 BY MR. WHITEHAIR:

12     Q    Ms. Odean, I'm going to be asking you a few

13 questions and then counsel may ask you some follow-up

14 questions.

15     A    Okay.

16     Q    Just for the record, I introduced myself earlier,

17 I'm Greg Whitehair and I am, as you know, one of your counsel

18 in this lawsuit.

19          I want to direct your attention, as long as

20 it's up, to the very last Exhibit 26 that you were asked

21 about by counsel.  Will you take a look at that?

22          You were directed to paragraph 26 on page 3.

23 Will you look at the paragraph below that, and I'll just put

24 it in the record, the Department disavows enforcement of

25 contractual provision 18(B) against religious providers who

**DAWN ODEAN - April 10, 2024**

1 hire co-religionists in accordance with federal law and

2 against religious providers employment decisions involving

3 their ministerial employees as protected by federal law.  Do

4 you see that preference?

5     A    Yes.

6     Q    Just for backup and for the jury, when did you

7 prepare this declaration?

8     A    I believe it was in August of 2023.

9     Q    August of '23?

10     A    Yes.

11     Q    And was it to be used as a complement to the

12 Department's motion to dismiss the complaint filed by the

13 plaintiff in this case?

14     A    Yes.

15     Q    And that is your sworn testimony?  This is your

16 signature on the last page?

17     A    Yes.

18     Q    And what did you mean by the Department disavows

19 enforcement of 18(B)?

20     A    It was ensuring that the program wasn't doing

21 anything that might impact expectations set forth by federal

22 law in regards to hiring practice, practices of a religious

23 provider.

24     Q    And is that the same of a faith-based provider?

25     A    Yes.

**DAWN ODEAN - April 10, 2024**

1    Q    Is this contractual provision 18(B) found in the

2  present provider agreement that circulated at the -- for the

3  next calendar year, school year?

4    A    No, that was omitted.

5    Q    Did you ever express that this is -- this disavowed

6  position, have you ever expressed that position in any court

7  testimony?

8    A    I did for the St. Mary's case.

9    Q    So just give us a little context.  That was the

10  case that was tried to the bench in front of Judge Cane, you

11  were a witness in that case?

12    A    Yes.

13    Q    And did you at that time disavow the use of this

14  provision?

15    A    Yes.

16    Q    Do you recall the scope at which you described

17  whether this provision could come back?

18    A    It -- that's why it was omitted, because it was --

19  this disavow in writing that statement, the reason it was

20  omitted is so that it doesn't come back.

21    Q    Do you recall answering counsel's questions, there

22  were several that he used the phrase "case by case"; do you

23  recall that?

24    A    Yes.

25    Q    And what was the case-by-case review for?  Was it

**DAWN ODEAN - April 10, 2024**

1  about these preferences or exceptions, both terms were used,

2  how did the case-by-case -- what was the context in which you

3  were making a case-by-case review?

4      A    That I believe was in reference to our quality

5  standards where we define preferences to the deferred

6  acceptance algorithm.

7           Again, the deferred acceptance algorithm is a

8  standard -- industry standard for matching, but it doesn't

9  necessarily contemplate an inclusive mixed delivery program.

10 And so these programmatic preferences are to the algorithm.

11     Q    Was there, in the course of your analysis as you

12 were describing that, is there a case-by-case assessment of

13 whether or not any permitted provider -- let me say it a

14 different way.

15          So if you get a provider requesting, either

16 through the LCO or possibly more directly, a request to move

17 outside of the algorithm, is that what this matching -- this

18 provider matching program is designed to address, people

19 wanting outside of the standard match?

20     A    It's to -- yes.  These preferences are specific to

21 that algorithm and that process that's built within the

22 system.

23          This isn't a preference or an exception to the

24 law, this is specific to the application system process where

25 there is that deferred acceptance algorithm.

**DAWN ODEAN - April 10, 2024**

1    Q    And so you anticipated my question.  Is this in any
2  way a case-by-case assessment of whether a provider can evade
3  or in any way become non-compliant with the
4  anti-discrimination rules?
5    A    No.  No.  This is a preference to the algorithm.
6  It is not -- any rule we have in place doesn't allow for the
7  law not to be followed.
8              The rules are to help define how we implement
9  the law.  That particular preference was because of the
10  matching algorithm and in the spirit of inclusivity for mixed
11  delivery.
12    Q    And just for the record, we've been looking at and
13  talking about Exhibit 20; is that right?
14    A    Yes.
15    Q    Do you recall counsel's questions regarding a
16  provider coming to you and asking if they could impose a
17  race-based admission policy?  Do you recall that question?
18    A    Yes.
19    Q    And you said that there was a possibility you could
20  work with such a provider.  Could you tell us about what the
21  possibilities were that you had in your mind when you shared
22  that?
23    A    I didn't have specific possibilities in mind.  I
24  was not wanting to speculate what, why, how that program
25  defines what the actual policy states.  It would definitely

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**Exhibit 66**
**Page 97**

## DAWN ODEAN - April 10, 2024

1 start with a conversation with the provider, but again,

2 wouldn't allow for any preference in that regard to allow for

3 non-compliance of the law.

