IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01557-DDD-STV

**DARREN PATTERSON CHRISTIAN ACADEMY**

Plaintiff,

v.

**LISA ROY**, in her official capacity as Executive Director of the Colorado Department of Early Childhood; and

**DAWN ODEAN**, in her official capacity as Director of Colorado's Universal Preschool Program,

Defendants.

---

**DEFENDANTS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT (ECF 78 filed 6/21/2024)**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED
MATERIAL FACTS (RSUMF) ......................................................................................... 1

DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS
(DAUMF) ......................................................................................................................... 11

DEFENDANTS' STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS
(DADMF) ......................................................................................................................... 13

ARGUMENT ..................................................................................................................... 15

   I.    Plaintiff's claims involving the Blanket Provision are nonjusticiable ............................... 15

   II.    The nondiscrimination requirements do not violate the Free Exercise Clause ............. 15

      A.    Whether the nondiscrimination requirements are generally applicable is a disputed
issue of material fact ...................................................................................................... 16

         i.    Plaintiff points to preferences—real and imagined—involving characteristics not
protected by the statute .................................................................................................. 17

         ii.    Plaintiff mischaracterizes Defendants' testimony regarding the preferences ........... 17

         iii.    Plaintiff misinterprets the temporary waiver and income-based discrimination
provisions ...................................................................................................................... 18

         iv.    Plaintiff misunderstands the congregation preference ............................................... 19

      B.    Whether the nondiscrimination requirements are neutral is a disputed issue of
material fact ................................................................................................................... 21

      C.    UPK does not exclude any provider because of its religious character or exercise . 22

      D.    The nondiscrimination requirements satisfy rational-basis—and applying heightened
scrutiny would require assessment of disputed facts ...................................................... 23

   III.    The nondiscrimination requirements do not violate the Free Speech Clause because they
regulate discriminatory treatment, not protected expression ................................................... 26

IV.    The nondiscrimination requirements do not violate the Equal Protection Clause ......... 28

V.    Plaintiff's request for a permanent injunction should be denied.................................... 28

CONCLUSION.......................................................................................................................... 29

CERTIFICATE OF COMPLIANCE ........................................................................................... 31

CERTIFICATE OF SERVICE .................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*, 600 U.S. 570, 143 S. Ct. 2298, 216 L. Ed. 2d 1131 (2023). ........... 27

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). ................................................. 15

*Carson v. Makin* , 596 U.S. 767 (2022). ...................................................................... 22

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith,* 494 U.S. 872 (1990).................................. 23

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664 (9th Cir. 2023) ... 17

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)........................................... 20, 23, 25

*Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006) ............... 21

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ..................................................... 15

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). ...................................................... 27

*Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818 (10th Cir. 2007). ........................... 28

*Rumsfeld v. F. for Acad. and Institutional Rts.,* 547 U.S. 47 (2006). ................................... 26

*Runyon v. McCrary*, 427 U.S. 160 (1976) ..................................................................... 26

*United States v. Albertini*, 472 U.S. 675 (1985), .......................................................... 28

*United States v. Hardman,* 297 F.3d 1116 (10th Cir. 2002)................................................. 23

*United States v. O'Brien*, 391 U.S. 367 (1968) .............................................................. 28

**Statutes**

C.R.S. §26.5-4-201 (2022)................................................................................... 5, 6

C.R.S. §26.5-4-202 (2024)................................................................................... 5, 6

C.R.S. §26.5-4-203 (2022)...................................................................................... 6

C.R.S. §26.5-4-203(14) (2022) ............................................................................... 18

C.R.S. §26.5-4-204 (2023)................................................................................... 5, 6

C.R.S. §26.5-4-204(1) (2023) ............................................................................ 18, 23

C.R.S. §26.5-4-204(3) (2023) ................................................................................ 18

C.R.S. §26.5-4-205 (2023) ............................................................................... 5, 6

C.R.S. §26.5-4-205(1) (2023) ............................................................................. 19

C.R.S. §26.5-4-205(2) (2023) ......................................................... 4, 5, 15, 17, 23

C.R.S. §26.5-4-206 (2022) ............................................................................... 5, 6

C.R.S. §26.5-4-207 (2022) ............................................................................... 5, 6

C.R.S. §26.5-4-208 (2024) ............................................................................... 5, 6

C.R.S. §26.5-4-209 (2024) ............................................................................... 5, 6

C.R.S. §26.5-4-210 (2022) ............................................................................... 5, 6

C.R.S. §26.5-4-211 (2023) ............................................................................... 5, 6

**Other Authorities**

8 CCR 1404-1 §4.109(B) (May 16, 2024) ................................................................ 11

8 CCR 1404-1 §4.110(B) (May 16, 2024) ................................................ 9, 10, 11, 14

*Church v. Polis*, No. 20-1391, 2022 WL 200661 (10th Cir. Jan. 24, 2022) ............................... 16

*Crosspoint Church v. Makin*, 2024 WL 810033 (D. Me. 2024) ........................................... 23, 27

*Roman Catholic Diocese of Albany v. Vullo*, 2024 WL 2278222 (Ct. App. N.Y. May 21, 2024)
................................................................................................ 20

*St. Mary Cath. Par. in Littleton v. Roy*, No. 23-CV-02079-JLK, 2024 WL 3160324 (D. Colo.
June 4, 2024) ................................................................. 18, 19, 20, 22, 23

## INTRODUCTION

Colorado is a national leader in providing universal preschool through a mixed-delivery system that welcomes faith-based providers. To ensure every preschooler is provided a safe and healthy learning environment, Colorado's Universal Preschool Program ("UPK") requires every participating provider to satisfy certain quality assurance standards, including those that prohibit discrimination based on gender identity, sexual orientation, race, and other characteristics.

Today, DPCA asks this Court to permit it to treat transgender children differently from their peers. But the First Amendment does not preclude Colorado from ensuring that every Colorado preschooler has an equal opportunity, free from discrimination on any of the statutorily-identified bases, to receive high-quality, publicly-funded preschool services that best fit their family's needs. The Motion should be denied.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS (RSUMF)

1.      Admit.

2.      Admit.

3.      Admit.

4.      Admit these are among DPCA's stated beliefs; deny factual support for whether, or how, DPCA "teaches" these to preschoolers.

