IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:23-cv-01557-DDD-STV

DARREN PATTERSON CHRISTIAN ACADEMY,

    Plaintiff,

v.

LISA ROY; and
DAWN ODEAN,

    Defendants.

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

Last academic year Colorado implemented its new Universal Preschool Program (the parties tend to refer to this as the "UPK" Program, but I try to use my words and will call it the "Program" or "Universal Preschool") —a program that allows children to attend the preschool of their parents' choice for free. Plaintiff is a private, Christian preschool currently participating in the program. As a condition of participating in the program, schools must agree to a number of conditions, including that they not discriminate on the basis of religion, gender, sexual orientation, or gender identity. Pursuant to its faith,[1] however, Plaintiff refuses to hire employees who do not share its faith and requires its staff

---

[1] Defendants do not dispute that Plaintiff's position is motivated by a bona fide religious belief.

- 1 -

and students to abide by certain policies determined by biological sex rather than gender identity.

After agreeing to participate in the program, Plaintiff raised concerns with Defendants—two state executives charged with overseeing the universal preschool program—that its religious policies may run afoul of the state's non-discrimination requirements. Defendants refused to grant Plaintiff an exemption to those requirements, and this suit followed. In late 2023 I denied Defendants' motion to dismiss and preliminarily enjoined Defendants from enforcing certain of the Program's anti-discrimination provisions against Plaintiff.

Since then, Defendants have withdrawn one of the provisions that I found likely to violate Plaintiff's First Amendment rights. Plaintiff's claims pertaining to that provision are therefore moot. Because the other provision remains in effect, however, Plaintiff's claims pertaining to it still present a live controversy. Since there is no material fact, but only legal arguments remaining in dispute, a trial is not warranted and Defendants are permanently enjoined from enforcing the provision against Plaintiff.

## BACKGROUND

In 2020, Colorado voters approved a referendum that established a dedicated source of funding for statewide preschool. The state legislature enacted implementing legislation in 2022. Colo. Rev. Stat. § 26.5-4-201 *et seq*. That legislation created the "Colorado universal preschool program." *Id.* § 26.5-4-204. The stated purposes of the program are (1) to provide children with high-quality preschool services free of charge, (2) to provide access to preschool services in the year immediately preceding kindergarten for children in low-income families and children "who lack overall learning readiness due to qualifying factors," (3) to provide access to preschool services for younger children who have

disabilities, are in low-income families, or lack overall learning readiness, and (4) "to establish quality standards for publicly funded preschool providers that promote children's early learning and development, school readiness, and healthy beginnings." *Id.* § 26.5-4-204(1)(a)–(d).

To accomplish these goals, the legislature also created the Department of Early Childhood to oversee the program. Under the program, eligible preschool providers receive tuition reimbursement from the state for certain students. Every child is eligible for up to half-day, voluntary preschool each week for the year prior to kindergarten. *Id.* § 26.5-4-204(2); Dkt. 28-1 ¶ 6. For younger preschoolers, the state may reimburse tuition if the student has a disability or is low-income and meets certain "qualifying factors." *See* Colo. Rev. Stat. § 26.5-4-204(3)(a). Under the program, students first apply for tuition coverage and list their preferred preschools. *See id.* § 26.5-4-208(3). The Department will only match students with one of their preferred preschools. Dkt. 28-1 at ¶¶ 15–16.

The legislature tasked the Department with recruiting preschool providers and for establishing "quality standards" that providers must meet to remain eligible for state funding. Colo. Rev. Stat. § 26.5-4-205(1). Under state statute, those quality standards, "at a minimum," must require providers to "provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2).

But the Department may grant temporary exemptions to the quality-standards requirements as "necessary to ensure the availability of a mixed delivery system within a community." *Id.* § 26.5-4-205(1)(b)(II).

- 3 -

The statute defines a "mixed delivery system" as "a system for delivering preschool services through a combination of school- and community-based preschool providers, which include family child care homes, child care centers, and head start agencies, that are funded by a combination of public and private money." *Id.* § 26.5-4-203(12).

The Department also requires providers to sign a "Program Service Agreement" before allowing them to participate in the program. *See* Dkt. 28-1 at ¶ 28; Dkt. 1-6 (exemplary Program Service Agreement). Provision 18(B) of that agreement provides, among other things, that preschools "shall not discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." Dkt. 1-6 at 28. The agreement further provides that "Any person who thinks he/she has been discriminated against as related to the performance of the Agreement has the right to assert a claim, Colorado Civil Rights Division, C.R.S. §24-34-301, et seq." *Id.* at 28–29. The Agreement also requires providers to "strictly comply with all applicable federal and State laws, rules, and regulations," including all laws "applicable to discrimination and unfair employment practices." *Id.* at 27. State regulations implementing C.R.S. § 24-34-301 *et seq*. list "deliberately misusing an individual's preferred name, form of address, or gender-related pronoun" as "prohibited conduct" under the state's sexual harassment laws. 3 Colo. Code Regs. § 708-1:10.1 ("Statement of Purpose" noting that the purpose of the rules is to implement "Parts 3 through 7 of Article 34 of Title 24" of Colorado Revised Statutes), § 708-1:81.6 (addressing pronoun usage).