4      Q    Is that -- are you say saying it's a preference of

5 the algorithm or are you saying that it's an overarching or

6 some other rule?

7            I'm trying to get a distinction here, right.

8 So the hypothetical was offered to you was I come in and I'm

9 very baldly telling you I intend to violate your

10 non-discrimination clause.  And you request -- you said that

11 it was possible that you could work with such a provider.

12 I'm trying to understand what is it that would be the work

13 that you would do together in the face of their promise to

14 violate the non-discrimination rule?

15     A    If there was a promise to violate and not allow

16 equitable access to a child or their family, that does go

17 against the law, that would not be allowed.

18            MR. WHITEHAIR:  I have no further questions.

19            MR. GALUS:  None from me.

20            THE VIDEOGRAPHER:  The time now is 2:50.  We're

21 going off the record.  This concludes today's deposition.

22            MR. WHITEHAIR:  We didn't really make a record

23 about the personal deposition.  Do you want to go into the

24 personal?

25            MR. GALUS:  No, we can end it.  No personal

**DAWN ODEAN - April 10, 2024**

```
1   deposition needed.

2           MR. WHITEHAIR:  I'm good with that.

3           THE COURT REPORTER:  Same orders, Counsel?

4           MR. GALUS:  Yes, please.

5           MR. WHITEHAIR:  Yes.

6       (The deposition concluded at 2:50 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**DAWN ODEAN - April 10, 2024**

```
 1                    AMENDMENT SHEET

 2   DEPONENT NAME:                    DATE OF DEPOSITION:
     DAWN ODEAN                        April 10, 2024
 3

 4   The Deponent wishes to make the following changes in the
     testimony as originally given:
 5

 6   PAGE LINE               CHANGE                    REASON

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16

17   Signature of Deponent:

18   _____

19   Subscribed and sworn to before me this _____ day of

20   _____, 2024.

21                      Notary's signature _____

22                      Notary's address _____

23                      My commission expires _____

24

25
```

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**Exhibit 66**
**Page 100**

**DAWN ODEAN - April 10, 2024**

```
 1                 DEPONENT'S AFFIDAVIT
 2            I have read my deposition and the same is true and
 3   accurate, save and except for changes and/or corrections, if
 4   any, as indicated by me on the amendment sheet(s) attached
 5   hereto as indicated.
 6
 7   Amendment sheet(s) attached [ ]
 8   No changes; no amendment sheet attached [ ]
 9
10                         _____
11                                   Deponent
12
13   SUBSCRIBED AND SWORN TO before me this
14   _____day of _____, 2024.
15   My commission expires _____.
16
17                         _____
18                              NOTARY PUBLIC
19   in and for the State of _____.
20
21
22
23
24
25
```

**DAWN ODEAN - April 10, 2024**

1                          CERTIFICATE

2   STATE OF COLORADO          )
                               )ss.
3   CITY AND COUNTY OF DENVER)

4          I, SANDRA SCHRAMM, Registered Professional
    Reporter, Certified Realtime Reporter, and Notary Public for
5   the State of Colorado, do hereby certify that previous to the
    commencement of the examination, DAWN ODEAN, was duly sworn
6   by me to testify to the truth in relation to the matters in
    controversy between the said parties.

7
           I further certify that said deposition was taken in
8   shorthand by me and was reduced to typewritten form by
    computer-aided transcription, that the foregoing is a true
9   transcript of the questions asked, testimony given, and
    proceedings had.

10
           I further certify that I am not an attorney, nor
11  counsel, nor in any way connected with any attorney or
    counsel for any of the parties to said action or otherwise
12  interested in its event.

13         IN WITNESS WHEREOF, I have affixed my signature
    this 23rd of April, 2024.

14

15

16
                              /s/ Sandra Schramm
17                            _____

18                            Sandra Schramm
                              Registered Professional Reporter
19                            Certified Realtime Reporter
                              Notary Public
20

21

22

23

24

25