5.      Admit Mr. Drexler's stated desire.

6.      Admit DPCA expressed these religious beliefs and described oral "policies." Deny any "administered" regarding preschoolers' gender identity.  First, lodging doesn't apply to

preschoolers. LubbersDep. (Ex.73) 84:11-15/85:2-9; BrownDep. (Ex.1075) 53:1-10 (no

overnight trips for preschoolers).  Second, DPCA has no written pronoun policies. DPCADep.

(Ex.72) 222:18-19 (no language directly addresses pronouns); LubbersDep. 101:25-102:2. Third,

Busy Bees' "toileting policy" doesn't discuss "sex" or "gender;" preschoolers' and staff

bathrooms will be unisex for 2024-25. LubbersDep. 78:13-21, BrownDep. 49:1-7 (single-stall

classroom bathrooms); DPCADep. 126:5-18, BrownDep. 47:5-11 (male/female staff use staff

bathroom); BBHandbook (Ex.1027) pp.23-24. Fourth, no preschool dress code apart from

recommending "casual play clothes and non-skid shoes." BBHandbook p.9. Finally, DPCA

hasn't "administered" any policy on gender identity to preschoolers. DPCADep. 99:2-5 (no child

with transgender parent enrolled); LubbersDep. 59:11-14 (no transgender/LGBT preschooler in

her tenure).

      7.     Admit these are among DPCA's stated religious beliefs/mission.

      8.     Admit these are among DPCA's stated expectations.

      9.     Admit some families choose DPCA for religious reasons. Deny "many" do, or as

the only reason. DPCADep. 34:4-25/35:1-14 (robust, excellent education; curriculum

model/outdoor adventures; classroom size considerably smaller than most public schools;

teachers' greater availability/attention); LubbersDep. 24:14-21 (not enough childcare in

County for younger kids); OdeanDec. (Ex.1076) ¶32 (hours and home/work proximity).

      10.    Admit DPCA holds these beliefs. Deny DPCA "welcomes" LGBT

students/families. DPCADep. 97:1-5, 99:2-5 (no child of same-sex/trans parent

attends/enrolled); LubbersDep. 59:11-14 (no transgender/LGBT child in tenure); DPCADep.

85:4-19 (would need to "work through" situation if parent transitioning genders); DPCADep.

105:7-108:13 (parents must use restroom corresponding with birth certificate regardless of appearance); BrownDep. 65:1-66:5; MillerDep. (Ex.1077) 55:14-58:2; DrexlerDep. (Ex.1078) 45:4-17 (transgender child would be admonished for using staff bathroom).

11.    Admit.

12.    Admit.

13.    Admit accuracy of partial quote, but deny under doctrine of completeness, given conditional statutory text: to provide "voluntary, high-quality, universal preschool services...."

14.    Admit.

15.    Admit accuracy of partial quote but deny under doctrine of completeness for omitting condition "to the extent practicable...within their respective communities."

16.    Admit.

17.    Admit.

18.    Admit as to participating schools; deny as to seats available. OdeanDec ¶31.

19.    Admit.

20.    Admit.

21.    Admit parental choice is a factor in matching process but deny it's only basis. CDEC-OdeanDep. (Ex.66) 52:10-13 (must have seats); 52:21-53:17 (may decline based on matching preferences); CookeDep. (Ex.68) 55:18-56:15/58:18-59:1 (same).

22.    Admit providers may "decline" a match provisionally but deny substance because Local Coordinating Organizations review "declines" and reverse unapproved criteria. CDEC-OdeanDep. 84:19-86:1.

23.     Admit.

24.     Admit.

25.     Admit partial quotation but deny, under doctrine of completeness, Department could temporarily waive nondiscrimination requirement: it's a health and safety requirement. STMTr.Tr. (Ex.1080) 210:5-12 (waiver couldn't exempt provider from nondiscrimination statute, which is health and safety requirement).

26.     Deny. Statute determines health and safety standards. CDEC-OdeanDep. 39:19-22/40:10-13; CDEC-DerocherDep. (Ex.65) 26:19-22 (referring to "health and safety requirements in quality standards"); C.R.S. §26.5-4-205(1)(b)(II).

27.     Admit.

28.     Admit.

29.     Admit.

30.     Admit Equal Opportunity Provision (EOP) applies to enrollment decisions and preschool services delivery. Deny remainder as beyond statute and legal conclusion Department staff testimony cannot expand/contradict. C.R.S. §26.5-4-205(2)(b).

31.     Deny.  Cited questions timely objected to as drawing legal conclusions/speculation. Department investigates complaints as required by statute but doesn't prevent faith-based providers from teaching faith-based curricula and doesn't speculate about hypothetical impacts. CDEC-DerocherDep. 28:14-23 (evaluation on how children treated/effect on them; can't know without real person); OdeanDec. ¶¶19-20 (No Department rule/requirement regulating faith-based curricula or imposing additional limitations).

32.    Admit.

33.    Deny Department "maintains" any such "authority" position. Cited questions were timely objected to as drawing legal conclusions and qualified with "that's why we have legal counsel." CDEC-DerocherDep. 56:17. Further, given the Department's creation as a brand-new agency and the expedited timeline for implementing UPK, other state departments created the 2023-24 Agreement and included the provision from old template. OdeanDec. ¶¶4-9, 13-14, 44. Department disavowed enforcement and never took action under it. *Id.* ¶¶41-42; ECF 77 at 8-10.

34.    Deny. Cited questions were timely objected to as drawing legal conclusions. Witness testified he was unaware of an explicit provision preventing provision from being added back, not "nothing" would. CDEC-DerocherDep. 58:17-21. Ms. Odean testified it was omitted so it doesn't come back. CDEC-OdeanDep. 95:18-20.

35.    Deny. "Blanket Provision" has been removed. CDEC-DerocherDep. 56:1-10; 2023-24 Agreement (Ex.6); 2024-25 Agreement (Ex.1063). Department doesn't have specific requirement on pronouns. C.R.S. §§26.5-4-201 to -211; Rules (Ex.20). EOP requires providers to "provide eligible children an equal opportunity to enroll and receive preschool services…regardless of gender identity." C.R.S. §26.5-4-205(2)(b). Cited questions timely objected to as drawing legal conclusions, and witness testimony mischaracterized. CDEC-OdeanDep. 24:22-23/25:10-14 (Department would investigate complaints, would depend on child's treatment, and couldn't speculate about possible impacts); RoyDep. (Ex.69) 58:14-17 (Department would investigate).