Since I entered a preliminary injunction in October 2023, Defendants have decided not to include Provision 18(B) in the 2024–2025 version of the Service Agreement. Dkt. 77 at 16. They have also testified under

oath that they do not intend to reinstate that provision or enforce it in any way going forward. *Id.* at 18. Since the material facts are not in dispute, both parties moved for summary judgment on June 21, 2024. *See* Dkt. 77; 78. Defendants' motion is granted in full and Plaintiff's is granted in part, as explained below.

## APPLICABLE LAW

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding whether the moving party has carried its burden, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145; *Scott v. Harris*, 550 U.S. 372, 378 (2007). But a nonmovant's unsupported conclusory allegations or mere traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). And "[i]f a party fails to properly

support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## DISCUSSION

### I. Defendants' Motion for Summary Judgment (Dkt. 77)

"Federal courts do not possess a roving commission to publicly opine on every legal question," even ones involving important legal or constitutional matters. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The federal courts' subject-matter jurisdiction is limited, and among the most foundational limitations is that Article III of the Constitution permits federal courts to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2. "[T]he existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996); *see also Allen v. Wright*, 468 U.S. 737, 750 (1984) ("The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government.").

"To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Off. English v. Ariz.*, 520 U.S. 43, 67 (1997). "The doctrines of standing and mootness aim to ensure federal courts stay within Article III's bounds throughout the litigation." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1159–60 (10th Cir. 2023); *see also Allen*, 468 U.S. at 750. "Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it remains one at the time a court renders its decision." *Rio Grande Found.*, 57 F.4th at 1160.

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted).[2]

Defendants' recycled arguments that Plaintiff never had standing to begin with fail for the same reasons they failed originally. *See* Dkt. 53 at 9–27. Without rehashing that same analysis here, the facts of this case support the conclusions that Plaintiff may be arguably violating the anti-discrimination terms of the Program and related statutes and that it credibly fears enforcement or at least investigation of its compliance. Plaintiff brought this case to vindicate its religious objections to the terms imposed by the Program by law and regulation. That remains a live case or controversy that is within the federal courts' jurisdiction.

Whether Plaintiff's claims pertaining to certain aspects of the Program are now moot, however, is a distinct question, and it does appear

---

[2] *See also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (dispute is only cognizable case or controversy if it is both "definite, concrete, and touches on the legal relations of the parties" and "sufficiently immediate and real"); *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012) (plaintiff seeking injunctive relief must show "ongoing, personal stake in the outcome of the controversy, a likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law").

that intervening developments have rendered some aspects of Plaintiff's claims moot and nonjusticiable. "Mootness usually results when a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the elements of standing during litigation; thus, courts have sometimes described mootness as 'the doctrine of standing set in a time frame.'" *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012); *see also Smallwood v. Scibana*, 227 F. App'x 747, 748 (10th Cir. 2007) ("Mootness is implicated when a case or controversy, originally present, ceases to exist."). Mootness, "though analytically similar to standing," differs in some ways. *WildEarth Guardians*, 690 F.3d at 1182. As relevant here, "the plaintiff bears the burden of demonstrating standing, [while] the defendant bears the burden of proving mootness." *Id.* at 1183.

While Plaintiff's challenges to the application of Provision 18(B) to its policies, educational goals, and hiring practices may once have been ripe, Defendant's withdrawal of that provision from the 2024–2025 UPK Service Agreement means that Plaintiff's claims addressing Provision 18(B) no longer present an active controversy which the federal courts are capable of resolving. Any ruling on those claims would be no more than advisory. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109–10 (10th Cir. 2010) ("It is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff.") (cleaned up and internal quotation marks and citation omitted). *See also St. Mary Cath. Par. in Littleton et al. v. Roy et al.*, 1:23-cv-02079-JLK, Dkt. 116 at 41 (analyzing the same question as to other plaintiffs).

- 8 -

Plaintiff is correct, of course, that Defendants bear the "heavy burden" of proving mootness. *Brown v. Buhman*, 822 F.3d 1151, 1167 (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1116); *see also* Dkt. 89 at 10. But that burden "is not insurmountable, especially in the context of government enforcement." *Id.* "Most cases that deny mootness following the government officials' voluntary cessation 'rely on *clear showings* of reluctant submission [by governmental actors] and a desire to return to the old ways.'" *Id.* (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1117 (brackets and emphasis in original)). "A case ceases to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency." *Id.* at 1117 (cleaned up and internal quotation marks and citation omitted).