36.    Deny. *See* RSUMF ¶35. Program doesn't have requirement for "sex-separated"

facilities. C.R.S. §§26.5-4-201 -211 ; Ex.20.

37.    Deny. *See* RSUMF ¶35. Department doesn't have requirement about dress

codes. C.R.S. §§26.5-4-201 -211 ; Ex.20. Witnesses stated Department would investigate

complaints. CDEC-OdeanDep. 26:2-4/26:10; RoyDep. (Ex.69) 58:18-21.

38.    Deny. "Blanket Provision" has been removed and 2023-24 Agreement expired

June 30, 2024. CDEC-DerocherDep. 56:1-10; Exs.6, 1063; CDEC-OdeanDep. 88:11-17.

39.    Deny. Cited question was timely objected to as drawing legal conclusions. Ms.

Odean relied on legal counsel in understanding "federal law." CDEC-OdeanDep. 88:11-20.

40.    Deny. Blanket Provision never enforced, no longer in Agreement. CDEC-

DerocherDep. 56:1-10; Exs.6, 1063; OdeanDec. ¶28. Additionally, EOP-related questions

were timely objected to as drawing legal conclusions and question was mischaracterized as

it covered only "quality assurance provision."

41.    Admit.

42.    Deny. Department investigates when alleged violation is brought to its

attention. CDEC-DerocherDep. 36:17-37:1; RoyDep. 39:19-2; CDEC-OdeanDep. 20:21-

23 ("I can't speculate how I would learn of [a possible violation] outside of a

complaint."); SOP (Ex.17) at 2-5.

43.    Admit.

44.    Admit Agreements so provide. Deny Department would terminate, suspend,

or deny payment absent investigation and opportunity to cure per its standard operating

procedure ("SOP"). Ex.17; CDEC-DerocherDep. 38:22-39:12; RoyDep. 42:23/43:7

45.    Admit in part, deny in part. RSUMF ¶44.

46.     Admit quotation appears in Agreements but deny implied automaticity:
Department would follow SOP. CDEC-DerocherDep. 38:22-39:12; Ex.17.

47.     Deny. Cited question was timely objected to as drawing legal conclusions.
Witness stated "public interest" comes from State contracts team, is governed by State fiscal
rules and "defined and explained elsewhere." CDEC-DerocherDep. 47:8-16/48:9-10.

48.     Deny. Cited question was timely objected to as drawing legal
conclusions/speculation.

49.     Admit.

50.     Admit.

51.     Admit.

52.     Admit. Under doctrine of completeness, Department informed provider
complaint was unfounded; no action was taken against provider. Ex. 1076 ¶40.

53.     Admit Department investigated and determined complaint unfounded.
RSUMF ¶52; CDEC-OdeanDep. 46:9-12.

54.     Admit Department investigated and determined complaint unfounded.
RSUMF ¶53.

55.     Admit a few faith-based preschools expressed concerns; deny all faith-
based preschools objected.

56.     Admit.

57.     Deny. Dr. Roy relied on statutory "expectation for quality standards," and
"do[es] not have authority to create an exemption" because only legislature can make
statutory changes. DPCARoyExchange (Ex.10); RoyDep. 55:22-23.

58.     Deny and MOVE TO STRIKE—inadmissible expert opinion evidence. *See*

Mot. Strike (ECF 83). Dr. Levine's report nowhere addresses DPCA's policies nor whether

they're "safe and welcoming." *See* Ex.76 at 89-91 (sworn statements may be used in cross-

examination at trial). *See infra* DADMF ¶1,7 (expert Tishelman report, different treatment of

transgender and gender-diverse children can be harmful and lead to poor academic

performance).

59.     Deny. Misstates question ("did you do any *specific* research into *[DPCA]* before

sending this email?") RoyDep. 56:15-17. Additionally, Dr. Roy spoke with counsel. *Id*. 55:2-

3.

60.     Deny. Dr. Roy did not have statutory authority to consider exemption;

encouraged DPCA to participate; Department continued to pay DPCA. RoyDep. 56:7-9/57:11-

14.

61.     Admit.

62.     Admit.

63.     Admit DPCA is/intends to keep participating.  Deny Department would stop

DPCA from participating. RSUMF ¶60.

64.     Deny. Quoted language was never "condition" for UPK and not part of

adopted Quality Standards. CDEC-DerocherDep. 21:24-5; 23:15-16 ("never ratified or

approved or put into effect"); OdeanDec. ¶¶19-25 (no rule/requirement regulating faith-

based curricula or treating faith-based differently, language never adopted).

65.     Deny. RSUMF ¶64 (never condition of participation).

66.     Deny. Cited question was timely objected to as drawing legal

conclusions/speculation; witness restates he didn't understand the questions; sheet

doesn't state anything in it is required by law. UPKFactSheet (Ex.16).

67.     Deny Sheet imposed any "condition."  Department didn't include stated

language in quality standards rule; engaged with stakeholders and media member to clarify

no such condition existed. DerocherDep. 22:4-23; Ex.20; OdeanDec. ¶22; ShimkeEmail

(Ex.1079).

68.     Admit employee wrote email based on misunderstanding. OdeanDec. ¶24. Deny

Department ever conditioned use of Program funds on foregoing religious instruction.

OdeanDec. ¶22; CDEC-DerocherDep. 21:24-22:10.

69.     Admit Department created preferences to enable providers to save seats for

continuity-of-care/serve other programmatic goals. Ex. 20 §4.110; CookeDep. 56:19-24

(preferences created to recognize unique circumstances and avoid loss of continuity-of-care

under algorithm); CDEC-OdeanDep. 61:2-19 (all providers can prioritize seats for

employees' children - critical to ensuring workforce). Under doctrine of completeness, deny

preferences may violate statute. Ex.20 §4.110(B).

70.     Admit. RSUMF ¶69.

71.     Admit Department's process for referenced requests but under doctrine of

completeness, any participating provider must still comply with nondiscrimination

requirements. Ex.20 §4.110(B).