The possibilities about which Plaintiff is concerned — that Defendants may reverse course or initiate investigations for Plaintiff's prior conduct — are speculative at most. As Defendants note, "the Department's leadership has made clear, under oath at trial and in a sworn declaration, that it will not enforce or reinstate 18(B) against *any* preschool provider." Dkt. 94 at 11 (emphasis in original). That is far more than an "informal promise or assurance on the part of the [government] defendants that the challenged practice will cease." *Rio Grande Silvery Minnow*, 601 F.3d at 1118 (quoting *Burbank v. Twomey*, 520 F.2d 774, 748 (7th Cir. 1975)). It is an official promise, made under penalty of perjury, that Defendants will refrain from the exact conduct which Plaintiff claims makes this case an ongoing controversy. *See also St. Mary Cath. Par.*, 1:23-cv-02079-JLK, Dkt. 116 at 42 ("The possibility of Defendants implementing the same or a substantially similar policy to paragraph 18(B) in the future is a speculative contingency, and any determination regarding that speculative policy would necessarily be advisory."); *Grace Bible Fellowship et al. v. Polis et al.*, 1:20-cv-02362-DDD-

NRN, Dkt. 182 at 12 ("As for plaintiffs' reasserted free-exercise challenges to the CDEA, their as-applied claim is moot."). If in fact the state were to alter its position, a live controversy would again exist and federal courts would be constitutionally authorized to intervene. But until then, we are not. Defendant's Motion for Summary Judgment, Dkt. 77, is granted, and Plaintiff's first and fourth claims, as well as those portions of its second, third, fifth and sixth claims pertaining to Provision 18(B), are dismissed.

## II. Plaintiff's Motion for Summary Judgment (Dkt. 78)

As to Plaintiff's remaining claims, its motion for summary judgment is granted. While Defendants now maintain[3] that the "quality standards" provision in the UPK Service Agreement is a neutral law of general applicability, the record is clear, as it was at the preliminary injunction stage, that it is not and that it is subject to strict scrutiny. Because it cannot withstand such demanding scrutiny, Plaintiff is entitled to a narrow permanent injunction against enforcement of that provision.

The standard for a permanent injunction is the same as a preliminary injunction, except that a permanent injunction "requires showing actual success on the merits, whereas a preliminary injunction requires showing a substantial likelihood of success on the merits." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F. 3d 818, 822 (10th Cir. 2007). Because the prior order granting a preliminary injunction addressed the other factors, Dkt. 53, and nothing of relevance to that analysis has changed in the intervening time, here I only address whether Plaintiff has actually succeeded on the merits.

---

[3] Defendants did not raise any substantive arguments at the preliminary injunction stage and instead chose to challenge Plaintiff's claims solely on the grounds that it did not have standing to sue.

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Emp't Div., Dept. of Hum. Res. v. Smith*, 494 U.S. 872, 878–82 (1990). Where a law "invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," however, it is not generally applicable and strict scrutiny applies. *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021) (internal quotation marks omitted).

As explained in the preliminary injunction order, the Department allows categorical exemptions from its admission policies for preschools operated by houses of worship that seek to reserve seats for members of the school's "congregation." Dkt. 53 at 6; 33. That remains the case now. Because such houses of worship can impose requirements on their congregations—including the same sorts of rules that Darren Patterson imposes on its staff and students—such congregations may be able to effectively exempt themselves from these anti-discrimination rules. Preferences for formal religious organizations ("congregations") over less traditional religious endeavors (Darren Patterson academy) are constitutionally impermissible. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (law violated the Free Exercise Clause where it "discriminate[d] amongst religious institutions on the basis of the pervasiveness or intensity of their belief"). And as Defendants admit, "'congregations' need not be understood in religious terms." Dkt. 90 at 24. That means that the "quality standards" provision at issue here contemplates exemptions for religious or secular "congregations" but does not permit exemptions for the religious reasons that Plaintiff has sought here.

The statute itself also empowers the Department to grant individualized exemptions from the quality standards if doing so is "necessary to

- 11 -

ensure the availability of a mixed delivery system within a community." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). Such a broad grant of discretion to provide exemptions, standing alone, may be sufficient to render the anti-discrimination laws no longer generally applicable. *See Fulton*, 593 U.S. at 535 (holding that law granting "sole discretion" to city commissioner to exempt anti-discrimination laws was not generally applicable even where city never granted an exemption). Here, seemingly in contrast with *Fulton*, the Department has provided exemptions to others—or expressed a willingness to do so—while denying an exemption for Plaintiff. The fact that the state recognizes conditions could exist in which it would exempt a preschool from the quality standards, but does not consider Plaintiff's religious convictions sufficiently compelling to do so here, triggers strict scrutiny.[4] *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise") (emphasis in original).