72.     Admit examples of types of preferences but deny Department "would approve"

any request in violation of nondiscrimination requirements. Ex.20 §4.110(B).

73.     Admit "exceptions" from matching algorithm but deny they're exceptions

from nondiscrimination requirements. Ex.20 §4.110(B); CookeDep. 56:21-24.

74.    Admit.

75.    Deny preference allows providers to discriminate in violation of statute.
STMTrTr. 244:19-21/245:19-24 (would be conversation, no discrimination permitted);
276:10-19 (would investigate complaint that preference used to discriminate).

76.    Admit.

77.    Admit.

78.    Admit.

79.    Admit declination criteria cited. Under doctrine of completeness, providers
must also ensure implementation doesn't conflict with Program statute or any other
applicable law or regulation. Ex.20 §4.110(A)(10)(b).

80.    Deny. Cited question was timely objected to as drawing legal
conclusions/speculation. For completeness, Ms. Odean then testified that decisions about
preferences are made with senior leadership and counsel to ensure legal compliance.
CDEC-OdeanDep. 71:22-23.

81.    Deny. STMTrTr. 277:11-280:5 (no preference may violate law; Department has
never received requests for any such preference or thought about how to handle them; Ms.
Odean would consult with leadership and likely counsel to ensure requested preference
complies with nondiscrimination requirements).

82.    Deny. Cited testimony addresses legal requirements for children with
Individualized Education Plan (IEP), preferences to allow school districts to enroll children
within district boundaries and manage slots for children with disabilities. CDEC-OdeanDep.

63:24-64:2 (provider can't decline based on disability, must work with administrative unit

("AU")/district consistent with IDEA); 65:7-9 (only AU can match child with IEP/place with

providers who can accommodate); 66:12-15 (AU/family determine best placement).

83.      Deny. Cited question was timely objected to as drawing legal

conclusions/speculation. Testimony also mischaracterized: said Department would need to

have a conversation with provider wanting to create all-boys/all-girls preschool "about

whether that fits within the expectations of the agreement and the statute" and provider would

be required to "agree to follow the rules that are put in place." CDEC-OdeanDep. 29:16-

18/30:12-13; Ex.20 §§4.109(B)/4.110(B) .

## DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS (DAUMF)

1.      Busy Bees preschool has no formal dress code other than to wear clothes that are

appropriate for preschool play. RSUMF ¶6.

2.      Plaintiff has no sex-specific written dress code other than middle-school girls

cannot wear leggings without a long shirt. DPCAHandbook. (Ex.1030) pp.9-10; DPCADep.

188:8-13; LubbersDep. 90:6-13/91:21-92:2/92:7-94:2.

3.      DPCA has no policy regarding haircuts, jewelry, nail polish, or makeup use by

any gender. DPCADep. 186:7-10/200:19-22; LubbersDep. 93:1-8; BrownDep. 60:12-18;

MillerDep. 51:11-22.

4.      DPCA has no written policy regarding pronouns (LubbersDep. 101:25-102:2;

MillerDep. 27:21-23).

5.      Busy Bees will have single-stall bathrooms for all preschoolers starting in 2024-25 school year. RSUMF ¶6.

6.      DPCA has a single-stall staff bathroom used by all genders. RSUMF ¶6.

7.      At least one student, Mr. Drexler's son, uses the staff bathroom without being disciplined. DPCADep. 127:24-128:3; DrexlerDep. 44:10-45:3.

8.      Parents and visitors are occasionally directed to use all-gender staff bathroom. DPCADep. 126:23-127

9.      The Department hasn't asked DPCA to change any practices or policies and has continued to make payments. DrexlerDep. 68:8-25; Ex.10; OdeanDec. ¶¶35-36.

10.     DPCA hasn't changed any of its practices or policies due to its participation in UPK. DrexlerDep. 42:3-11; PIHearingTranscript (Ex. 1070) 30:20-25 (Since signing UPK contract in January 2023, no changes to internal policies/hiring practices).

11.     Many parents choose DPCA for reasons other than the school's religious mission. RSUMF ¶9.

12.     DPCA has utilized at least three of the preferences available to all Program providers to match with students. OdeanDec. ¶¶34, 51.

13.     Sixteen of the 17 UPK students enrolled at DPCA in 2024-25 are continuing students, siblings of students, and/or children of DPCA employee that matched with DPCA based on those preferences. *Id*. ¶50.

14.     At least forty-one faith-based providers participated in UPK in 2023-24, with over 1,000 children matched to them. OdeanDec. ¶30.

15.    At least forty-three are participating for 2024-25, with over 900 children matched to them to date. OdeanDec. ¶47.

16.    No child that has identified themselves to DPCA as LGBTQ+, nor any child with a parent that identified themselves as LGBTQ+, has enrolled or applied for enrollment at DPCA within at least the last 5 years. PlResp2ndDiscReq (Ex.1028) pp.5-7 (no intersex child, transgender child, or child with same-sex parents enrolled); DPCADep. 97:1-5 (no child of same-sex couple attends DPCA); DPCADep. 99:2-5 (no child with transgender parent enrolled at DPCA); LubbersDep. 59:11-14 (no trans or LGBT child at DPCA in her tenure).

17.    The Department has never exempted any provider from the statutory provision protecting children from discrimination based on gender identity. Ex.10; CDEC-OdeanDep. 77:5-22/78:20-22/80:7-9/82:18-23; CookeDep. 45:3-6; 48:7-11; 52:10-13.

## DEFENDANTS' STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS (DADMF)

1.    Gender identity discrimination is harmful to preschoolers and such discrimination undermines the safe and healthy school environments required by statute. TishelmanRep. Ex.37, pp.7-14 (narrative contains statements which may be used as testimony by Defendants at trial).

2.    Schools' policies should not constrain parents' best judgment on how to support their gender-questioning or gender-diverse children. *Id.* p.13-14, p.17; *See* ECF 83-3, LevineDep. (Ex.1074) p.11 (85:8-13).

3.    Plaintiff's expert concedes a teacher's direct challenge to a child's identity would be a "hostile" event and would "interfere with a child's ability to learn." ECF 83-3, pp. 16-17 (290:17-19; 291:1-3).