The quality standards provision fails that exacting standard. While Defendants argue that "[e]ven if strict scrutiny were to apply, determining whether Defendants' action satisfies such review requires consideration of disputed facts," they have not demonstrated a compelling interest even assuming they could prove facts showing the "harm that discriminatory treatment poses to preschoolers." Dkt. 90 at 29.

---

[4]   That is so despite Defendants' argument that "[w]hether the nondiscrimination requirements are neutral is a disputed issue of material fact." The Supreme Court made clear in *Fulton* that a statute is not generally applicable, as a matter of law, when it prohibits religious exemptions but permits secular ones that undermine its stated interests in the same way. 593 U.S. at 534.

Anti-discrimination principles no doubt serve important purposes. But as Plaintiff correctly notes, "broadly formulated interests" do not suffice, and Defendants must do more than profess a "compelling interest in enforcing [their] non-discrimination policies generally"—they must demonstrate why they have a compelling interest in "denying an exception" to Plaintiff. *Fulton*, 593 U.S. at 541; Dkt. 93 at 13. Even assuming Defendants' facts are true, as I must for purposes of this motion, they have not done so here. I do not doubt the harm that discrimination may cause to the precocious preschoolers who understand the concept, or that religious parents with gay or transgender children may suffer if Plaintiff is permitted to exclude them from its preschool. But the state's effort to prevent that harm does not permit it to abridge Plaintiff's First Amendment rights, at least where, as here, Defendants' "system of exceptions" undermines its "contention that its non-discrimination policies can brook no departures." *Fulton*, 593 U.S. at 542. Defendants have offered no convincing explanation for "why its interest[s] [are] served by granting exemptions" for some reasons "but not others," and this subverts its contention that its stated goal is constitutionally compelling and that its policies are narrowly tailored to achieve it. *Does 1–11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1273 (10th Cir. 2024). Accordingly, there are no legitimately disputed material facts that would necessitate a trial.

Because Colo. Rev. Stat. § 26.5-4-205 permits exceptions in the discretion of the government, but the government refuses to allow an exception to accommodate Plaintiff's sincere religious beliefs, the statute is not neutral as a matter of law. And I assume that Defendants could prove at trial that preschoolers and their families would be harmed by facing discrimination from Plaintiff. But that is not a material dispute because the fact that Defendants permit exemptions from the Program's anti-discrimination rules undermines their contention that this interest

is constitutionally compelling. There is thus no material disputed fact that trial is necessary to resolve. Even under Defendants' version of the facts, the provision cannot be constitutionally applied to Plaintiff. *See, e.g., Hagelin for President Comm. v. Graves*, 25 F.3d 956, 959 (10th Cir. 1994) (Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.") (quoting Fed. R. Civ. P. 56(c)).

Plaintiff's Motion for Summary Judgment, Dkt. 78, is granted to the extent it seeks a permanent injunction enjoining enforcement of the Service Agreements' quality standards provision.[5]

## CONCLUSION

It is ORDERED that:

Defendant's Motion for Summary Judgment, **Dkt. 77**, is **GRANTED**, and Plaintiff's claims pertaining to Provision 18(B) are **DISMISSED AS MOOT**;

Plaintiff's Motion for Summary Judgment, **Dkt. 78**, is **GRANTED IN PART** as to all of Plaintiff's remaining claims, and Defendants, their officers, agents, servants, employees, and attorneys, and any others who are in active concert or in participation with any of the above, are **PERMANENTLY ENJOINED** from expelling, punishing, withholding funds from, or otherwise disciplining Plaintiff under the Universal Preschool Program on the basis that Plaintiff's policies, as alleged in the

---

[5] Because a permanent injunction is justified on Free Exercise grounds alone, there is no need to address Plaintiff's additional contentions that Defendants' rules violate its rights under the Free Speech and Equal Protection Clauses. *See* Dkt. 78 at 24–32.

verified complaint, violate the program's statutory or contractual anti-discrimination provisions;

Defendant's Motion to Strike, or, in the Alternative, Narrow the Use at Trial of Dr. Stephen Levine's Expert Disclosure, **Dkt. 83**, is **DENIED AS MOOT**;

Defendant's First Contested Motion to Amend the Joint Amended Scheduling Order, **Dkt. 84**, is **UNREFERRED** and **DENIED AS MOOT**;

The Clerk of Court is **DIRECTED** to close this case.

DATED: February 24, 2025     BY THE COURT:

Daniel D. Domenico
United States District Judge