4.      DPCA staff disagree about whether they would refer to all children by names to avoid using pronouns for gender-diverse children. MillerDep. 56:22-57:2 (would use name instead of pronoun for non-binary child); DPCADep. 227:14-228:4 (wouldn't use name for transgender child).

5.      No preference allows providers to discriminate in violation of the statute.  Ex.20 §4.110(B); STMTrTr. 244:19-21/245:19-24 (would be conversation, no discrimination permitted), 276:10-19 (Department would investigate preference allegedly used to discriminate); CDEC-OdeanDep. 56:16-18 (if there were concerns regarding lack of access that might violate law, would investigate); 96:20-97:11 (preferences specific to algorithm, not exception to law; provider cannot use preference to violate nondiscrimination requirements or otherwise evade law).

6.      Families choose preschools based on several factors, including class size, program hours, curricular content, type of provider, and location. OdeanDec. ¶32; RSUMF ¶9.

7.      Some families with gender-diverse children have strong religious beliefs, and they can experience harm when they are excluded from religious schools because of LGBTQ+ status. TishelmanRep. at 14-15 (religion can be a powerful support for children and families, having to leave religious communities due to support for their transgender children leads to a significant void in their lives).

8.      The Department convened a working group that met regularly to ensure faith-based provides' inclusion. Ex.26 at ¶12-13; CookeDep. 33:1-5.

9.      The Department developed the congregation preference to enable faith-based providers to save seats for members of their communities, but no preference allows a provider to

violate nondiscrimination statute. CDEC-OdeanDep 67:1-6 (faith-based providers voiced priority of serving their communities); CookeDep. 59:21-23/61:3-5 (can designate seats for congregation members); DADMF ¶5.

## ARGUMENT

Because many material facts remain genuinely disputed, summary judgment is inappropriate. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## I.        Plaintiff's claims involving the Blanket Provision are nonjusticiable

As Defendants' Motion for Partial Summary Judgment [ECF 77] demonstrates, all Plaintiff's challenges to the Blanket Provision are nonjusticiable on standing and mootness grounds.  ECF 77 at 8-17.

The remainder of this Response addresses Plaintiff's challenges to the statutory nondiscrimination requirements that prohibit publicly-funded preschools from discriminating against children on eight separate bases (Plaintiff refers to these as the "Equal Opportunity Provision"), ensuring children "an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." C.R.S. §26.5-4-205(2)(b).

## II.       The nondiscrimination requirements do not violate the Free Exercise Clause

Plaintiff has not met its burden to prove the nondiscrimination requirements are not generally applicable or not neutral. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (burden on movant).

**A. Whether the nondiscrimination requirements are generally applicable is a disputed issue of material fact**

Plaintiff misunderstands UPK's "preferences" as creating "exceptions" from its nondiscrimination requirements when they do nothing of the sort. Developed after public feedback on how to implement a mixed delivery system of public and private providers, the preferences are departures from UPK's default algorithm for matching children with preschool providers—*not* exceptions from nondiscrimination requirements. Because the nondiscrimination requirements permit no exception, they are generally applicable. *See Church v. Polis*, No. 20-1391, 2022 WL 200661 *9 (10th Cir. Jan. 24, 2022) (unpublished) (law neutral and generally applicable because "the so-called" exemptions didn't "actually operate" as exemptions) (citations omitted).

Without the preferences, the algorithm would match children with providers randomly or on a first-come, first-served basis—so that providers couldn't save seats for children already attending their school; school districts couldn't save seats for children with IEPs to address their disabilities; and much more. RSUMF ¶69. The preferences avoid these unintended consequences by permitting preschools to ensure continuity of care by saving seats for continuing students, siblings, and employees' children, among other examples. *Id.* Indeed, DPCA utilizes at least three of these preferences: this year, 16 of 17 children matched to DPCA were already enrolled before reaching the UPK eligibility age; seven are also siblings of DPCA students; and one is a DPCA employee's child. DAUMF ¶¶12-13.

None of the preferences allow providers to discriminate on bases prohibited by the nondiscrimination requirements: Defendants testified they have not approved, and will not

approve, any preference that would violate those requirements.[1]  RSUMF ¶75; DADMF ¶5.

Plaintiff nevertheless repeatedly mischaracterizes the preferences as creating exceptions from the

requirements.

### i.    Plaintiff points to preferences—real and imagined—involving characteristics not protected by the statute

Plaintiff asserts that allowing dual-language program providers to save seats for children

who can speak the relevant languages, or allowing providers to prioritize refugees, to serve all

boys or all girls, or to limit enrollment based on parents' marital status would permit unlawful

discrimination, Mot. at 14-15. But the statute doesn't include language ability, immigration

status, sex, or marital status among the prohibited bases for discrimination. C.R.S. §26.5-4-

205(2)(b).

### ii.    Plaintiff mischaracterizes Defendants' testimony regarding the preferences

Plaintiff also asserts that UPK permits unlawful disability discrimination. Mot. at 15. But

Plaintiff mischaracterizes deposition testimony, RSUMF ¶82, and nothing in the record supports

Plaintiff's claim that publicly-funded providers can exclude students based on disability. *Id*.

---

[1] *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664 (9th Cir. 2023), is
thus inapplicable. It involved a public school district policy that permitted student clubs to select
leaders based on "nondiscriminatory criteria," but didn't identify characteristics protected from
discrimination. *Id*. at 678. Because the district retained case-by-case discretion to determine
whether clubs' decision-making criteria were "nondiscriminatory," the Ninth Circuit found that
policy not generally applicable. *Id*. at 688-90. UPK's nondiscrimination requirements, in
contrast, specifically identify eight statuses protected from discrimination. The preferences don't
permit providers to discriminate on those bases.

Plaintiff further claims that Defendants permit providers to prefer gender-nonconforming children, children of color, and LGBTQ+ families in violation of the nondiscrimination requirements, when Defendants testified they have never received requests for such preferences and wouldn't approve preferences that violated any of the nondiscrimination requirements. RSUMF ¶81; *see also St. Mary Cath. Par. in Littleton v. Roy*, No. 23-CV-02079-JLK, 2024 WL 3160324 *31 (D. Colo. June 4, 2024) (crediting this testimony).

Finally, Plaintiff claims the preference permitting providers to reserve seats for their employees' children creates an exception from nondiscrimination requirements because "many faith-based schools require employees to share their beliefs—including those related to marriage, sexuality, and gender." Mot. at 14. But the record provides no factual support for Plaintiff's speculation that this preference permits providers to discriminate on bases prohibited by the statute nor that providers are using this preference in a discriminatory manner. RSUMF ¶75; DADMF ¶5.

### iii. Plaintiff misinterprets the temporary waiver and income-based discrimination provisions

Plaintiff also alleges the preferences permitting providers to prioritize low-income families and those who receive public assistance create exceptions from the requirement prohibiting income-based discrimination. Mot. at 14-15. But the statute expressly directs the prioritization of low-income children to address longstanding barriers to their preschool access, and requires inclusion of Head Start providers that prioritize low-income families. C.R.S. §26.5-4-203(14)(e); 26.5-4-204(1)(b) and (3)(a). Because the statute permits providers to prioritize low-income children, preferences allowing these priorities aren't exceptions from the

nondiscrimination requirement. *See St. Mary*, 2024 WL 3160324*30 (providers prioritizing low-income children don't violate UPK nondiscrimination requirement).

Plaintiff also claims the statutory provision authorizing temporary waiver of a provider's compliance with some quality standards creates an exception from the nondiscrimination requirements. But that provision doesn't permit waiver of quality standards that protect children's health and safety, C.R.S. §26.5-4-205(1)(b)(II). Because the nondiscrimination requirements seek to protect children from discrimination that interferes with their health, safety, and ability to learn, the temporary waiver provision doesn't permit exceptions from those requirements. RSUMF ¶25; *see St. Mary*, 2024 WL 3160324 *26 (statute's plain language/purpose support this interpretation).

### iv.    Plaintiff misunderstands the congregation preference

Developed in response to faith-based providers' feedback, the congregation preference enables faith-based providers to match with members of the communities they serve. DADMF ¶¶8-9. Defendants do not interpret this preference to permit discrimination in violation of any nondiscrimination requirements. DADMF ¶¶5, 9. Indeed, "congregations" need not be understood in religious terms. For example, some faith-based organizations make clear that all are welcome to participate in their activities—just as DPCA does not limit its services to families of a particular religion. SUMF ¶11.

Even if the congregation preference was understood to permit faith-based providers to discriminate based on religion, strict scrutiny would not apply because that preference doesn't "prohibit[] religious conduct while permitting *secular* conduct that undermines the government's

asserted interests in a similar way." *See Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021)

(emphasis added). Because the congregation preference is available only to faith-based

providers, it treats faith-based providers *more* favorably than secular providers—not vice versa.

If government's choice to provide religious actors an exemption from one provision triggered

strict scrutiny of its decision to decline an exemption from a different provision, government

would be discouraged from providing any exemption requested by religious entities. *See Roman*

*Catholic Diocese of Albany v. Vullo*, 2024 WL 2278222, at *10-11 (Ct. App. N.Y. May 21,

2024) (rejecting "novel argument" that *Fulton* should "not be limited to comparable secular

conduct that results in distinctions between secular and religious conduct, but should be extended

to distinctions drawn among religious entities").

Moreover, even if the congregation preference was understood as an exception to the

requirement prohibiting religious discrimination, that means only that that specific requirement is

not generally applicable: strict scrutiny would apply only to Defendants' refusal to exempt

Plaintiff from the religious-discrimination provision. The statute specifically identifies eight

characteristics protected from discrimination, each involving distinct barriers to children's equal

opportunity to receive preschool services. An exception from the religious-discrimination

provision does not create an exception from any of the other seven nondiscrimination

requirements, each of which would remain generally applicable because no exception has been

granted for them. *See St. Mary,* 2024 WL 3160324 *29 (separately considering alleged

exceptions to each nondiscrimination requirement because "instead of enacting a generic

nondiscrimination provision, the General Assembly specifically enumerated each characteristic"

and "the specific State interests in eliminating discriminatory barriers for children and families

and protecting children from discrimination are distinct depending on the basis for the

discrimination"). Plaintiff's Complaint similarly recognizes these as separate protections,

seeking exemptions from three of those requirements, but not from the requirements prohibiting

discrimination based on race, ethnicity, lack of housing, income level, or disability. ECF 1

(Complaint) ¶131.

### B.  Whether the nondiscrimination requirements are neutral is a disputed issue of material fact

"A law is neutral so long as its object is something other than the infringement or

restriction of religious practices." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d

643, 649-50 (10th Cir. 2006). The nondiscrimination requirements' object is not to suppress

religious conduct, but instead to ensure that children have equal opportunity to receive publicly-

funded preschool services regardless of protected-class status.

Plaintiff alleges three indications of Defendants' non-neutrality, Mot. at 17-18, but none

suggest hostility to religion. First, as explained by the facts identified in Section IIA, the

nondiscrimination requirements prohibit discrimination regardless of secular or religious

motivation. Second, because Defendants didn't have time to promulgate rules before the

Program's inaugural year, they simply enforced the statutorily-required quality standards, and

included the Blanket Provision as part of another agency's pre-existing template. RSUMF ¶33.

Third, some employees' early misunderstandings regarding providers' religious programming

never reflected Defendants' enforcement policies or practices. RSUMF ¶¶64-68.

To the contrary, Defendants took action from the beginning to include religious

providers, convening a working group to encourage their UPK participation. DADMF ¶¶8-9.

Responding to religious providers' concerns, Defendants developed a congregation preference to add to the other preferences that enable them to hold seats for members of their communities. *Id*. At least forty-one faith-based providers participated in 2023-24, with over 1,000 children matched with them. DAUMF ¶14. Even more are participating in the 2024-25 school year. DAUMF ¶15.

### C.  UPK does not exclude any provider because of its religious character or exercise

Faith-based providers (including Plaintiff) participate in UPK and receive UPK funding. DAUMF ¶¶9, 14-15; *see St. Mary*, 2024 WL 3160324 *21-22 (holding Colorado's UPK program does not exclude faith-based plaintiffs based on religious character or exercise). UPK is thus nothing like the program at issue in *Carson v. Makin*, which "specifically carved out private religious schools from those eligible to receive [public] funds" by expressly excluding religious schools from participating in the state's tuition assistance program. *Carson v. Makin,* 596 U.S. 767, 780 (2022). The Supreme Court held that the Free Exercise Clause prohibits such a categorical exclusion of religious schools "solely" because they were religious. *Id*. at 780, 785.

Plaintiff nevertheless claims it is categorically excluded because it does not agree, for religious reasons, to comply with the nondiscrimination requirements. But Plaintiff incorrectly conflates analysis of government's categorical exclusion of religion with the analysis for government action that has the effect of burdening religion. The nondiscrimination requirements ensure all publicly-funded preschools, both secular and religious, provide equal opportunity to enroll and receive preschool services regardless of protected class status; Plaintiff seeks an exemption from some of these requirements because it believes they burden its religious practice.

The relevant Free Exercise Clause analysis is thus provided not by *Carson* but instead by *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990). *See Crosspoint Church v. Makin*, 2024 WL 810033 *15-18 (D. Me. 2024)  (applying *Smith*, not *Carson*, to law prohibiting publicly-funded schools from discriminating); *Youth71Five Ministries v. Williams,* 2024 WL 3183923 *2-3 (D. Or. 2024) (applying *Smith,* not *Carson,* to public-funding program's nondiscrimination requirements).

### D.  The nondiscrimination requirements satisfy rational-basis—and applying heightened scrutiny would require assessment of disputed facts

Colorado's nondiscrimination requirements seek to ensure that all children have equal opportunity to enroll in and receive the high-quality, publicly-funded preschool services that best meet their needs, free from discrimination on statutorily-identified bases, so that they can learn and grow in a safe and healthy environment. C.R.S. §§26.5-4-204(1)/26.5-4-205(2); DADMF ¶5. If Colorado sought only to maximize the number of participating preschools, it wouldn't have imposed nondiscrimination requirements or other quality assurance standards. Colorado's interests thus differ from the government's interest in *Fulton* of "maximizing the number of foster parents." *See Fulton*, 593 U.S. at 541; *see also St. Mary*, 2024 WL 3160324 *33, 35 (concluding Colorado's "interests are not factitious, hypothesized, or invented post hoc" and distinguishing Colorado's interest from that asserted in *Fulton*).

Plaintiff hasn't met its burden to show the nondiscrimination requirements are not neutral or not generally applicable, and Defendants' action satisfies the requisite rational-basis review. *See United States v. Hardman,* 297 F.3d 1116, 1126 (10th Cir. 2002).

Even if strict scrutiny were to apply, determining whether Defendants' action satisfies such review requires consideration of disputed facts, including the harm that discriminatory treatment poses to preschoolers and whether an alternative would effectively achieve the government's interests.

Schools' discrimination based on children's gender identity interferes with those children's ability to learn and grow in a safe and healthy environment. Expert testimony establishes that gender-diverse children who experience discrimination, especially in school contexts, suffer a range of harms to their health, safety, and well-being. DADMF ¶1. Adverse experiences during early childhood—including schools' different treatment of children based on gender identity—can lead to profoundly negative effects for a child's development, life-long mental and physical health, and sense of safety in the world. *Id*. Children experience harm when accepted in one environment (like home) but not in another (like school); in contrast, home and school environments foster positive academic and emotional outcomes for children's development when both offer accepting environments. DADMF ¶2. "Policies that thwart the opportunity for a child to be recognized as a consistent gender at home and at school, or which create conflict for a child between home and school expectations, disrupt these important partnerships and are likely to create strife and confusion for a child." *Id*. Even Plaintiff's expert agrees that teachers create a "hostile event" that "interferes with a child's ability to listen to and feel safe with that teacher" when they invalidate a child's identity. RSUMF ¶58; DADMF ¶3.

Plaintiff offers just one argument that Defendants' action is not narrowly tailored, claiming Colorado could achieve its interests while exempting Plaintiff from the nondiscrimination requirement by ensuring that families "who desire an 'affirming' environment

for transgender-identifying children are placed *only* in preschools willing to take an 'affirming'

approach." Mot. at 24. Plaintiff contends this "would allow those families to have the desired

environment for their children, while still allowing other families—like the Eulers and the

Tippetts—to choose an educational environment that reinforces their beliefs and values to their

children." *Id*.

Whether this would achieve the state's compelling interests, however, is a disputed issue

of material fact. The evidence shows that families prefer certain preschool environments for

many different reasons—for example, families (including those with transgender children) may

choose Plaintiff because of its small class sizes, its unique expeditionary learning model, its

religious focus, its location close to their home or work, or because of the area's limited

preschool options. RSUMF ¶9, DAUMF ¶11, DADMF ¶¶6-7. Although, for instance, no family

can be sure that a preschool will be located near its home, the nondiscrimination requirements

ensure that no child will be forced—*because of* their protected-class status—to travel a greater

distance for publicly-funded preschool. Again, Colorado's interest is not in ensuring that all

children have access to *some* publicly-funded preschool services; it seeks instead to ensure that

children have *equal* opportunity, regardless of protected-class status, to receive the high-quality,

publicly-funded preschool services that best meet their needs. Colorado cannot achieve this

interest if some publicly-funded preschools are permitted to discriminate against children based

on their gender identity.[2]

---

[2] Colorado has permitted no exceptions from this requirement. DAUMF ¶17. *Fulton* is again
distinguishable, as Philadelphia created a system of individualized exceptions from its
antidiscrimination provision that undermined its articulated interest in ensuring equal treatment
of parents and children. *Fulton*, 593 U.S. at 542.

**III.    The nondiscrimination requirements do not violate the Free Speech Clause because they regulate discriminatory treatment, not protected expression**

The nondiscrimination requirements prohibit publicly-funded providers from treating children differently based on protected-class status, thus regulating discriminatory conduct rather than protected expression. The facts do not support Plaintiff's claim that the nondiscrimination requirements restrict the content of its religious instruction, as Defendants don't review or regulate faith-based providers' curriculum when enforcing those requirements. RSUMF ¶¶ 31, 64-65. As the Supreme Court recognized, a law prohibiting a school's discriminatory conduct doesn't interfere with that school's ability to control its instructional content. *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (prohibiting school's discriminatory admissions practice would not inhibit school's ability to teach what it wanted to teach).

Nor do the nondiscrimination requirements compel Plaintiff's speech. As the Court observed, a law prohibiting publicly-funded universities from discriminating against military recruiters "regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Rumsfeld v. F. for Acad. and Institutional Rts.,* 547 U.S. 47, 60 (2006). Although the universities "object[ed] to having to treat military recruiters like other recruiters, [] that regulation of conduct does not violate the First Amendment." *Id.* at 70.

Because the nondiscrimination requirements regulate discriminatory conduct and do not compel speech, they trigger no heightened First Amendment review. *See Crosspoint*, 2024 WL 810033 *19 (denying pre-enforcement preliminary injunction motion because law prohibiting publicly-funded high schools from discriminating regulated "conduct, not speech"). Nor did *303 Creative v. Elenis* hold otherwise, as that decision relied on a series of specific stipulations

involving the nature and content of the contested products and services, the process for creating

them, and what the challenger would and wouldn't make or sell for various customers—

stipulations entirely absent from this case. 600 U.S. 570, 587, 588, 593, 594-95, 597, 598 & n. 5,

599, 143 S. Ct. 2298, 216 L. Ed. 2d 1131 (2023).

 Moreover, the undisputed material facts don't establish that the nondiscrimination

requirement compels Plaintiff to use certain pronouns. Defendants don't regulate providers'

policies in the abstract, instead only investigating complaints that providers are treating children

differently based on protected-class status—a determination that turns on a complaint's

underlying facts (as demonstrated by Defendants' determination that complaints received

alleging gender-identity discrimination were unfounded).[3]  RSUMF ¶¶35, 52-54. Moreover,

Plaintiff has never dealt with a gender-diverse child and Plaintiff's own witnesses disagreed

about whether they would refer to all children by their names regardless of gender identity; doing

so could obviate pronoun use while treating children equally. RSUMF ¶6, DAUMF ¶16,

DADMF ¶4.

 As additional evidence that the undisputed facts don't establish that compliance with the

nondiscrimination requirement requires any change in Plaintiff's practices, Plaintiff seeks an

exemption to require children to use bathrooms and to dress consistent with their sex as assigned

at birth even though it has neither a sex-specific dress code nor sex-segregated bathrooms for

---

[3] Another circuit permitted a public university professor's free speech challenge to proceed when he was disciplined for declining to use a transgender student's pronouns—a claim raising academic freedom interests not involved here. *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021). Even so, that court emphasized the necessarily fact-specific inquiry required of such assessments. *Id.* at 511 (noting, "at this stage of the litigation," the absence of evidence that professor's conduct "inhibited Doe's education or ability to succeed in the classroom").

preschoolers. DAUMF ¶¶1-8. Nor has Plaintiff made any changes to its policies or practices because of the nondiscrimination requirements. DAUMF ¶10.

Even if restricting publicly-funded discriminatory conduct were to incidentally burden expression such that intermediate scrutiny applied, *see United States v. O'Brien*, 391 U.S. 367, 377 (1968), the facts identified in Section I.D. show how UPK's nondiscrimination requirements "promote[] a substantial government interest that would be achieved less effectively absent the regulation," *see United States v. Albertini*, 472 U.S. 675, 689 (1985), for the same reasons they satisfy strict scrutiny.

## IV.    The nondiscrimination requirements do not violate the Equal Protection Clause

The facts identified in Section II demonstrate that the nondiscrimination requirements apply to all UPK providers both secular and religious, treating Plaintiff identically to similarly-situated schools.

## V.    Plaintiff's request for a permanent injunction should be denied

Plaintiff argues that its success at the preliminary injunction stage is sufficient to merit a permanent injunction. Mot. at 25. But a "permanent injunction requires showing actual success on the merits, whereas a preliminary injunction requires showing a substantial likelihood of success on the merits." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007). The record here has developed substantially since October 2023, revealing multiple disputed issues of material fact that preclude Plaintiff's showing of actual success.

Nor can Plaintiff establish irreparable injury because it continues to participate in, and receive public funding from, UPK and has made no changes to its policies and practices because

28

of the nondiscrimination requirements. DAUMF ¶¶9-10. In fact, the preliminary injunction has had zero effect on either party's actions. Even before its issuance, Plaintiff was participating in UPK, the Department encouraged DPCA to continue participating and made payments to DPCA, and the Department had disavowed enforcement of the Blanket Provision, which it ultimately removed from the 2024-25 Agreement. DAUMF ¶10; RSUMF ¶60; ECF 77.

Finally, the public's strong interest in ensuring that children have equal opportunity to receive quality publicly-funded preschool services tilts the balance in Colorado's favor.

## CONCLUSION

Because many material facts remain genuinely disputed—including what the preferences actually do, the harm posed to children by preschools' gender-identity discrimination, whether an alternative would effectively achieve the government's interests, and whether compliance would require any change to Plaintiff's practices—summary judgment is inappropriate. This Court should deny Plaintiff's Motion.

Respectfully submitted July 26, 2024.

PHILIP J. WEISER

Attorney General

*s/ Virginia R. Carreno*
VIRGINIA R. CARRENO*

Second Assistant Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General
MICHELE MULHAUSEN*
Assistant Attorney General
BRIANNA S. TANCHER*
Assistant Attorney General
J. GREGORY WHITEHAIR*
Senior Assistant Attorney General
Colorado Attorney General's Office
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: virginia.carreno@coag.gov
        janna.fischer@coag.gov
        michele.mulhausen@coag.gov
        brianna.tancher@coag.gov
        greg.whitehair@coag.gov
        *Attorneys for Defendants*
        *Counsel of Record

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1) as modified by Court Order dated June 25, 2024, ECF 80. This pleading contains 6,467 words.

Dated July 26, 2024.

 /s/   Hannah Rose
For the Office of the Attorney General

**CERTIFICATE OF SERVICE**

I hereby certify that on July 26, 2024, I electronically filed the foregoing **DEFENDANTS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

Jacob E. Reed
Philip A. Sechler
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
Email: jreed@ADFlegal.org;
psechler@ADFlegal.org

David A. Cortman
Ryan J. Tucker
Jeremiah Galus
Bryan Neihart
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
Email: dcortman@ADFlegal.org;
rtucker@ADFlegal.org;
jgalus@ADFlegal.org;
bneihart@ADFlegal.org
*Attorneys for Plaintiff*

 /s/   Hannah Rose
For the Office of the Attorney General